**HOFFMAN & POLLOK LLP**

ATTORNEYS AT LAW
260 MADISON AVENUE
NEW YORK, N.Y. 10016
(212) 679-2900
FAX NO: (212) 679-1844

JEFFREY C. HOFFMAN
JOHN L. POLLOK
SUSAN C. WOLFE
WILLIAM A. ROME
LISA ROSENTHAL
JACQUELINE N. LAND

MICHAEL S. POLLOK
OF COUNSEL

ROBERT H. KIERNAN
(1973 - 1995)

October 12, 2005

Hon. Kenneth M. Karas
Judge, U.S. District Court
United States Courthouse
500 Pearl Street – Rm. 2260
New York, N.Y. 10007-1312

Re:     *United States v. Alberto Vilar* - 05 Cr. 0621

Dear Judge Karas:

On behalf of the defendant Alberto Vilar, we submit this letter as an application to modify the defendant's conditions of release. More specifically, for the reasons set forth below, we request that the Court eliminate the condition of home detention.

The Bail Reform Act provides that, if release on personal recognizance or an unsecured appearance bond will not reasonably assure the defendant's appearance or the safety of the community, the court shall order the pretrial release of the person "subject to **the least restrictive** further conditions, or combination of conditions" necessary to assure the defendant's appearance and the safety of the community.18 U.S.C. §3142(c)(1)(B). In this case, Mr. Vilar is a citizen who has never before been arrested; he has lived in the New York area for the better part of 30 years, and; he has lived most of his life as an admired and respected member of the community who championed many charitable causes. Nevertheless, he is subject to the most, rather than least, restrictive conditions of release -- imprisonment in his home "24/7,' except for two brief reprieves each week to attend religious services and shop for necessities.

As set forth below, the main issue at the prior bail proceedings was Mr. Vilar's access to funds outside of the United States. There is significantly more information available to the government now about Mr. Vilar's finances than there was at the time bail was initially set. That information may justify the substantial bail package already posted, but it does not warrant the additional excessive restraint of home detention.

**Procedural History**

Mr. Vilar was arrested on a complaint on May 27, 2005. At the presentment before the Magistrate, the government moved for detention and was granted an adjournment until May 31,

HOFFMAN & POLLOK LLP

Page 2
10/12/2005

2005 to prepare its presentation for the hearing. Mr. Vilar's then counsel appealed to District Judge Harold Baer, who set bail but in an amount that required several days if not weeks of effort to post the property and secure appropriate sureties.

In reviewing the government's arguments at the two appearances before Judge Baer, it is difficult to discern the basis upon which the government claimed that Mr. Vilar was a risk of flight. On May 27th, the government essentially argued that Mr. Vilar is a wealthy man with offshore assets at his disposal. The government claimed that it had concerns about the scope of the alleged fraud and about transfers of funds to accounts in the Bahamas and Luxembourg. (Tr. 5/27/05 at p.9; attached hereto as Exhibit A). AUSA Esseks argued that a "rapid examination" of the 100 or so boxes seized from the Amerindo offices "may well bear out our concerns . . . that there were additional victims, that the exposure Mr. Vilar faces is higher, and that . . . for flight concerns . . . there may well be a substantial amount of liquid assets abroad that are within his control." *Id.* at 10-11. AUSA Esseks claimed that the seized materials likely included documents showing the trail of money. *Id.* at 15. In discussing whether a continuance was warranted under the statute, Judge Baer stated that he did not have a concern that Mr. Vilar posed a serious risk of flight. *Id.* at 11. In response to the government's argument that the amount of time Mr. Vilar is facing provided "a powerful motive to flee," Judge Baer noted that that is true in almost every white collar case. *Id.* The government acknowledged that it was before the court with "only partial information" and pressed its application for an adjournment to "provide the court with more concrete facts upon which it can make a determination." *Id.* at 17.

Defense counsel argued that, at the time of his arrest, Mr. Vilar had already been responding to an SEC inquiry involving the Cates allegations and, when he learned that his offices had been shut down, he immediately flew back to New York (rather than somewhere else) from an investment conference in Las Vegas. *Id.* 3-5. Judge Baer denied the government's request for a continuance and set bail in the amount of $10 million cash, with leave to seek a modification after the holiday weekend (Mr. Vilar was arrested the Thursday before Memorial Day). *Id.* at 18.

On June 3, 2005, Mr. Vilar's then counsel requested that Mr. Vilar be released on a bail package comparable to that set for his co-defendant Tanaka. Counsel proposed to secure the $10 million bond with approximately $4 million in property and four co-signors, together with home detention and electronic monitoring. In response, the government reiterated its position that the potential penalty created a risk of flight and that it did not have an accurate picture of Mr. Vilar's resources. The government's review of the seized materials did not reveal that Mr. Vilar had overseas resources. Instead, the government focused on specific transactions for which it sought an explanation, including transfers of funds from a Bahamas bank account to Mr. Vilar's personal bank account. Judge Baer noted that the passage of money in the course of business

HOFFMAN & POLLOK LLP

Page 3
10/12/2005

between individuals and corporate entities is "hardly criminal." (Tr. June 3, 2005 at p. 12; attached hereto as Exhibit B). At this appearance, the government appeared to abandon its position that Mr. Vilar should be detained, but argued that it could not determine an appropriate amount of bail without more information about Mr. Vilar's assets and his relationship to certain overseas accounts from which he received funds. *Id*. at 14 -16. Defense counsel explained that, as the SEC and the government knew, Amerindo was comprised of several companies and that the defendants received fund management fees from both the Panamanian and United Kingdom entities. Since the transactions the government mentioned were allegations in the complaint, the government was essentially asking for a waiver of the Fifth Amendment privilege before it would make a bail recommendation. Judge Baer rejected this proposition. *Id*. at 15-17.

Judge Baer accepted the proposed package of a $10 million bond secured by approximately $4 million in property, the signatures of the four specified sureties, surrender of the defendant's passport and strict pretrial supervision with electronic monitoring. *Id*. at 21.

**Bases for Modification of the Conditions**

Since the date of these arguments, the defendants have been indicted and the charges are still limited to the investments of a single alleged victim. The government has now had four months to review the seized documents. In addition, Mr. Vilar, through counsel, has sent the government two letters summarizing his assets and liabilities and addressing some of the government's questions about Amerindo bank accounts in the U.K. and the Bahamas. Mr. Vilar has no information about these accounts and, if he is a signatory on any such account, which he doubts, he is willing to instruct the banks to remove his name as a signatory. His only significant unencumbered asset at this point is an interest in a portfolio of technology-based private placement holdings. The value of these private equities is based on the valuations of the investee small companies. Mr. Vilar does not have an up-to-date list of the holdings nor does he have any way to ascertain their value without reviewing each company's financial statements. These holdings are not liquid assets, as there is no organized market for their exchange. Value from these companies is realized either when a sale or merger takes place or when a company goes public and the private placement investors receive shares of its stock. Mr. Vilar has no current information as to the value of any of the companies or whether any of them have gone or are in the process of going public. The only way for Mr. Vilar to liquidate any of these assets (if they were liquable) would be through instructions from his co-defendant, who is himself in home detention under electronic monitoring.

In short, contrary to the government's initially expressed concerns, Mr. Vilar does not have access to any resources outside of this country that he could, if he were so inclined (which he is not), utilize to flee and expatriate.

00001285

**HOFFMAN & POLLOK LLP**

Page 4
10/12/2005

In *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986), a presumption case (which this case is not), the Court of Appeals addressed the kind of showing necessary where the government moves for detention on the ground of risk of flight. The Court held that "[t]he judge or magistrate . . . retains the responsibility for assessing the reliability and accuracy of the government's information, whether presented by proffer or by direct proof." Id. at 1145. If ability to flee were the sine qua non of posing a risk of flight, then any individual of means or with business interests outside the United States would be ineligible for pretrial release. That has never been the case in this Circuit. *See United States v. Khassoggi*, 717 F.Supp. 1048 (S.D.N.Y. 1989)(Keenan, D.J.)(bail granted where defendant had been a fugitive for six months and was an enormously wealthy foreign businessman charged with, inter alia, obstruction of justice). Not only is there an absence of any evidence that Mr. Vilar is inclined to flee, but this case does not present the kind or combination of factors typically considered sufficient to establish a risk of flight. *See, e.g. United States v. Minns*, 863 F.Supp. 360 (N.D.Texas, 1994)(defendant not a citizen, had substantial assets in other countries, applied for five different passports using three different names while on probation); *United States v. Geerts*, 629 F.Supp. 830 (E.D.Pa. 1985)(foreign national facing 50 years on deceit charges and source of bond money and net worth unknown); *United States v. Botero*, 604 F.Supp. 1028 (S.D.Fla 1985)(Colombian citizen facing 35 years who failed to return to the jurisdiction for three years after indictment, with considerable means and foreign connections). In each of the cases cited above, there were factors not present in this case, such as lack of citizenship or previous attempts to conceal identity or avoid prosecution that are absent in this case.

### Mr. Vilar's Background and Personal Circumstances

Mr. Vilar was born in 1940 in Newark, New Jersey. He is the only son of Cuban parents who returned to Cuba shortly after his birth. When he was nine years old, his father was transferred to Puerto Rico by his company in Havana to run their sugar operations there. Mr. Vilar spent the rest of his grade school and high school years in Catholic schools in Puerto Rico, where he was an excellent student with interests in classical music and religion. He later graduated with honors from Washington & Jefferson College in Pennsylvania in 1962. He also received a commission as a Second Lieutenant from the United States Army R.O.T.C. program.

While Mr. Vilar was in college, his father's business was expropriated by Castro. As a result, there were no funds available for graduate school. Mr. Vilar instead spent the next two years in military service on the East German border during the cold war. He was promoted from platoon leader to a tank battalion supply officer with responsibility for 100 soldiers. He wanted to extend his service but, because his family had lost everything in Cuba, they were growing more dependent on him financially.

HOFFMAN & POLLOK LLP

Page 5
10/12/2005

In 1964 he joined Citibank's Overseas Division as a trainee in their Executive Development Trainee Program. He was trained in financial engineering and sent to Latin America for two years. He then returned to New York and went to work on Wall Street in security analysis and portfolio management.   At the same time, he attended graduate school on a part-time basis at Iona College and New York University, studying mathematics, finance and business.   He completed two Masters' programs as well as all of the coursework for a Ph.D.  In 1973, he moved to Boston and worked for five years at two investment firms specializing in university endowment programs.

In 1976 he started his own firm specializing in emerging technologies, which was not a developed investment field at that time.  In 1982 Gary Tanaka joined him to manage institutional portfolios in the emerging technology of electronics.  Between 1981 and 2000, their company, Amerindo, was repeatedly ranked number one in the United States in performance.  At the top of the bull market in 2000, the assets under the firm's management were about $9.5 billion, largely in pension accounts. In contrast, overseas assets were typically between 1 to 5% of total assets under management.

In 1985, he got married and lived in London with his then wife for about four years, while also maintaining offices and residences in New York and San Francisco.  After a divorce in 1989, he returned to New York full time and dedicated himself to running the Amerindo U.S. registered investment advisory firm.  In about 1990 he began a program of charitable contributions in the fields of classical performing arts, education and healthcare.

This is not the profile of a person who would run from his problems and live in the shadows.

It should be noted that no Judge has reviewed the propriety of the home detention condition in this case.  The condition was imposed without objection at the beginning of the case, when Mr. Vilar was sitting in jail and the government was claiming that it had not yet been able to ascertain the extent of Mr. Vilar's resources.  Four months later, after the government has been able to pursue its investigation, no additional charges have been brought and, upon information and belief, the court-appointed monitor for Amerindo U.S. has found no wrong-doing.[1]  Mr. Vilar has posted $4 million in property and four friends have signed onto a $10 million bond.  Unless the government can come forward with articulable facts demonstrating that Mr. Vilar poses a risk of flight – a risk that cannot be addressed by the current monetary and

---

[1]     At the last SEC hearing, the court-appointed monitor indicated that he had not yet finished his report but that he anticipated a finding of no wrong-doing.

HOFFMAN & POLLOK LLP

Page 6
10/12/2005

moral suasion conditions - then the restrictiveness of Mr. Vilar's current conditions should be ameliorated.

The home detention condition is particularly onerous for Mr. Vilar because it only allows him to attend religious services once per week on Sundays and it severely curtails his ability to pursue a medically necessary exercise regimen. We understand that a Court might suspect that a person confined to his home may suddenly become devout; however, that is not the case with Mr. Vilar. For most of his adult life, Mr. Vilar has attended church several times a week, even daily when his schedule permitted. We have attached a letter from the Reverend Andrew Mead of Saint Thomas Church Fifth Avenue who states that Mr. Vilar "for years attended Mass here on weekdays as well as Sundays" and he has seen "Mr. Vilar's devotion in action nearly ten years." Reverend Mead also makes the following astute observations about Mr. Vilar's particular personal situation:

> The restrictions that have been placed on Mr. Vilar are very painful to him and, in my opinion, amount to a prohibition of a regular religious practice that has always meant a great deal to him. This is all the more relevant in his present trials and stresses, when he needs the church which has been a staple of his entire life.

Reverend Mead's letter is attached hereto as Exhibit C.

We have also attached a letter from Dr. Cammisa, Mr. Vilar's spinal surgeon. Mr. Vilar has had three extensive spinal surgeries, in 2000, 2001 and 2002. His last spinal reconstructive surgery, a "four-level spinal fusion," alleviated his back and leg pain. Dr. Cammisa, however, points out that "it is extremely important that the patient remain mobile and be on a continuing exercise program" that involves, "at least, walk[ing] up to two hours a day." Prior to his arrest, Mr. Vilar maintained such a program. Indeed, walking to and from church each day provided him with both the physical exercise and spiritual fulfillment he required. Dr. Cammisa's letter is attached hereto as Exhibit D. Mr. Vilar believes that the area around the incision, where several titanium rods were inserted, has been stiffening recently due to the significant reduction in his physical activity.

In addition, Mr. Vilar's companion for many years is a woman who is currently undergoing chemotherapy after a radical bilateral mastectomy. At the same time, she is raising a six-year old son by herself. Mr. Vilar cannot even visit her let alone assist her, and it is difficult for her to visit him on a regular basis because the chemotherapy has severely compromised her immune system. Finally, as Mr. Vilar's financial situation continues to deteriorate, he needs to find work. A former client has offered him office space and the opportunity to help oversee a

HOFFMAN & POLLOK LLP

Page 7
10/12/2005

portfolio, an offer Mr. Vilar would like to accept. He is not in a position to promote himself in
the context of professional relationships when he cannot leave his home to meet with people and
pursue employment prospects. He is also in the process of selling his apartment and it is quite
uncomfortable for him to be present every time the broker shows the apartment.

While it is true that, if he is convicted, Mr. Vilar is facing substantial time (our
worst-case scenario guidelines calculation is 97 to 121 months), that is also true, as Judge Baer
noted, in a great many white collar cases. We have attempted a review (through the Court's
Pacer system) of comparable cases, where the alleged harm is in the neighborhood of at least $5
million, and we have not found any bail conditions as restrictive as Mr. Vilar's. To take a few
examples from our own cases, in 1997 we represented the head of a brokerage firm alleged to
have defrauded his clients of more than $5 million. He was released on a $50,000 personal
recognizance bond. *See United States v. Jeffrey Szur*, 97 Cr. 108. We also represented on appeal
a defendant who was charged with stock manipulation causing a loss of between $40 and $80
million. During the District Court proceedings, he was released on a secured bond with strict
pretrial supervision. *United States v. Ilan Arbel*, No. 01 Cr. 930; 01 Cr. 917 (ILG). We currently
represent a defendant in the Eastern District alleged to have committed an $80 million fraud and,
while he is under house arrest, he is allowed to leave his home from approximately 8 a.m. to 6
p.m. for religious services and to go to work. *See United States v. Herman Jacobowitz*, 04 Cr.
558 (JG). In addition, currently pending in this Court are securities fraud charges against David
Finnerty and Thomas Murphy, both alleged to have caused harm in excess of $5 million, and
they have both been released on personal recognizance bonds with co-signers. In the Adelphia
case, defendant John Rigas was released on a substantial bail package, 02 Cr. 1236, and even the
Tyco defendants in State Court were released on bond without electronic surveillance.

In sum, now that several months have passed and the government can no longer claim a
lack of opportunity to review the documents in its possession, it is time to take a realistic and
sober look at Mr. Vilar's conditions of release. For all of the reasons set forth above, we
respectfully request that the Court modify his conditions to eliminate home detention.

Respectfully submitted,

HOFFMAN & POLLOK

By: Susan C. Wolfe
    Susan C. Wolfe

Cc: Marc Litt, AUSA

00001289