<u>AMERINDO TECHNOLOGY GROWTH FUND LIMITED (ATGFL)</u>

<u>Purpose</u>:      This  memorandum  and  appendices  support  our  CPR  for
extension  by  Merrill  Lynch  International  Bank  Limited  of  a  US 50 MM five
year  revolving  Security  Financing  Facility  to  be  made  available  to
ATGFL.

<u>Background</u>

The  history  of  Amerindo  Technology  Growth  Fund  Limited  can  be  traced
back  to  1976  with  the  establishment  of  Amerindo  Management  Limited,
(AML)  a  Hong  Kong  registered  investment  management  company  specializing
in  emerging  growth  stocks.

AML  was  established  jointly  in  1976  by  Albert  W.  Vilar,  Michael  W.
Gibson  and  a  group  of  wealthy  Indonesian  and  Singaporan  individuals  to
manage  personal  assets  of  US 7 MM including  substantial  assets  of  Vilar.
Albert  Vilar  began  his  professional  career  with  Citibank  NA  in  New  York
in  1964  as  an  international  credit  officer.   From  1967  to  1971  he  served
as  Vice  President,  Portfolio  Manager  of  the  Investment  Management
Division  of  Drexel  Burnham  Lambert  in  New  York.   From  1971  to  1973  Vilar
was  Executive  Vice  President,  Portfolio  Manager  and  Director  of  Equity
Strategy  at  M.D.  Sass  Investment  Services  in  New  York.   In  1973  he
became  President  and  Portfolio  Manager  of  Endowment  Management  and
Research  Corporation  in  Boston.   From  1977  to  1979  Vilar  served  as
Senior  Vice  President,  Director  of  Research,  Chief  Investment  Strategist
of  the  Boston  Company  in  Boston.

**AUK-34-01857**

-2-

The connection between Vilar, Gibson and the Far Eastern investors arose through Gibson's adopted brother Tanri Abeng, currently a director and President of the largest non-Indonesian conglomerate, PT Multi Bintang, Indonesia jointly owned by Heiniken and one of the first six companies listed on the Indonesian stock market.   AML's registered shareholders are:

| | |
|---|---|
| Tanri Abeng | 30% |
| J. Darmadi | 30% |
| D. Danata | 10% |
| K.C. Sim | 10% |
| R. Badruddin | 10% |
| Others | 10% |

Between 1976 and 1979 AML funds increased to US 16MM – entirely managed by A. Vilar who resigned his position as Chief Investment Officer of The Boston Company (assets of over US$ 7 MMM) to devote his full time to managing AML's growing portfolio.

In 1978, Vilar and Gibson established Amerindo Investment Advisors Limited (AIAL), a Hong Kong registered company to book the fee income generated from AML.   For US tax purposes, AIAL was established with the original AML shareholders as majority nominee shareholders (51% of AIAL) and Vilar and Gibson as 49% shareholders.

Amerindo has developed since 1976 into a speciality off-shore investment manager with a demonstrated capability in perhaps the highest return sector of the U.S. equity market, emerging growth stocks.   In 2 of the last 4 years, Amerindo has outperformed the best of the listed U.S. Mutual Funds.   A summary of AML's performance and growth since 1976 is provided as an Appendix.

AUK-34-01858

-3-

Amerindo has capitalized on extensive overseas contacts developed by Vilar over 15 years in Latin America, the Far East and more recently, the Middle East. Because Amerindo is an off-shore advisor, it can and does charge an incentive fee based on profits (15%) which is generously shared with a select reputable finder network.

Amerindo successfully markets a unique leveraged tax effective portfolio package to off-shore investors utilizing its attorneys in New York, Curtis, Mallet-Prevost to structure appropriate investor legal vehicles, and a London based international bank (such as MLIB) to provide incremental leverage financing available solely to off-shore clients. This has translated since 1976 into a high performance profitable private portfolio management company.

In 1979, Vilar was approached by Euro Kuwaiti, a private Kuwait investment company (the only Kuwait investment company licensed to deal in international securities), to establish an investment management venture, Amerindo-Euro Kuwaiti, to be headquartered in London. Initially Vilar was mandated to go to Kuwait to assist in structuring EK's Kuwait operations in preparation for the London move. This was anticipated as a six month exercise prior to establishing the London office. Vilar was subsequently named as General Manager and asked to undertake the structuring and implementation of a EK real estate department, Venture Capital and International Brokerage department. The six month period extended to over two years during which Vilar restructured their overseas investment program and continued to manage AML's portfolios. Part of the contractual arrangement with EK was that Vilar be allowed to continue managing AML but restrict any new marketing activities until the London joint venture was established.

AUK-34-01859

-4-

During Vilar's period in Kuwait, Gary Tanaka joined forces with AIAL (1980) as a partner and agreed to assist in the restructuring of EK's portfolio and international brokerage activities prior to establishing the joint venture in London. Gary Tanaka served as Portfolio Manager for Crocker Bank in San Francisco from 1971 to 1977 and as Fund Manager for Crocker Investment Management Corporation from 1978 to 1980. From 1975 to 1980 he also served as Consultant to Andron Cechettini and Associates in San Francisco.

The formal understanding between EK, Vilar and Tanaka was that they would remain in Kuwait until the arrival of the new US Bull market (1983) and then relocate to London. Under this scenario, Vilar and Tanaka kept EK out of the US equity market until July 1983. Within two months they informed EK that timing was right for the London move. By this time, third quarter 1983, they had increased EK's US equity portfolio management activities from nil in 1980 to over US 35 MM.

Prior to their London relocation agreement had been reached with EK for AIAL to formally manage EK's client and company portfolios totalling approximately US 50 MM on a transition basis until such time as EK had developed the local manpower to manage their own portfolios. With the advent of the Souk Al Manak crisis in late 1982, EK had decided to temporarily shelve the original joint venture concept until the general investment environment improved in their local market. The negative effect of the Manak crisis forced EK to take a hard look at their portfolio management business and to develop a means (an arrangement with A.G. Becker) to capture brokerage commissions for both commodity and equity transactions. This translated, in part, to a requirement that AIAL channel at least 50% of the EK managed portfolio brokerage through A.G. Becker.

AUK-34-01860

-5-

This arrangement was satisfactory for both parties although Vilar had felt a policy decision was necessary as the EK business took entirely too much time to manage when offset against the concessional pricing EK paid AIAL, following the move to London.

Vilar and Tanaka reactivated AML's marketing activities shortly after the London move. During the second half of 1982 they had begun the ground work necessary to structure Amerindo Technology Growth Fund Limited (ATGFL) and had progressed sufficiently to begin marketing the concept by mid-1983 through their contacts in the Far East and Latin America.

## Amerindo Technology Growth Fund Limited (ATGFL)

ATGFL is an open-ended investment company incorporated as an exempt company under the laws of the Cayman Island for an unlimited term. The principal objective of the fund is growth of capital through concentrated investment, primarily in U.S. publically traded emerging growth companies that are generally in the field of applied science and high technology.

The investment objective of the fund is to achieve high growth of capital by investing principally in small, relatively young US companies undergoing exceptional growth of earnings. The investments of the fund are managed by Amerindo Investment Advisors Limited (AIAL) which also manages the investments of AML.

The fund will invest principally in common stocks and other securities convertible into or exchangeable for common stocks having, in the opinion of the investment manager, a potential for above average appreciation and may also buy call options on such securities. The fund may also sell stock or buy put options  for securities when, in the

-6-

opinion of the investment manager, they are likely to decline in value. In addition, when the investment manager believes that a more defensive or conservative postion seems appropriate, the fund may hold all or a portion of the portfolio in cash or cash equivalent investments not subject to US withholding tax.

The Offering Circular of ATGFL clearly spells out that the fund may seek to enhance capital appreciation by leveraging its investment through the purchase of securities with money borrowed from banks using portfolio securities as collateral. Agreements under which borrowings may be made may require the fund to pledge additional securities as collateral from time to time if the value of the existing collateral declines due to market conditions or otherwise and if the fund is unable to do so it may have to sell a portion of it's investments at a time when it may be disadvantageous to do so.

Fund Safeguards

While the fund has broad powers as to the type of investments it may make and the investment methods it may adopt the Directors of the fund have resolved that the fund will not:

(1) invest more than 10%, except in exceptional circumstances (but in no event more than 20%), of its total assets (calculated at the time of investment) in the securities of any one issuer, except that the Fund may invest an unlimited portion of its assets in the securities of any U.S. governmental issuer;

(2) invest in more than 4.99% (calculated at the time of investment) of the voting securities of any one issuer, except in exceptional circumstances.

AUK-34-01862

-7-

(3)   underwrite or participate (except as an investor) in the marketing of securities of any other company;

(4)   buy or sell commodities;

(5)   buy or sell real estate;

(6)   buy or sell currencies, except as required to pay operating expenses;

(7)   invest in debt instruments other than bonds, governmental securities, certificates of deposit with recognized banking institutions, or similar short term securities; publicly-distributed debt securities, subject to the limitation set forth in (10) below;

(8)   lend money, except to the extent that the investments permitted by (7) above may be considered to be loans;

(9)   purchase securities of any other investment company or investment trust except temporarily in connection with merger or consolidation with, or acquisition of the assets of, any such company or trust;

(10)  invest more than 10% of its total assets (calculated at the time of investment) in securities that are not listed on a stock exchange or quoted on a recognized over-the-counter market;

(11)  purchase securities of any issuer for the purpose of exercising control of management of that issuer;

(12)  purchase securities of the Investment Manager or any affiliate thereof.

MLIB Relationship

MLIB's relationship with Amerindo dates back to late 1981. At that time we were marketing Euro Kuwaiti (a client since 1980) for a second leveraged ICMD Eurobond facility and were introduced to Albert Vilar,

AUK-34-01863

-8-

General Manager. Vilar made it clear that EK was not at that time particularly interested in the bond market but did have a strong interest in developing their US equity portfolio management service. EK had negotiated a US 25MM leverage facility (50%) with Chase in the first quarter of 1981 which had proved expensive and difficult operationally. EK's general concensus was that the Chase facility did not meet their needs, was overpriced and unduly cumbersome.

Vilar asked if MLIB thought it possible to create a US equities leverage facility similar to our Eurobond product which would be at least as flexible as brokerage margin and possibly enable EK to leverage beyond the 50% permitted in the US. This request was seminal in the creation of MLIB's Secured US Equities Financing Facility. In putting the product elements together MLIB worked closely with our client EK (represented by Vilar) and Law and Compliance to assure that we provided a competitive well secured (L & C guidelines) client flexible credit facility (75% leverage 25% equity) adaptable for different profile clients.

The first facility for US 25MM was extended to EK in May of 1982 on a one year renewable basis. It was subsequently renewed in May 1983 for a second year. The facility has been properly utilised with no administrative problems during the term and well managed by Vilar and Tanaka for EK. A second facility of US 25MM was extended in 1983 to EK's managing director's family (Al Hamads') also managed by Vilar and Tanaka. For both facilities average utilisation has approximated 70% of facility amounts with average returns produced by Vilar and Tanaka as managers for the client portfolio's of 106% in 1982 and 38% in 1983. We have had two margin calls during the last two years, both of which were

**AUK-34-01864**

-9-

met promptly by cash injections.

When Vilar and Tanaka relocated to London and reactivated Amerindo Management Limited, both EK and the Al Hamads put their leveraged portfolios under AML management pending the internal restructuring of their investment department.  In addition EK asked Vilar and Tanaka to manage their unleveraged US 50MM US equities portfolio outside the AML structure.

Throughout the last two years we have worked closely with both Vilar and Tanaka towards developing a mutually satisfactory client-bank relationship.  We have discussed on numerous occasions the possibility of MLIB providing our secured leverage facility on a case-by-case basis to selected AML clients.  For example, we currently have an offer outstanding to George Soros (Quantum Fund reputed to be "the money manager's money manager" - Institutional Investor - June 1981) who late in 1983 became an AML client.  Soros choose AML as one of Quantum's portfolio managers based on their consistent high performance and the excellent industry reputations of Vilar and Tanaka.  We have also discussed in general terms the possibility of MLIB creating a credit product which would enable AML to leverage on a pre-screened selective basis new issue portfolio purchases.

Over the same two year period by virtue of MLIB providing credit facilities to EK and the Al Hamad's we have built ties between Merrill's Broadcort Capital Corporation (our custodian) and AML and effectively provided incremental brokerage business for the firm from a portion of AML's portfolio brokerage business directed at MLIB's request through Merrill Lynch.

AUK-34-01865

-10-

When AIAL began the prep work for the fund their first choice was Merrill to provide the mutual fund accounting package and MLIB the 50% leverage facility. Vilar spent considerable time with R. St. Angelo of Broadcort Capital Corporation in an attempt to assess Merrill's capability to provide the accounting package requisite for the fund. Unfortunately as Merrill does not provide the mutual accounting package Vilar was forced to make alternative arrangements with Brown Brothers Harriman who insisted on lead managing the credit facility as well as providing the fund accounting package.

At this point, (late November 1983) Vilar asked if MLIB would be interested in participating in the credit facility along with Goldman and several other banks. However, in the process of negotiating with Brown Brothers it became obvious to Vilar that Brown Brothers lacked the experience necessary to tailor the type of security financing package required for the Fund. At one point Brown Brothers insisted they be allowed to approve on a case-by-case basis equities to be bought by the fund under their proposed 50% financing package – this proposed condition was unacceptable to Amerindo who worked closely with us to create the MLIB defined universe of financable equities which are "...US equity securities listed on the NYSE, ASE, or traded OTC and included on the Federal Reserve Board OTC Margin Stock List." Additionally Vilar felt the fund could not be successful if it were clearly stated that the banks providing 50% financing had the right to second-guess the investment manager.

Discussions were then held with State Street Bank and Trust who were pleased to be named Custodian Bank for the fund and indicated their willingness and ability to act as Custodial Agent on behalf of a bank or

-11-

banks' who would provide the US 50 MM financing package.

Vilar then contacted MLIB and asked if we would be interested in proposing lead manager terms and conditions for a US 50MM five year equity financing facility to be made available to ATGFL. We were pleased to do so and subject to several rounds of negotiation received a mandate based on our proposed terms and conditions a copy of which is included in the Appendix.

<u>The MLIB Revolving Securities Financing Facility</u>

The following discussion is based on our proposed terms and conditions as presented to Amerindo (see appendix -). The only significant variances from our standard Securities Financing product as currently marketed are:

- this proposal predicates financing on a 50% equity to 50% finance basis as opposed to our standard 75% financing to 25% equity.

- the second variance is numerical. We have in the past provided up to US25MM on a 75% leveraged basis to individual clients entirely funded by MLIB. Our Amerindo proposal is for US50MM on a 50-50 basis and we have obtained an option to either syndicate or fund on a risk participation basis as opposed to retaining the entire credit on MLIB books. Our intention is to offer the deal to MLIB Panama.

- the custodial agent function will be undertaken by State Street Bank and Trust as opposed to our usual working arrangement with Broadcort Capital. This implies the necessity to define State Street's legal and administrative role in providing us with sufficient daily or weekly

AUK-34-01867

-12-

information on the funds portfolio market value to enable loans admin to monitor outstandings against collateral value.

Use of Proceeds

Our definition of financable acceptable common stocks is our standard universe of NYSE, ASE or traded OTC and included on the Fed OTC Margin Stock List.  Our past two years experience has clearly shown this to be a practical spectrum in both financing and collateral terms.  Amerindo's purchase of new issue technology stocks (not yet officially marginable) does not concern us as lenders in so far as they are excluded for financing purposes and hence collateral valuation.  There is additionally some comfort in so far as Amerindo's track record and performance with regard to picking new issues assures us of a marketable buffer of up to 10% (maximum as defined in the Offering Circular) of new issues which will increase our collateral coverage level versus loan advances against marginable stocks, as these new issues will be an integral part of the pledged collateral account.

Security

Our collateral consists of several different elements.  State Street will hold on our behalf the entire fund portfolio (MLIB/ATGFL account) and MLIB will maintain a MLIB/ATGFL cash account for fund subscriptions – the US50MM fund equity anticipated.  The cash account is critical for Maintenance of Collateral.  Under our standard Securities Financing Facility when a margin call occurs the client either injects fresh funds to meet the call, liquidates sufficient equities or combines the two procedures to top-up the account to our required collateral level. The ATGFL facility by virtue of being a mutual fund requires a slightly

AUK-34-01868

-13-

different tailored approach. Operationally a mutual fund always maintains a specific amount of liquidity to meet redemptions and/or calls. ATGFL have indicated they will operate on the same basis allowing us to specify a percentage which provides sufficient comfort as outstandings increase under the loan facility. Generally they would anticipate holding 7% to 10% liquidity at all times for redemption or call contingencies. We anticipate this will be more than sufficient under virtually any market scenario.

Portfolio Diversification - Taken from our MLIB product, as developed with Law & Compliance guidance, and coincidentally (and importantly) precisely as described in ATGFL's offering circular. From the lenders point of view it assures sufficient portfolio diversification of marketable, marginable collateral.

Documentation

Over the last two years MLIB has developed reasonably standard documentation in conjunction with Law and Compliance for our secured equity financing facilities. This documentation contains various boiler plate covenants, warranties, portfolio diversification requirements, events of default and collateral maintenance requirements. Our intention will be to use this basic agreement form as a working document to draft, in conjunction with Roger and Wells, our Law and Compliance and Curtis, Mallet-Prevost, Colt and Mosle (AML's legal counsel) an acceptable loan agreement which will secure the best interest of MLIB. We anticipate a similar procedure to create the Custodial Agreement with State Street who are intended to act as collateral agent for MLIB and provide the required daily portfolio valuations.

AUK-34-01869