UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA     :

     -v.-     :     S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,     :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,     :

     Defendants.     :
------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF ITS APPLICATION
## TO REMAND DEFENDANT ALBERTO VILAR
## PURSUANT TO 18 U.S.C. 3143(a)

LEV L. DASSIN
*Acting United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*

Marc Litt
Joshua Klein
Benjamin A. Naftalis
*Assistant United Stats Attorneys*
*Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Scheme To Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Point I:      Courts Routinely Remand White Collar Defendants
               Following Their Conviction after Trial . . . . . . . . . . . . . . . . . . . . . . . . 3

    Point II:     Mr. Vilar Should Be Remanded Pending Sentencing . . . . . . . . . . . . . . . 7

             A.     Mr. Vilar Is Facing A Lengthy Term Of Incarceration . . . . . . . . 7

             B.     Mr. Vilar Has Access To Substantial Financial Resources . . . . . . 8

             C.     Mr. Vilar Has Extensive Experience Living
                   And Traveling Abroad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             D.     Mr. Vilar's Ties To New York Are Weak . . . . . . . . . . . . . . . . . . 10

             E.     Mr. Vilar Can Not Be Trusted To Appear . . . . . . . . . . . . . . . . . . 11

                   1.     Vilar Lied To This Court . . . . . . . . . . . . . . . . . . . . . . . . 12

                   2.     Vilar Lied To The Clerk Of The New York
                        County Supreme Court . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                   3.     Vilar Lied To The SEC . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                   4.     Vilar Lied To The IRS . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                        a.     Vilar Lied About The SBIC . . . . . . . . . . . . . . . . . 13

                        b.     Vilar Lied About His Charitable Donations . . . . 14

           c.      Vilar Provided The IRS With
                    Phony Documents . . . . . . . . . . . . . . . . . . . . . . . 14

       5.      Vilar Lied To Bear Stearns . . . . . . . . . . . . . . . . . . . . . . . 15

       6.      Vilar Lied To The World About His Background . . . . . . 18

  F.     Granting The Government's Application For Remand
        Would Fall Squarely Within The Accepted Practice
        In This District Under These Circumstances . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA                    :

           -v.-                                  :          S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,                      :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                           :

              Defendants.              :
------------------------------------------------------x


GOVERNMENT'S MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS APPLICATION
TO REMAND DEFENDANT ALBERTO VILAR
PURSUANT TO 18 U.S.C. 3143(a)

PRELIMINARY STATEMENT

      The Government respectfully submits this memorandum in further support of its

application for the remand of Alberto Vilar following his conviction after trial of twelve serious

felonies that expose him to imprisonment for up to 155 years and an advisory sentence under the

U.S. Sentencing Guidelines that would likely result in his incarceration for a significant portion

of the rest of his life.

      As the Court well knows, Vilar was convicted following an approximately two-

month trial for conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire

fraud, and money laundering, as well as the following substantive counts: two counts of

securities fraud; one count of investment adviser fraud; one count of mail fraud; two counts of

wire fraud; four counts of money laundering; and, one count of false statements to the Securities

and Exchange Commission ("SEC").  Immediately following the verdict, on November 19, 2008,

and again on November 24, 2008, the Government moved, pursuant to 18 U.S.C. § 3143(a) for the immediate remand of Vilar based: (1) on the increased likelihood of his flight as a consequence of the lengthy sentence he faces; (2) the fact that Vilar has not secured his $10 million bail with any assets of his own; (3) Vilar's willingness to steal from his friends when he has to; (4) his extensive international travel; and (5) his track record of lying to courts, other governmental authorities, and others when he believes it is in his interest to do so.

As set forth below, the Government reiterates its argument that Vilar has not met, and cannot meet, the burden which he faces post-conviction: showing by clear and convincing evidence that he is not likely to flee.

### Applicable Law

Title 18, United States Code, Section 3143(a) provides for mandatory detention of a defendant who is awaiting imposition or execution of sentence pending appeal unless the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the community if released under section 3142(b) or (c)." 18 U.S.C. § 3143(a). As the Second Circuit held in *United States* v. *Abuhamra*, 389 F.3d 309 (2d Cir. 2004), "the Bail Reform Act of 1984 creates no general expectation of post-verdict liberty. To the contrary, it establishes a presumption in favor of detention." *Abuhamra*, 389 F.3d at 319. The Court further noted that the Government had a "strong and obvious countervailing interest in detaining defendants who have been found guilty beyond a reasonable doubt of serious crimes: such detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by law." *Id.* at

2

319-20.  Indeed, that was a "significant impetus" to the enactment of 18 U.S.C. § 3143.  *Id.* at

320 (citing S. Rep. 225, 98th Cong., 1st Sess. 26 (1983), reprinted in 1984 U.S. Code Cong. &

Admin. News at 3209 (noting that "release of a criminal defendant into the community after

conviction may undermine the deterrent effect of the criminal law")).

## ARGUMENT

### I.

### COURTS ROUTINELY REMAND WHITE COLLAR DEFENDANTS FOLLOWING THEIR CONVICTION AFTER TRIAL

As shown by the examples set forth below, courts in the Southern District of New

York routinely remand defendants convicted of non-violent crimes following their conviction

after trial.  This Court should follow suit here.

In *United States* v. *Kevin O. Kelley*, S2 05 Cr. 254 (KMW), for example, Judge

Kimba M. Wood remanded the defendant following his conviction of four counts of securities

fraud and three counts of wire fraud.  In that case, the defendant was arrested on December 8,

2004, and was released on a $1.5 million personal recognizance bond, with two co-signers and

strict supervision by Pretrial Services.  The defendant was fully compliant with those conditions

of release through his conviction at trial on June 8, 2006.  Following his conviction, upon the

application by the Government, the Court remanded the defendant pursuant to 18 U.S.C. § 3143.

The defendant had defrauded more than ten victims of approximately $4.2 million, and faced a

guidelines sentence that was ultimately calculated to be 168-210 months.  Judge Wood issued an

order (the "Kelley Order") finding that:

> The Defendant has a strong incentive to flee,
> because he likely faces a minimum of twelve years in

3

prison.  He is unlikely to prevail on appeal because the
evidence of his crimes introduced at trial, is very
substantial.  The Defendant has the ability to flee, because
he has sufficient wealth to do so, including unexplained
sources of income and/or person(s) willing to finance his
living expenses (according to defense counsel, a man
named Nicholas Adamson has permitted Defendant and his
family to live free of charge for the past ten months in a
house that rents at $17,000 a month).  The Defendant is
unlikely to be constrained by any law or promise he makes:
(1) he continues to contend that he violated no law,
notwithstanding the very substantial evidence against him;
(2) he committed perjury at trial denying he defrauded
others.

The Defendant also poses a danger to the safety of
others.  He has shown a propensity to defraud others for his
own pecuniary gain, and no only refuses to acknowledge
his crimes, but also committed perjury at trial concerning
his criminal conduct.

Kelley Order at 1-2 (attached hereto as Exhibit A).  Here, Vilar defrauded victims of substantially

more than $4.2 million, faces a Guidelines range that is higher than that faced by Kelley, and also

possesses, or has access to, unexplained resources that have allowed him to continue to live in a

luxurious Manhattan apartment.

In *United States* v. *Yehezkel Elia*, 07 Cr. 543 (KMK), the defendant first appeared

on June 20, 2007.  He was released on a $1 million bond, secured by property, and cosigned by

his wife.  Prior to trial, the defendant, who has dual citizenship (U.S. and Israeli), was permitted

to travel to Tuscon, Arizona, Las Vegas, Nevada, and Puerto Rico.  (*See* docket sheet attached

hereto as Exhibit B).  Following his conviction on July 2, 2008, after trial of 24 charged tax

offenses, Judge Karas remanded the defendant.  Judge Karas subsequently rejected defendant's

bail application (attached hereto as Exhibit C) which set forth his ties to family in New York,

4

hundreds of thousands of dollars of investments in his businesses in Westchester County, additional pledged assets including over $300,000 of equity in his daughter's New York City apartment, electronic monitoring, a written waiver of extradition from Israel, and the importance of the defendant's release to over 50 employees.

In *United States* v. *Sergei Kapirulja*, 05 Cr. 1246 (RO), the defendant was arrested on July 26, 2005, and was subsequently released on a $100,000 personal recognizance bond with three co-signers. The defendant was convicted after trial on July 27, 2006 of one count of mail fraud, and was remanded by Judge Owen following the verdict. The docket sheet (attached hereto as Exhibit D) does not reveal any failure to comply with pretrial conditions of release. The defendant had some ties to Russia, but was a permanent resident of the United States. He was sentenced to 51 months' imprisonment and ordered to pay restitution of $230,380.13.

In *United States* v. *Daniel Ojeikere*, 03 Cr. 581 (JGK), the defendant was arrested on March 10, 2003, and released on a $500,000 bond co-signed by four financially responsible persons and secured by $300,000 in property (which appears to have been his residence), home detention with electronic monitoring, and strict pretrial supervision. The defendant was also required to turn over his children's passports. Mr. Ojeikere was convicted after trial on July 27, 2005 of conspiracy and wire fraud, and was remanded by Judge Koetl following the verdict upon the oral application of the Government. The defendant was born in Nigeria, came to the U.S. in the late 1990s, and became a U.S. citizen in approximately 2001. The Court based its decision to remand on the defendant's ties to Nigeria and the fact that he faced a substantial sentence. The docket sheet (attached hereto as Exhibit E) does not reveal any failure to comply with pretrial

conditions of release.  The defendant was sentenced to 43 months' incarceration and restitution in the amount of $679,132.82 was ordered.

In *United States* v. *Michael O'Donnell*, 02 Cr. 411 (CM), the defendant was arrested on April 19, 2002, and released on his own recognizance.  The defendant had close ties to the community, having lived in Orange County for a lengthy period and being the father of eight children.  Immediately following his conviction for seven tax charges on May 16, 2003, Judge McMahon remanded the defendant based on his employment as an airline pilot and the Court's finding that he had perjured himself at trial.  The docket sheet (attached hereto as Exhibit F) does not reveal any failure by the defendant to appear when required.  The defendant was ultimately sentenced to 37 months' incarceration.

In *United States* v. *Mayzar Gavidel*, et al., 01 Cr. 417 (TPG), the defendant was arrested on November 28, 2000, and released on a $250,000 personal recognizance bond co-signed his uncle and one other financially responsible person, and secured by an interest in his uncle's home and $10,000 in cash.  On August 15, 2002, the defendant was convicted of conspiracy to commit money laundering, five counts of money laundering, one count of structuring, and one count of violating an embargo and was remanded by Judge Grisea following the verdict upon the oral application of the Government.  The defendant was sentenced to 70 months' incarceration and the docket sheet (attached hereto as Exhibit G) does not reveal any failure to comply with pretrial conditions of release.  Here, Mr. Vilar faces a greater sentence and has no family with assets at risk.

In *United States* v. *Fitzgerald*, 97 Cr. 205 (RO), the defendant was arrested on March 13, 1997 and was released on a $100,000 personal recognizance bond with three co-

signers.  The defendant was convicted after trial on March 18, 1998 of three counts of tax

evasion, and was remanded by Judge Owen following the verdict.  The docket sheet (attached

hereto as Exhibit H) does not reveal any failure by the defendant to comply with his conditions of

release; indeed, the terms of his bail were extended to permit travel to Rhode Island and Florida

for business purposes on August 13, 1997.  The defendant was ultimately sentenced to a term of

imprisonment of 37 months.  In sentencing the defendant, Judge Owen found that he had

committed perjury at trial.  *United States* v. *Fitzgerald*, 232 F.3d 315, 317 (2d Cir. 2000).

## II.

## MR. VILAR SHOULD BE REMANDED PENDING SENTENCING

Because Mr. Vilar has no incentive to remain in New York, has access to the

resources to flee, has vast experience living and traveling abroad, and has a track record of lying

whenever it is in his interest to do so that renders his promise to appear for sentencing essentially

meaningless, the Court should remand him pursuant to 18 U.S.C. § 3143 notwithstanding the fact

that he has complied with his bail conditions since his arrest.  In light of the changed

circumstances arising from his conviction and his pattern of deception, Mr. Vilar simply can not

meet his burden to show by "clear and convincing" evidence that he is not likely to flee.

A.     **Mr. Vilar Is Facing A Lengthy Term Of Incarceration**

Here, Mr. Vilar faces the prospect of a lengthier sentence than any of the above-

described defendants.  The statutory maximum sentence is 155 years, and the Government's

current estimate of the advisory Guidelines sentence is 324-405 months based on the following

calculation of an offense level of 41 and a criminal history category of I:

| | |
|---|---|
| Base Offense Level (§ 2B1.1 (a)(1)): | 7 |
| Loss > $20 million (§2B1.1(b)(1)(L)): | 22 |

| | |
|---|---|
| Ten or more victims (§ 2B1.1(b)2)(A)): | 2 |
| Scheme outside the U.S. (§ 2B1.1(b)(9)): | 2 |
| Inv. Adv./Sec. Fraud (§ 2B1.1(b)(16)(A)): | 4 |
| Aggravating Role (§ 3B1.1(c)): | 2 |
| Obstruction of Justice (§3C1.1): | 2 |
| | 41 |

Moreover, Mr. Vilar is 15 years older than Mr. Kelley (whose crimes and circumstances are most analogous to those of Mr. Vilar) and, as a consequence, faces the very realistic prospect of spending most, if not all, of the rest of his life in jail.[1]

## B.     Mr. Vilar Has Access To Substantial Financial Resources

Like Mr. Kelley, Mr. Vilar has unexplained sources of income and/or persons willing to finance his expenses.  Despite the fact that Mr. Vilar has not put up a single penny of his own to secure his bond, he continues to live in a costly, mammoth, apartment at 860 United Nations Plaza, and has managed to find a way to pay three sets of high-priced criminal defense attorneys over the past three and one-half years, as well as lawyers to defend various civil actions.  Furthermore, Mr. Vilar has assets of his own.  According to his own consolidated statements of financial condition, Mr. Vilar has owned millions of dollars of art, furniture and jewelry between November 1999 and April 2004 (the latest such statement).  (*See* Exhibit I). When his initial bail package was being litigated, Mr. Vilar attempted to post $500,000 in artwork that he owned, but could not sell the art through an auction house because of a lien placed on his property as a consequence of a judgment obtained against him in private litigation. There is no reason, however, why a wealthy benefactor might not buy Mr. Vilar's art and/or furniture (perhaps at a discount) to help fund his flight.  Similarly, Mr. Vilar purports to own

---

[1]      In addition to the obvious incentive to flee posed by his potential sentence, Mr. Vilar also faces the prospect of civil litigation from the SEC and private litigants that will likely consume his time and resources for years to come.

$125 million of private securities as of April 2004.  (*Id.*).  Those assets, too, could be transferred

to friends at a discount.[2]  In short, Mr. Vilar has assets that could be sold and wealthy friends

who have apparently bankrolled him for three and one-half years, and his incentive to use those

assets to flee increased markedly following his conviction.

## C.    **Mr. Vilar Has Extensive Experience Living And Traveling Abroad**

As the Government noted at the November 24 hearing, Mr. Vilar has traveled

extensively abroad, lived in Kuwait for a period of time, and lived in London prior to relocating

to New York in the late 1980s.  According to a document that purports to describe the history of

Amerindo Technology Growth Fund Limited in connection with an effort to obtain a $50 million

five-year revolving security financing facility from Merrill Lynch, Mr. Vilar lived in Kuwait

between 1979 and 1983, when he and Mr. Tanaka relocated to London.  (*See* Exhibit K at AUK-

34-01859-60, 1865).  According to the October 12, 2005 bail submission from Mr. Vilar's

counsel, Mr. Vilar then lived in London between 1985 and 1989.  (*See* Exhibit L at 5).  Indeed, in

his April 21, 2005 deposition (excerpts of which are attached hereto as Exhibit M), Mr. Vilar

stated that he had been "a permanent resident of the United Kingdom . . . since 1981" and that,

"I'm moving back to England this year."  (Ex. M at 30).  Finally, as reflected in Mr. Vilar's

passport covering the period 1996-2005 and a spreadsheet summarizing the legible entries in that

passport, Mr. Vilar has traveled extensively all over the world, including to countries such as

Kuwait, United Arab Emirates, Saudi Arabia and Russia.  (*See* Exhibits N and O attached

---

[2]        Indeed, in an e-mail to Vita Cusumano of Citibank in October 2003, Vilar
indicated that he and Tanaka were "negotiating with an investor group to purchase part of their
private portfolio, in the ra[n]ge of several million dollars."  (*See* Ex. J).

hereto).  Mr. Vilar is obviously quite comfortable traveling and living abroad.  There is no reason

to think that he has lost his capacity to do so over the past three and one-half years.

**D.**     **Mr. Vilar's Ties To New York Are Weak**

Following his convictions, there is no possibility that Mr. Vilar will ever be able

to revive Amerindo – a business that was, in any event, in a downward spiral beginning in 2000.

As a consequence, he has no business reason to stay in New York.  As for friends and family, the

people who have stepped forward to support Mr. Vilar since his arrest have largely been from out

of state or from other countries.  When asked during his deposition who were the people that he

considered to be his two best friends, Mr. Vilar responded, "My two best friends would be my

partner [Gary Tanaka] and a woman in California [Joyce Lonergan]."  (Ex. M at 50-51).  When

asked who was his closest friend in New York, Mr. Vilar responded, "I didn't say I had a close

friend in New York," and when asked whether he had a friend in New York, he said, "I know

most of the people from the world of the arts and business."  (*Id*. at 51).  Mr. Vilar subsequently

stated that, "The person that I would talk to the most [in New York] is somebody who works

with my firm. [S]he's an old friend [, Dana Smith]."  (*Id*. at 52).  Mr. Vilar's responses to these

questions are telling.

First, he did not mention any of the individuals who have outwardly supported

Mr. Vilar by co-signing his bond, pledging assets to secure his bond, or writing letters to the

Court.  Rather, he identified as his two closest friends Gary Tanaka (now a convicted felon) and a

woman who lives in San Francisco whose address Mr. Vilar did not know, and who is not the

woman in New York City with whom he has been in "a loving relationship" for "approximately

six years" according to his November 25, 2008 memorandum in support of bail pending sentencing.[3]

Second, the individual that he claimed to be closest to in New York was Dana Smith, the former chief compliance officer at Amerindo (with whom Mr. Vilar was romantically involved for several years). In an interview with the Government in June 2005, Ms. Smith stated that Mr. Vilar was "pathological" and reported, in substance, that she had told him that he believes what he wants to believe and that is what he considers to be "the truth."[4] Ms. Smith's assessment appears to be borne out by Mr. Vilar's demonstrated willingness to bend the truth or outright lie when it suits his purposes.

### E.   Mr. Vilar Can Not Be Trusted To Appear

Although Mr. Vilar, unlike Mr. Kelley, Mr. O'Donnell, and Mr. Fitzgerald, did not commit perjury at trial, he has lied to this Court and other governmental authorities and, as detailed below, has a longstanding pattern of lying whenever it suits his interests.[5] Accordingly, he can not meet his burden to show by clear and convincing evidence that he is not likely to flee.

---

[3]   It also strains credulity to think that he could have been in such a relationship for so long in light of his revelation on June 10, 2002 to Lily Cates of his recent engagement to Karen Painter.

[4]   In the interest of full disclosure, the Government notes that Ms. Smith's failure to be completely candid with the Government concerning her role in backdating documents that Vilar supplied to the IRS to reduce his outstanding tax obligations prevented the Government from calling Ms. Smith as a witness at trial. As a consequence, the Government was unable to elicit testimony that would have corroborated Michael Shattner's account of Mr. Tanaka's review and approval of the May 20, 2005 letter to the SEC that was the subject of Count 12 of the Indictment.

[5]   The Government will not attempt here to catalogue all the lies that Mr. Vilar told Ms. Cates and GFRDA investors over the years because the Court is no doubt well aware of that history from the testimony and documents introduced at trial.

1.    **Vilar Lied To This Court**

In connection with his motion to suppress his post-arrest statements, Mr. Vilar submitted a declaration in which he claimed that, "On or about May 25, 2005, I was arrested at Newark Airport.  To the best of my recollection, and I believe my recollection is accurate, at no time before my arrest or while I was being transported for processing or thereafter was I ever told or read a list of rights." (Ex. P, ¶ 4).  Following a hearing on December 14, 2005 and supplemental briefing, the Court found that, "Vilar was informed of his [Miranda] rights and affirmed that he understood those rights." (Jan. 23, 2006 Order attached hereto as Exhibit Q, at 3).  Thus, this Court (Judge Karas) found that Mr. Vilar lied in the declaration that he filed with this Court.  As the Court observed on November 24, Mr. Vilar has previously lied to other courts as well.

2.    **Vilar Lied To The Clerk Of The New York County Supreme Court**

When it was in his interest to escape his civic duty of performing jury duty, Mr. Vilar twice falsely certified in 1999 and 2003 to the County Clerk and Clerk of the New York County Supreme Court that he was a resident of the United Kingdom.  (*See* Exs. R and S, attached hereto).  In response to the question posed by the Court to Mr. Vilar's counsel on November 24, there is no reason, in the Government's view, why this Court should believe that Mr. Vilar would take his promise to this Court any more seriously than he took his promise to tell the truth to the state court located right next door.  Simply put, if Mr. Vilar would lie to get out of a couple of weeks of jury duty, why should this Court trust him to appear for sentencing?

3.    **Vilar Lied To The SEC**

As the Court knows, the defendant lied to the SEC in his May 20, 2005 letter in which he sought to distance himself from responsibility for the fraud perpetrated on Lily Cates.

4.    **Vilar Lied To The IRS**

The Government described in its 404(b) notice and motion the numerous lies that Mr. Vilar told the IRS in his April 20, 2004 letter to Harold Campbell.  (A copy of that letter is attached hereto as Ex. T).

a.    **Vilar Lied About The SBIC**

In the April 20 letter, Mr. Vilar stated:

> I should also like to mention that three years ago Amerindo was awarded a license by the Small Business Administration for an SBIC fund.  This involves our having a joint venture with the Small Business Administration to fund new companies in technology.  In retrospect, Amerindo correctly withheld making any investments during the three-year bear market.  But as a result of not having invested the funds raised during this period, we have had to reapply for an extension of our original license.  The Commissioner of the SBA, the Honorable [Hector] Barreto, has met with me twice to tell me that we should expect this license[] to be renewed.  Given the turmoil of the market over the past few years, I am proud of the vote of confidence a US government agency has given my firm and the future of technology investing.

(Ex. T at 2-3).  Nearly every word of this paragraph – a paragraph designed to reassure the IRS that Mr. Vilar would soon be in a position to begin to make good on his sizeable obligation to the IRS – was false.  First, as demonstrated at trial, Amerindo was never awarded a license by the SBA for an SBIC.  Second, Amerindo did not "correctly withh[o]ld making any investments" through an SBIC.  The early investors, whose funds were held in escrow, demanded the return of

their money, and Lily Cates' $5 million investment was simply stolen.  Third, the Administrator

never informed Mr. Vilar that he should expect to receive an SBIC license, but rather gave him

general words of encouragement.  Finally, the SBA never gave Amerindo any "vote of

confidence."  Amerindo failed to obtain an SBIC license between 2000 and 2004, despite its

persistent efforts to do so.  Mr. Vilar's statements reflect a willingness to blatantly lie to

government authorities over a matter involving mere money.  The Government believes that

demonstrates that he would be more than willing to lie over the much more important matter of

his liberty by reneging on his promise to appear for sentencing.

### b.   Vilar Lied About His Charitable Donations

In the same April 20 letter to the IRS, Vilar stated, "Since 2000, I have not

contributed to charity and have no plans to do so now or any time in the near future."  (Ex. T at

3).  This, too, was a lie – a lie designed to persuade the IRS that he was not putting charitable

donations ahead of his tax liabilities.  As demonstrated at trial, Mr. Vilar took credit for $540,000

of Lily Cates' SBIC investment that he donated to Washington & Jefferson College in 2002 and

$177,000 of that investment that he donated to the American Academy in Berlin in 2002.

### c.   Vilar Provided The IRS With Phony Documents

In or about September 2004, Mr. Vilar told another set of lies to the IRS in an

effort to reduce his outstanding federal tax obligations.  Mr. Vilar claimed that more than $10

million had improperly been reported as income on his tax returns for the years 2000 and 2001

when, according to him, those funds were the proceeds of loans that he had received from

Amerindo Panama and Amerindo UK.  To support his claim, Mr. Vilar provided the IRS with

several promissory notes that he had Diane Cooper create in September 2004.  To add an air of

authenticity to those documents, and to create the false impression that these notes were executed prior to 2002, Mr. Vilar had Dana Smith, a notary public, place her notary seal on the documents. In so doing, Ms. Smith indicated on those documents that her notary commission expired on April 11, 2002 when, in fact, at the time the documents were created, Ms. Smith's notary commission expired on June 27, 2006.  (*Compare* Ex. U (an example of one of the promissory notes provided to the IRS) with Ex. V (a document Ms. Smith notarized just a few weeks earlier)).[6]  Mr. Vilar's willingness to direct the fabrication of false documents and to supply them to the IRS to avoid tax liability is additional evidence of his lack of trustworthiness.

### 5.   Vilar Lied To Bear Stearns

The Court is well familiar with Mr. Vilar's lies to Bear Stearns about the purported sale of Amerindo Panama to Morton Financial Corporation.  Mr. Vilar also lied to Bear Stearns about his personal investments.  Indeed, when Richard Marin caught Mr. Vilar in that lie, he and Bear Stearns determined that they would no longer deal with Mr. Vilar and all negotiations concerning a prospective transaction with Amerindo were terminated.

During the conduct of its due diligence, Bear Stearns attempted to make sure that there was no possibility that Mr. Vilar was putting his own financial interests ahead of those of his clients.  To that end, Bear Stearns explored how stock obtained by Amerindo in initial public offerings was allocated and whether Mr. Vilar was invested in any of the IPOs that subsequently went public.  As reflected in an e-mail memorandum prepared by Mr. Marin summarizing a

---

[6]      Had Ms. Smith used the then-current information about the expiration of her commission, a knowledgeable reader would have known that the documents could not have been prepared prior to 2002 because, at least as of June 2002, notary commissions had a four-year term.

conference call that he had with Alberto Vilar on July 28, 2004, Mr. Vilar told him that

Amerindo had invested in only four private companies that subsequently were taken public in an

IPO, including "Cancerva[x] and [Eye]tech." (*See* Ex. W, at 2).  The next day, while senior

executives were meeting to decide whether to go forward with the contemplated transaction – a

transaction that would have resulted in the purchase of one-quarter of Amerindo U.S. for $5

million – Bear Stearns uncovered a document which showed that Mr. Vilar had told Vita

Cusumano in October 2003 that he had an investment in Cancervax and Eyetech that "could

become valued at $5MM, although he would be an insider who would not be able to dispose of

the shares immediately." (Ex. J).  When Mr. Marin confronted Mr. Vilar with the contents of the

memo over the telephone, Mr. Vilar did not deny the facts, but rather became irate about the

incompetence of his lawyers who had allowed the document to be discovered in due diligence.

Mr. Marin concluded the call by informing Mr. Vilar that the deal was off and could not be

salvaged.

      In an apparent effort to save the deal, Mr. Vilar wrote a letter to his investment

banker, Roberto DeGuardiola, in which he stated, among other things

> My initial response to Rich unfortunately reflected my
> annoying surprise at having the confidential
> correspondence of my private assistant to my private banker
> be reviewed by a battery of company lawyers without my
> knowledge or time to review it.  On calmer reflection, I do
> believe the explanation I gave you stands.  The fact is that I
> never owned the cited shares privately, as can be easily
> corroborated by public records.  Moreover, whatever
> interpretations might be given to what Diane meant to say
> on my behalf in her memo, it remains an undisputable fact
> that I did not own the shares.  While I had hoped at that
> time to own those shares in the near term future, before
> they went public, that obviously did not happen, as I
> explain below."

(Ex. X). This explanation was patently false, and demonstrates, yet again, Mr. Vilar's willingness to say whatever he deems to be in his best interest at the time. In fact, in the days leading up to this exchange with Mr. Marin, Mr. Vilar had arranged to move $4.6 million of Eyetech shares from the ATGF II account (one of the four Amerindo Bear Stearns accounts about which evidence was introduced at trial) to a new account established at Smith Barney. On July 21, 2004, Vilar wrote to Vicki Moran (at Smith Barney)

> On July 28, my shares in Eye Tech Parmaceuticals (EYET) will have their "underwriters lock up" expire. My question to Crissell is as follows: can we borrow against the shares on the 28ᵗʰ of July, yes or no . . .Initially I don't think we're going to borrow more than a million dollars against the shares, which are worth over 5 million.

(Ex. Y). On July 23, 2004, Mr. Vilar and Mr. Tanaka opened a new account at Smith Barney in the name of ATGF II. On July 28, 2004, the very day that Mr. Vilar told Mr. Marin that he did not own any shares of Eyetech, Ms. Moran wrote to Mr. Vilar: "We received the Eyetech stock certificate today and it has been deposited into safekeeping. You can borrow against it as soon as tomorrow – all I need is the wiring instructions as to where you want the proceeds to go." (Ex. Z). On August 3, 2004, Mr. Vilar directed that $871,285 of funds borrowed against those shares be sent to Citibank to repay part of his Citibank mortgage and line of credit, and that another $102,500 be sent to his Wilmington Trust account. (*See* Ex. AA). Between August 11 and August 18, 2004, Mr. Vilar directed that another $671,000 of funds borrowed against those shares be sent to either Citibank or his Wilmington Trust account. (*See* Ex.BB). Over the following months, Mr. Vilar and Mr. Tanaka borrowed against those shares and used the proceeds to wire funds to various clients including the Mayers and the Colburn estate. In March

and April of 2005, Smith Barney liquidated the shares to recoup the money borrowed by Vilar, Tanaka and Amerindo.

The saga of the Eyetech shares shows once more Mr. Vilar's pattern of saying and doing whatever is in his interest at the time, without regard to the truth of what he says. Mr. Vilar told the IRS that he owned Eyetech and Cancervax shares in the April 20, 2004 letter when it was in his interest to show that he had the prospect of obtaining the resources necessary to repay his obligations. (*See* Ex. T at 1). It was likewise in his interest to say that to Vita Cusumano in an effort to further stall Citibank's foreclosure of his apartment in the fall of 2003. (*See* Ex. J). But when it was in his interest to mislead Bear Stearns so that he could obtain $5 million by selling a piece of his dying business, he lied and said that he did not own the shares at the very time he was arranging to transfer the shares from a Bear Stearns account to a Smith Barney account (presumably where no one from Bear Stearns would be able to see what he did with those shares). Then, immediately after the transfer of the shares, Mr. Vilar personally used more than $1.5 million of their value for personal purposes.

### 6.   <u>Vilar Lied To The World About His Background</u>

Mr. Vilar has also spent a considerable amount of time inventing a myth about his identity. He has repeatedly claimed to have been born in Cuba, to have been raised in Cuba, and/or to be a "refugee" from Cuba. He told Lily Cates when he first met her that he had been born in Cuba. Likewise, he told Carlos Castellanos (who was born in Havana, Cuba) that he was born and raised in Santiago de Cuba (a city about as far away from Havana as one can get and still be in Cuba). Mr. Vilar also told Roberto DeGuardiola (who was born in Cuba) that he was from Cuba. When he was awarded an honorary doctorate from his alma mater, Washington &

Jefferson College, Mr. Vilar approved a draft press release which stated that, "He came to W&J from Cuba and Puerto Rico in 1958 and graduated in 1962." (*See* Ex. CC). Mr. Vilar gave numerous interviews to the media over the years, resulting in the publication of numerous stories perpetrating that myth. (*See, e.g.*, the articles reproduced in Exs. DD-II). Indeed, Mr. Vilar's counsel even cited this myth as fact in his opening statement at trial. (*See* 9/29/08 Tr. at 27) ("Mr. Vilar, who was raised in Cuba, came to this country, went to school here and then took out a deep interest in investments and that phase of the financing of our economy.").

In fact, as reflected on Mr. Vilar's passport, he was born in New Jersey in 1940. (*See* Ex. N). Furthermore, as demonstrated by the Form DD-398 that Mr. Vilar completed for the Department of the Army, and signed under penalty of perjury on May 18, 1961, his only residences (other than college) had been in New Jersey and Puerto Rico. (*See* Ex. JJ at 3). Moreover, the myth that his father's property had been expropriated when Castro came to power, and that he and his family fled and became refugees in the United States, is further belied by his statement on the Form DD-398 that, "My Father entered the USA in 1920 at New York City. He obtained his citizenship through that of his Mother who had preceded him, information concerning her is unknown." (*Id.* at 4).

It appears that Mr. Vilar likely never spent a day of his life in Cuba. His persistent efforts to perpetrate a fraud about the essence of his identity should give the Court further pause about trusting his word to appear to face a sentence that will likely result in incarceration for most of the remainder of his life.

**F.**     **Granting the Government's Application For Remand Would Fall Squarely <u>Within The Accepted Practice In This District Under These Circumstances</u>**

At the last conference the Court identified several cases in which defendants, who had been released on bail prior to their conviction, complied with their bail conditions, and were subsequently released on bail following their conviction.  Specifically, the Court mentioned Bernard Ebbers, the Rigases, Phil Bennett, Frank Quattrone, Sam Waksal, Martha Stewart, Sanjay Kumar, Dennis Kozlowski, and Mark Swartz as defendants who had been released on bail following their conviction for white collar offenses.  Understandably, the Court inquired as to the bases upon which the Government seeks to distinguish Mr. Vilar's circumstances from those of the foregoing defendants.  The Government submits that Mr. Vilar's case is distinguishable from those identified by the Court.

The cases of defendants Frank Quattrone and Martha Stewart are wholly inapposite.  While Mr. Quattrone and Ms. Stewart were both convicted white collar defendants who were released on bail following their conviction, they both faced sentences that were far lower than the sentence faced by Mr. Vilar.  Mr. Quattrone received a sentence of 18 months and Ms. Stewart received a sentence of 10 months (5 months of which was to be served in home confinement).  The Government does not believe that the prospect of serving several months in prison ordinarily creates a high incentive to flee and, were Vilar facing a sentence comparable to that faced by Mr. Quattrone or Ms. Stewart, the Government would not have moved for remand.  Mr. Vilar's incentive to flee, however, is dramatically greater than that which faced Mr. Quattrone and Ms. Stewart because Mr. Vilar faces a potential sentence that is far more severe.  Because the Government's remand motion is predicated, in large measure, on the severity of the

20

sentence Mr. Vilar faces, the cases of Mr. Quattrone and Ms. Stewart should not guide the Court's decision in this case.[7]

The cases of Sam Waksal, Sanjay Kumar, and Phil Bennett are likewise distinguishable from this case. Unlike Mr. Vilar, Messrs. Waksal, Kumar and Bennett pleaded guilty (indeed, Mr. Waksal did so within 4 months of his arrest) instead of proceeding to trial. These guilty pleas constituted an acknowledgment by Mssrs. Waksal, Kumar, and Bennett, *prior to their convictions*, that they had committed crimes for which they would be punished. While the fact of these guilty pleas carried those defendants one step closer to imprisonment, their convictions did not create a radically different shift in their perception of their own circumstances. Messrs. Waksal, Kumar and Bennett had all accepted responsibility for their crimes prior to their convictions and, while they faced the near certain prospect of imprisonment following their conviction, their willingness to enter guilty pleas indicated their acceptance of that prospect before their convictions became a reality.

Mr. Vilar, on the other hand, has strenuously asserted his innocence both until, and, indeed, throughout, the trial. In fact, on the eve of trial, Mr. Vilar reportedly gave a lengthy interview to the New York Times in which he castigated the Government for carrying out what he characterized to be a misguided prosecution and indicated that he was eagerly anticipating the opportunity to vindicate himself at trial. Mr. Vilar's post-trial conviction has created a dramatic change in circumstances. Unlike Messrs. Waksal, Kumar, and Bennett, who had accepted, as a psychological matter, the prospect of conviction and imprisonment before it became a reality

---

[7]     It also bears mentioning that neither Mr. Quattrone nor Ms. Stewart were ever perceived to be flight risks given that they were both released on their own recognizance following their arrests. Here, the circumstances are far different.

(which is obvious from the fact that their convictions came about through guilty pleas), Mr. Vilar apparently believed that he would be vindicated at trial, and that he therefore would not have to face incarceration.  Consequently, the near certain prospect of imprisonment that Mr. Vilar now faces constitutes a significantly different change in circumstance for him as compared to the convictions of Messrs. Waksal, Kumar, and Bennett.  Moreover, as a result of Mr. Vilar's post-trial conviction, his substantial incentive to appear in court in the hopes of vindicating his reputation has now vanished.

The cases of Bernard Ebbers and John and Tim Rigas[8] can also be distinguished on the basis of Mr. Vilar's unchecked inclination to lie.  Mr. Vilar has demonstrated himself to be willing to lie *whenever* it suits his purposes and to *whomever* he deems it necessary.  As described above, Mr. Vilar's willingness to lie to those supposedly near and dear to him, to Governmental authorities including this Court, and to his colleagues and friends, creates an enormous concern that should he wish to flee, he would do so irrespective of his promise to appear at sentencing, and, furthermore, this inclination to lie undermines any assurances Mr. Vilar may provide to the contrary.  While Mr. Ebbers and the Rigases were, like Mr. Vilar, all convicted of fraud, and while those defendants all faced the prospect of severe sentences, there is no evidence that those defendants possessed Mr. Vilar's unbridled inclination to lie.  By contrast, Mr. Vilar's willingness to do so has been demonstrated in spades.

Mr. Vilar has argued that his appearance at court proceedings during a lengthy period of time prior to trial, and during the trial, constitutes clear and convincing evidence that he

---

[8]      The Government does not address the cases of Dennis Kozlowski and Mark Swartz, both of whom were convicted in state Court and whose bail determinations were not made under the federal bail statute that applies to this case.

will appear at sentencing.  However, it is the Government's view that Vilar appeared in court

prior to his conviction because he perceived it to be in his interest to do so.  As noted above, Mr.

Vilar wished to vindicate his reputation and believed his acquittal at trial would render moot any

prospect of imprisonment.  Consequently, the fact that Mr. Vilar complied with his bail

conditions from his arrest through trial provides no comfort that he will continue to comply with

his bail conditions now that he has been convicted.[9]

Finally, and perhaps most importantly, as indicated by the numerous cases cited in Part I,

above, in which defendants were remanded following their conviction, notwithstanding the fact

that they had complied with their pretrial bail conditions for long periods of time prior to

conviction, granting the Government's remand application in this case would fall squarely within

the normal, accepted practice in this District given these circumstances.

---

[9]     A final difference between Mr. Vilar's circumstances and those of many of the
defendants mentioned by the Court is that many of those defendants had secured their bail with
significant amounts of their own assets.  Mr. Vilar has not posted a penny of his own to secure
his bond.  As demonstrated by his willingness to steal millions of dollars from long-time clients
and friends when he had to, there is a significant risk that Mr. Vilar would not hesitate to leave
his co-signers and those who posted property on his behalf in the lurch if he calculated that it
would be in his interest to do so.

## CONCLUSION

For the foregoing reasons, Mr. Vilar should be remanded pending sentencing

pursuant to 18 U.S.C. § 3143.

Dated: December 3, 2008
       New York, New York

                                    Respectfully submitted,

                                    LEV L. DASSIN,
                                    Acting United States Attorney for the
                                    Southern District of New York,
                                    *Attorney for the United States of America*

                                    By: _____/s/_____
                                        Marc Litt
                                        Joshua Klein
                                        Benjamin A. Naftalis
                                        Assistant United States Attorneys
                                        (212) 637-2295