UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>ALBERTO WILLIAM VILAR and<br>GARY ALAN TANAKA<br><br>Defendants. | S3 05 Crim. 621 (RJS)<br><br>ECF Case |

## SENTENCING MEMORANDUM AND EXHIBITS
## ON BEHALF OF GARY TANAKA

Glenn C. Colton (GCC-2493)
Gary Meyerhoff (GM - 8267)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone:  (212) 768-6700
Fax:  (212) 768-6800

*Counsel for Defendant Gary A. Tanaka*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

INDEX OF EXHIBITS ............................................................................................... vii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    A.    Gary Tanaka's Childhood ................................................................................ 3

    B.    Gary Tanaka's Formal Education ..................................................................... 3

    C.    Gary Tanaka's Legacy Of Devotion To Family, Friends And To Those In Need ........................................................................................................... 5

        1.    Gary Aiding Family And Friends In Need ........................................... 6

        2.    Gary Through His Family's Eyes ......................................................... 8

        3.    Gary Through The Eyes Of Friends And Colleagues ........................... 9

    D.    Gary Tanaka's Career .................................................................................... 13

        1.    The Formation Of, And Success At, Amerindo ................................. 13

        2.    Vilar And Tanaka Regularly Disagree ............................................... 13

    E.    Gary Tanaka's Battle With Cancer ................................................................ 14

    F.    The Arrest And Pretrial Proceedings ............................................................ 15

    G.    The Long-Awaited Trial ................................................................................ 17

    H.    The Preliminary Presentence Report ............................................................ 18

I.     REQUIRED SENTENCING CONSIDERATIONS FOLLOWING BOOKER, GALL, AND KIMBROUGH ............................................................................................ 19

II.    THE ADVISORY GUIDELINES CALCULATION ........................................... 21

    A.    When The Trial Evidence Is Considered, And The Advisory Guidelines Followed, The Loss Caused By The Offense Is Zero, Or At The Most $450,000 ................................................................................................. 23

        1.    The Trial Evidence Demonstrated That The Mayer Family, Ms. Lecube-Chavez, Mr. Cox, And Seven Of The Ten Other Investors Incurred No Losses Under The Guidelines ................................................................ 24

|  |  | a. | Returned Money Constitutes A Credit Against Loss.........25 |

|  |  | b. | "Loss" Cannot Include Agreed-Upon Rates Of Return.....27 |

|  | 2. | The PSR "Loss" Amount For Tara Colburn Is Wrong.............27 |

|  |  | a. | The PSR Improperly Includes Expected "Rate Of Return"................................................................27 |

|  |  | b. | Ms. Colburn's "Loss" Was Not Caused By The Offense..28 |

|  | 3. | The Government Should Be Estopped From Seeking A Sentencing Enhancement For Alleged Losses Unless It Proves Losses Beyond The Amount Of The Accounts It Dubbed The "GFRDA Accounts"..............29 |

|  | 4. | There Are Multiple Grounds On Which To Exclude The Cates Loss.......31 |

|  |  | a. | Cates Suffered No "Loss" As She Was Repaid More Than She Invested....................................................................31 |

|  |  | b. | Sentencing Mr. Tanaka On Acquitted Conduct Violates His Constitutional Right To Trial By Jury...............................31 |

|  |  | c. | The Government Cannot Prove By A Preponderance Of The Evidence That Mr. Tanaka Caused Cates's SBIC Loss........................................................................33 |

|  | 5. | Including Alleged Losses By Investors Who Did Not Testify At Trial Violates Mr. Tanaka's Right To Trial By Jury And Right To Confront Witnesses....................................................................................34 |

| B. | The Number Of Victims Enhancement Does Not Apply; At Most, No More Than One Victim Suffered A Loss................................................................36 |

| C. | An Enhancement For Being An Investment Advisor Is Improper When Investment Advisor Act Fraud Is The Underlying Crime.......................37 |

| D. | Summary Of Mr. Tanaka's Guidelines Calculation...............................37 |

| III. | ANALYSIS OF SECTION 3553(a) FACTORS.................................................38 |

| A. | Section 3553(a)(1):  History And Characteristics Of Gary Tanaka.....................38 |

|  | 1. | Gary Tanaka's Devotion To His Family.................................39 |

|  | 2. | Gary Tanaka's Numerous Acts Of Kindness For Those In Need.............40 |

|  | 3. | Gary Tanaka's Lifelong Reputation For Honesty And Integrity.............41 |

| B. | Section 3553(a)(1):  Nature And Circumstances Of The Offense.....................42 |

C.      Section 3553(a)(2): The Purposes Of Sentencing.................................................43

    1.      Seriousness Of The Offense...................................................................43

    2.      Respect For Law, Adequate Deterrence, Just Punishment .......................44

    3.      Protecting The Public From Future Crimes Of The Defendant................45

    4.      Providing Gary With Needed Treatment ................................................45

D.      Section 3553(a)(3): The Kinds Of Sentences Available........................................45

E.      Section 3553(a)(4) and (a)(5): The Advisory Guidelines Calculation..................46

F.      Section 3553(a)(6): The Need To Avoid Unwarranted Disparities.....................46

G.      Section 3553(a)(7): The Need To Provide Restitution .........................................47

CONCLUSION...................................................................................................................49

# TABLE OF AUTHORITIES

## CASES

*Crawford v. Washington*, 541 U.S. 36 (2004) .................................................................35

*Davis v. Wakelee*, 156 U.S. 680 (1895) .........................................................................30

*Galin v. Goldfischer*, 2008 WL 5484318 (S.D.N.Y. Dec. 3, 2008)............................30, 31

*Gall v. United States*, 128 S. Ct. 586 (2007).........................................................19, 20, 21

*Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).................................................35

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ...............................................................30

*Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113 (2d Cir. 2004) .................31

*Rita v. United States*, 127 S. Ct. 2456 (2007) ..................................................................20

*S.E.C.  v. Amerindo*, 1:05-cv-05231 (LTS).....................................................................15

*Stinson v. United States*, 508 U.S. 36 (1993).....................................................................25

*United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008)................................................36, 37

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................46

*United States v. Anders*, 2009 WL 1649192 (6th Cir. June 11, 2009).............................26

*United States v. Booker*, 543 U.S. 220 (2005) .......................................................19, 20, 35

*United States v. Brownell*, 495 F.3d 459 (7th Cir. 2007)..................................................26

*United States v. Canania*, 532 F.3d 764 (8th Cir. 2008) .................................................32

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008), *cert. denied*, 129 S.Ct.
    2735 (2009).........................................................................................................19, 20

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) .....................................................28

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006) ..................................................33

*United States v. Hamilton*, 323 Fed. Appx. 27 (2009).....................................................45

*United States v. Hodges*, 2009 WL 366231 (E.D.N.Y. 2009) ..........................................45

*United States v. Ibanga*, 454 F. Supp. 2d 532 (E.D. Va. 2006), vacated 271 Fed. Appx. 298 (4th Cir. 2008)...........................................................................................33

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) ....................................................37

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .....................................................32

*United States v. Kimbrough*, 128 S. Ct. 558 (2007) ......................................................20

*United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007).............................................33

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) ...........................................26

*United States v. Nichols*, 416 F.3d 811 (8th Cir. 2005)................................................26

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).....................................46

*United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005) ..................................33

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 2488 (2008)..................................................................................................28, 29

*United States v. Sanchez*, 2007 WL 60517 (S.D.N.Y. Jan. 08, 2007) .............................45

*United States v. Sash*, 396 F.3d 515 (2d Cir. 2005)......................................................25

*United States v. Setser*, 568 F.3d 482 (5th Cir. 2009) .....................................................26

*United States v. Seval*, 293 Fed. Appx. 834 (2d Cir. 2008) ...........................................21

*United States v. Watts*, 519 U.S. 148 (1997) .................................................................33

## STATUTES

15 U.S.C. § 78ff..............................................................................................................45

15 U.S.C. § 806-17 ..........................................................................................................45

18 U.S.C. § 371.................................................................................................................45

18 U.S.C. § 3553(a) .................................................................................................. *passim*

18 U.S.C. § 3559(a) ...................................................................................................45, 46

18 U.S.C. § 3561 ..............................................................................................................45

U.S.S.G. § 1B1.7...............................................................................................................25

U.S.S.G. §2B1.1.................................................................................................... *passim*

U.S.S.G. §3B1.1(c) ....................................................................................................23

U.S.S.G. App. C, Vol. II ...........................................................................................26

# INDEX OF EXHIBITS

| _TAB_ | _EXHIBIT_ |
|---|---|
| **1.** | Letter from David Ashforth |
| **2.** | Letter from Michael Bell |
| **3.** | Letter from Barbara Tanaka Cerrduo |
| **4.** | Letter from Carl Cerrudo |
| **5.** | Letter from Judy Chang |
| **6.** | Letter from Ernest S. Chiu |
| **7.** | Letter from Robert N. Clay |
| **8.** | Letter from Rick Cohen |
| **9.** | Letter from Lincoln Collins |
| **10.** | Letter from Eugenio Columbo |
| **11.** | Letter from Alastair Donald |
| **12.** | Letter from Angela K. Dorn |
| **13.** | Letter from Neil Drysdale |
| **14.** | Letter from Barry C. Fong |
| **15.** | Letter from Sherry H. Fong |
| **16.** | Letter from Jim Furlong |
| **17.** | Letter from Vinod K. Garga |
| **18.** | Letter from Annelies Glen-Teven |
| **19.** | Letter from Douglas Glen |
| **20.** | Letter from John H. M. Gosden |
| **21.** | Letter from W. J. Gredley |
| **22.** | Letter from Robert Griffin |
| **23.** | Letter from Paul Haigh |

| *TAB* | *EXHIBIT* |
|---|---|
| 24. | Letter from JaDeane Ing |
| 25. | Letter from Charles Kaye |
| 26. | Letter from H. Darren Leavitt |
| 27. | Letter from Tidu Maini |
| 28. | Letter from David Mainzer |
| 29. | Letter from Paul Marcus |
| 30. | Letter from Mervin Marks |
| 31. | Letter from John R. Nardello |
| 32. | Letter from Michael A. O'Sullivan |
| 33. | Letter from H. A. Pantall |
| 34. | Letter from W. F. Purves |
| 35. | Letter from Andrew S. Reid |
| 36. | Letter from Paul S. Richter |
| 37. | Letter from Joel Romines |
| 38. | Letter from Jean de Roualle |
| 39. | Letter from Katherine Salmon |
| 40. | Letter from Lenny Shulman |
| 41. | Letter from Andrew James Smith |
| 42. | Letter from James Stableford |
| 43. | Letter from Diane C. Tanaka |
| 44. | Letter from Janette Tanaka |
| 45. | Letter from Jonathan Tanaka |
| 46. | Letter from Lucas Alan Tanaka |
| 47. | Letter from Lindsay Tanaka |

| *TAB* | *EXHIBIT* |
|-------|-----------|
| **48.** | Letter from Mark Tanaka |
| **49.** | Letter from Matthew Tanaka |
| **50.** | Letter from Michael Tanaka |
| **51.** | Letter from Victoria Tanaka |
| **52.** | Letter from E. Duncan Taylor |
| **53.** | Letter from Ling Tsui |
| **54.** | Letter from Darrell J. Vienna |
| **55.** | Letter from Patrick Wong |
| **56.** | Letter from Lester W. Young |
| **57.** | Letter from Maria Young |

## PRELIMINARY STATEMENT

If ever there was a case that highlights the United States Supreme Court's wisdom in restoring sentencing discretion to United States District Judges, the case of Gary Tanaka is the one. White collar cases have attracted much attention over the last year, with the discovery, prosecution and conviction of massive, completely bogus schemes runs by the likes of Bernard Madoff, Marc Dreier and others. However, unlike those notorious fraudsters, Gary Tanaka had a real business that provided real and appreciated services to real clients. Even by the government's own calculations, the charges in this case involved *less than one half of one percent* of the money under management at Amerindo, with the other 99.5% of the business being completely legitimate. Moreover, unlike many of the cases that come before this Court, the government was hard-pressed to find an investor-witness who actually lost money. After three-plus years of investigation and two-plus months of trial, the government called *only one witness* who failed to make a substantial profit investing with Amerindo. Also unlike in many of the cases the Court routinely hears, Gary Tanaka was acquitted of a vast majority of the charges for which he was forced to stand trial. Despite these substantial differences and the many other compelling factors detailed below, the government has stated that it will argue that, for all practical purposes, Gary Tanaka should be sentenced to die in jail. This Court should not countenance such a draconian and unjust result that flies in the face of the requirement that all sentences be no more severe than necessary to accomplish the goals of the sentencing statutes.

Thankfully, under *Booker* and its progeny, this Court has the ability to, and indeed must, conduct its own individualized assessment of Gary Tanaka. We respectfully submit that after conducting that assessment, the Court should conclude that Gary has suffered enough and that none of the goals of the sentencing statute would be furthered by imprisoning an elderly, first-time offender and cancer survivor. Rather, the Court should sentence Gary to a substantial term

of probation, with severe restrictions including the requirement -- *suggested by an investor* -- that Gary work for the investors marshalling assets and growing those assets so that greater restitution and recovery can be available to investors.

Society will not be a better place without Gary Tanaka. Quite the contrary. The letters submitted herewith paint a vivid and poignant picture of a devoted family man who spent his life looking after and caring for parents, in-laws, children and grandchildren. Those letters also provide specific details about the life of a man who continuously and routinely went to great lengths to support those in need. Family, friends, classmates, and even strangers all benefited from both Gary's extreme and simple acts of kindness. Whether he was secretly supporting an ailing father to allow him to save face, caring for a mother suffering from cancer while himself battling that heinous disease, or spending countless hours counseling an ailing brother-in-law who needed him while Gary was literally on trial for his own freedom, providing financial support for a injured worker he barely knew to help that worker pay medical bills and keep his family together, or buying personalized gifts that would make someone smile, Gary sought no credit, no accolades and no return for his genuine acts of kindness.

As demonstrated in this submission and the letters from those people from all facets of Gary's life, the offenses for which he will be sentenced are complete aberrations from a life marked by honesty, dependability, hard work and social responsibility. Letter after letter from classmates, friends, colleagues, clients, family members, journalists and others detail a scrupulously honest man of integrity who so many continue to trust. In other words, they describe precisely the kind of person who poses no danger to society, can quite obviously contribute to society, and who simply does not belong in the nation's already overcrowded prison system.

## STATEMENT OF FACTS

### A.   Gary Tanaka's Childhood

Gary Tanaka was born in the United States on June 23, 1943.  However, unlike most Americans, Gary Tanaka was not born free.  Rather, Gary was born a prisoner.  A couple of years earlier, the government had uprooted his parents from their home, confiscated their business and imprisoned them in a Japanese internment camp; Gary was born in captivity solely because of his parents' Japanese heritage.  The family's experience of being unjustly imprisoned had a dramatic formative influence on Gary's life.  Attorney Rick Cohen, Gary's long time friend and business associate, observed that Gary "spent the first years of his life in an internment camp . . . obviously left a profound impression on this man of such refined sensibilities").  Letter of Rick Cohen, Tab 8.  Similarly, college classmate Paul Richter makes clear that even almost two decades after the Tanaka family was released from the internment camp, "a very heavy sense of injustice . . . still hung over" Gary.   Letter of Paul Richter, Tab 36.

While there is no way to describe completely the after-effects of the Tanaka's ordeal, two specific and critical effects emerge from the record before the Court.  First, Gary was instilled with a work ethic -- an ethic born of a desire to rebuild that which had been taken away.  Gary's father worked long hours almost every day of the year in an attempt to recapture for the Tanaka family what was taken away.  *See* PSR 104.  Second, Gary viscerally felt the effects of living with the constant fear that, in the blink of an eye, all that you have can be taken from you.  These effects helped to form the quiet, hard-working, thoughtful man described in the volume of letters submitted herewith.

### B.   Gary Tanaka's Formal Education

During his youth and throughout high school, Gary demonstrated a gift with numbers.  After graduation, Gary left Seattle to enroll in one of the world's most prestigious colleges -- the

Massachusetts Institute of Technology ("MIT").  Gary earned his Bachelor of Science in

mathematics from MIT in 1965.  (PSR 120).   More than 40 years later, classmates recall a

brilliant, loyal, hard-working, caring, trustworthy student -- a young man who would not take

short cuts and a true friend who always had time for his fellow students.  Classmate Douglas

Glen writes:

> The Gary Tanaka I knew at MIT was a kind, rather shy man who *gave*
> *generously of his time to those who needed his help*.  He was a senior
> when I was a freshman.  Without Gary's patient tutoring in mathematics, I
> might not have made it beyond that freshman year.  Forty-five years later,
> Gary's character has not changed a great deal.  He remains a kind, shy,
> generous man . . . . *My personal experience is that Gary has always*
> *comported himself with scrupulous, meticulous honesty*.

Letter of Douglas Glen, Tab 19 (emphasis added).  Lester Young, Gary's college roommate,

agrees:

> I got to know [Gary] well and can attest to his high moral character.
> During those years, Gary had been consistently trustworthy, honorable,
> diligent, loyal and ethical, in fact several levels above our fellow students
> in those regards.  *Just one example makes the point:  it was common for*
> *the students to compare homework answers in order to improve grades*
> *and reduce the amount of sheer work.  Gary never did this because he*
> *considered it cheating. . . . Gary is still the same dependable, trustworthy*
> *and trusting Gary*.

Letter of Lester Young, Tab 56 (emphasis added).  MIT classmate Paul Richter also echoes

similar sentiments:

> Gary was in 1964/1965 a modest, soft-spoken man of few words . . . , but
> when he spoke he almost always had something significant and considered
> to say.  *The others always listened carefully to him because, as I learned,*
> *he was respected and liked by everyone.  He was also a diligent and*
> *unusually hard working student. . . . He . . . told me that his hard work*
> *there would honor his parents* who made such sacrifices so he could have
> those opportunities and whose example he was following.  Gary believed
> in substance, not fluff or B.S. and he was always forthright and honest in
> all dealings I had with him.  *He did not take short-cuts and never*
> *counseled others to do so*; he readily accepted and discharged
> responsibility; he did not shirk, and he never sought to blame others for
> anything for which he was responsible.  *He was also sensitive to and*

> *cared about others and their well-being; the members of the fraternity*
> *knew his character and abilities and selected him as special counselor for*
> *younger members*. . . .

Letter of Paul Richter, Tab 36 (emphasis added).

After MIT, Gary continued his education at the Imperial College in London. By 1970, at the age of 27, Gary had earned his PhD in Mathematics. (PSR 119). During his matriculation and throughout his life, Gary has been devoted to learning, to Imperial College and to its students. Classmate Vinod Garga, who lived next door to Gary at Imperial College during graduate school, writes: "One soon discovers the character of a person in these situations. I have always found Gary to be a man of integrity, with a brilliant mind, hard working and a good friend." Letter of Dr. Vinod Garga, Tab 17. The former Provost Rector of Imperial College, who had the opportunity to get to know Gary well, also describes a trustworthy, caring family man who remained committed to the mission of the College and the welfare of its students. *See* Letter of Dr. Tidu Maini ("I have know Dr. Tanaka for many years – he is a good family man, caring and in my experience a trustworthy person." ).

### C.    Gary Tanaka's Legacy Of Devotion To Family, Friends And To Those In Need

As the Court no doubt observed during the months of trial, Gary Tanaka is beloved by his family and friends. The letters to the Court submitted herewith paint a vivid picture of a man who has earned his place in their hearts through his unfailing devotion and attention. Specifically, those letters detail how Gary consistently went the extra mile to support and care for family and friends and even casual acquaintances no matter what he was going through or how dire his own situation became. Those letters also tell the story of a man who sought no credit and no accolades for those selfless acts of kindness.

1.      **Gary Aiding Family And Friends In Need**

Gary's mother, Janette Tanaka, describes how he came to his parents' aid when they

needed him:

> His father at age 84 developed kidney failure in early 1999.  Gary found
> out that his father had squandered all his funds, so he periodically
> deposited funds to his father's account without his knowledge. . . . *When*
> *his father could no longer care for himself, Gary hired two live-in nurses*
> *to care for him.  His father was under the impression that Medicare*
> *covered all of his needs.  He passed away on December 15, 1999 never*
> *knowing that Gary was his benefactor, taking care of all of his*
> *requirements.*
>
> *         *         *         *         *
>
> [I] was diagnosed with stage 3 colon cancer.  Gary always found time to
> fly to Los Angeles from London to check my condition and research the
> most advanced medical techniques.  *At the same time, unknown to us,*
> *Gary was fighting his own cancer.*

Letter of Janette Tanaka, Tab 44 (emphasis added).

Similarly, Gary's brother-in-law, Carl Cerrudo (his sister Barbara's husband) describes

how Gary, despite quite literally being on trial for his life, devoted countless hours to helping

Carl through the horrors of cancer:

> I started [2008] with a quintuple bypass in March.  During this same time,
> Gary was preparing for his upcoming trial.  Gary still made sure to call
> daily to check on [me] . . . . This personal commitment paled in
> comparison to his concern and support during my cancer diagnosis and
> treatment which also started in March and continued through mid-
> December.  *Gary has had to deal with his own mortality, especially after 2*
> *occurrences of mouth cancer.  Yet, knowing that I was about to undergo*
> *surgery, chemotherapy and radiation, Gary was willing to expose his*
> *inner thoughts and fears to me and continually talked me through my*
> *year's worth of treatments*.
>
> *         *         *         *         *
>
> I know in my case, it was extremely helpful to have the support of my
> brother-in-law, especially knowing how he was always there for me while
> experiencing his legal activities in the same time frame. . . . *Gary['s] . . .*
> *permanent legacy will be as a decent, thoughtful human being*.

Letter of Carl Cerrudo, Tab 4 (emphasis added); *see also* Letter of Barbara Cerrudo, Tab 3 (detailing how Gary insisted that his sister stay with her husband Carl rather than come to his side during his time of need).

Gary's friends and colleagues paint a similar picture of a man who was always there for them when the chips were down.  Friend and business colleague Jim Furlong details how Gary put aside his own medical woes to help him:

> *I was diagnosed with leukaemia [sic] in 2003 and Gary made himself*
> *available to talk to me about his own experiences enduring cancer*
> treatment and was a source of total encouragement and support through a
> difficult treatment programme which lasted for several years. . . . I think
> this clearly shows Gary's caring nature and sympathy for others . . . .  I
> cannot speak highly enough of Gary Tanaka.

Letter of Jim Furlong, Tab 16 (emphasis added); *see also* Letter of Katherine Salmon, Tab 39 (describing how Gary supported her and her family through her father's terminal illness); Letter of John Nardello, Tab 31 (MIT classmate who relates "at a time when I seriously considered giving up . . . [Gary] counseled me.  By his example and his words, he persuaded me to persevere."); Letter of James Stableford, Tab 42 (describing Gary's support when his father died unexpectedly); Letter of Anneliese Glen-Teven, Tab 18 (describing how Gary was a "tremendous shoulder to lean on during a very trying time in my life").

Gary's kindness and penchant for being there for those around him extends far beyond his close friends and family.  By way of example, Mervin Marks writes of Gary's helping a worker he barely knew:

> I would put Gary Tanaka at the top of my list in terms of honorable people
> I have met . . . [I] have witnessed Gary give a young rider who was injured
> while working the horses *a gift to help with his hospital and medical bills*
> *as well as keep his family together during very tough times for the boy*.

Letter of Mervin Marks, Tab 30 (emphasis added); *see also* Letter of W.F. Purves, Tab 34 (friend and colleague who has known Gary for 40 years, describing Gary's "loyalty and concern for others").

Finally on this point, Gary's willingness to come to the aid of those in need attracted the attention of Andrew Reid, who has sat as a Judge in various capacities in the U.K.:  Gary "is, in my view, a good and gentle man and a caring family man, who has always shown willingness . . . to help people when they have needed his counsel."  Letter of Andrew Reid, Tab 35.

### 2.    Gary Through His Family's Eyes

There are many letters from Gary's family ranging from his octogenarian mother to his sisters, his children and his grandchildren.   Anecdotes from two of those letters warrant special attention as they paint a poignant picture of who Gary really is.  Gary's son Mark describes how his dad inculcated in his children a sense of social responsibility:

> My father has always been a very patient teacher, and it was during these years that I remember him trying very hard to imbue in us a sense of social responsibility.  He modeled this behavior in ways ranging from regularly donating blood to recycling cans, glass, etc. long before it was fashionable or legally required.  I particularly remember him taking us camping and telling us "we should always come out of the woods with more trash than we go in with."  True to his word, we would come home every time with the car packed high with bags full of garbage.

Letter of Mark Tanaka, Tab 48 (also detailing how Gary is the "hub" for the family, insuring that everyone keeps in regular contact despite busy lives).

Gary's daughter-in-law Victoria (Tory) speaks in glowing terms of a father-in-law she never expected to have to house for year after year as he awaited a trial that seemed as if it would never come:

> I have often told friends that if a family member had to live with us for an extended period of time, he's the right one to have:  he doesn't drink, he doesn't smoke, he doesn't curse; he's mild-mannered, he's helpful, he's polite; he's pleasant, he's optimistic, and he is encouraging of others.

\*          \*          \*          \*          \*

The morning of Gary's arrest, he was getting ready to attend Grandparents Day at our children's school.  That morning I received a phone call from Gary telling me that he was unable to make it and asking me to tell the boys how sorry he was.  _He had just been arrested, and yet he had used his phone call to apologize for not making it to school!_

\*          \*          \*          \*          \*

Gary is a loving grandfather . . . .  He has helped with the kids' homework, worked on jigsaw puzzles with them and remembered every birthday and holiday.  He has encouraged them to work hard, and he has praised them for their accomplishments.  At some point early on he began cooking dinner every Sunday night, and this has become known as "family dinner."  The kids love family dinner, since it always seems special to have Grandpa cook a big meal and serve it around the dining room table.

Letter of Victoria (Tory) Tanaka, Tab 51 (emphasis added).[1]

### 3.      Gary Through The Eyes Of Friends And Colleagues

Business associates, clients and employees alike speak of Gary in glowing terms.

Attorney Rick Cohen describes a man who always went the extra mile to do something personal and thoughtful for others:

[O]ut of the blue, quietly and without any fanfare, with no expectation of gratitude, in fact, with embarrassment on Gary's part if any is expressed, something appears, something perfectly matched to you:  an obscure book about your favorite baseball team, Gary remembering a snippet of a conversation when you mentioned your love of the sport and the team; a new release by one of your favorite authors or on one of your favorite topics, Gary having absorbed that information and filed it away to await your birthday; a box full of hard to find mints which Gary noticed you munching on in ecstasy one day . . . .

\*          \*          \*          \*          \*

_Gary is a remarkable man who, if returned to society will, I believe, harm no one and no thing; instead, he will resume bringing love to his family_

---

[1] Additional letters from family not received as of this filing will be submitted in a later filing, including a letter from Gary's wife Renata.

> *and kindness and generosity to the people and causes that he cherishes*
> *and succors, warmly, self-effacingly, with such great humor and joy and*
> *absent any expectation of or need for repayment or reciprocity of any sort.*

Letter of Rick Cohen, Tab 8 (emphasis added).  Business associate Joel Romines recounts the

impression Gary has made and continues to make on him:

> I have known Gary since the late 1980's, when the fund of funds I
> founded was seeking an investment manager to invest in newly public US
> technology stocks. . . .  From the beginning, I was very impressed with
> Gary.  I found him to be extremely bright, very dedicated to his business
> mission, professional and responsible.  *I never had the slightest reason to*
> *question his integrity.  Quite the contrary; Gary's presence in the firm,*
> *especially his work ethic and his focus, were reassuring to me and my*
> *colleagues in the face of the well-publicized external interests of his*
> *flamboyant partner.*
>
>     *       *       *       *       *
>
> My impression is that even under great pressure, Gary remained hard at
> work on behalf of his investors and was beginning a successful recovery
> post the crash.  We all found it *extremely* hard to believe Gary was found
> guilty of wrongdoing.  While we accept the verdict of the court, we
> nevertheless believe that the actions were *aberrations in an otherwise*
> *exemplary career* . . . .

Letter of Joel Romines, Tab 37 (emphasis added); *see also* Letter of Barry Fong, Tab 14 (friend

and colleague of 40 years illustrating Gary's "loyal, generous, and caring" nature by recounting

his kindness and respect toward the janitorial staff whose first names he always knew and to

whom he always offered thanks).

Former employees from both the U.S. and U.K. describe a generous employer who

fostered the careers of those he mentored.   Quite telling is the letter from Robert Griffin (the

witness the government sought so desperately to depose but, because of their three year delay in

seeking that deposition, never did depose).  Specifically, Mr. Griffin, who worked with Gary in

the U.K., notes that Gary "was always generous with his time, kind, courteous and considerate.

In particular, he was keen to impart some of his knowledge and experience to those who worked

for him and do so in a way that was enjoyable as well as beneficial."  Letter of Robert Griffin,

Tab 22.  David Mainzer, who worked with Gary in the U.S., echoes similar sentiments:

> [Gary] created some wonderful opportunities for people at various stages
> of their careers.  Gary's approach at Amerindo challenged people to grow
> and become stronger professionally. . . . He was patient and supportive
> when things did not always go so well, as is the nature of any small
> business.  His confidence in me inspired me to persevere through
> desperate times and to accomplish goals that seemed impossible at their
> inception.

Letter of David Mainzer, Tab 28 (also describing how Gary "helped provide the financing that

built some of this country's most important and dynamic technology companies"); *see also*

Letter of Darren Leavitt, Tab 26  ("I worked closely with Gary for five years . . . .  Without a

doubt, his expertise in the financial markets has helped refine my professional skills, but more

importantly, I consider myself to be a better person due to Gary's influence."); Letter of JaDeane

Ing, Tab 24 (employee of 8 years describing how Gary took a keen interest in mentoring younger

people and in helping develop their careers); Letter of James Stableford, Tab 42 ("Gary taught

me a great deal [and] provided the launch pad for many . . . successful careers . . . .  Gary never

once gave any former employee anything but a glowing reference to the prospective employers

even if he had spent a lot of time, effort and money training them, only to see that person leave

for a perceived better offer.")

     Investors also had kind words for Gary.  Paul Marcus writes:  "I have known Gary

Tanaka personally and professionally since the early-mid 1980's.  I have always found him to be

a gentleman - an individual who worked very hard at investing and who treated his clients,

employees and friends with respect."  Letter of Paul Marcus, Tab 29.  Charles Kaye, whose

family invested in the GFRDA program, wrote a letter on behalf of Gary, noting "in all of our

business dealings he showed only the highest level of integrity, honesty and care for those he

dealt with . . . ."  Letter of Charles Kaye, Tab 25.  Lily Cates, one of the main witnesses for the

government, echoed similar sentiments when, from the witness stand, she described him as a

"gentleman."  (Tr. 2307.)

Gary's colleagues in the horse racing industry also rave about a man who is honest,

trustworthy, soft-spoken and universally liked and respected.   For example, racing journalist

Lenny Shulman, who has known Gary for over 20 years writes:  "[Gary] has always embraced

hard work and getting ahead by virtue of that, without shortcuts."  Letter of Lenny Shulman, Tab

40.  Attorney Darrell Vienna describes a man committed to fairness:

> In transactions involving the acquisition of horses, Mr. Tanaka required
> assurances that everyone was content with the transaction.  He was
> concerned that there be no hard feelings on any side.  He left one with the
> sense that no transaction was more important that the feelings of those
> involved.  This was a breath of fresh air in a business oftentimes devoid of
> any concern for others.

Letter of Darrell Vienna, Tab 54; s*ee also* Letter of Robert Clay, Tab 7 (describing him as a

"complete gentleman" who always "acted above board" and noting that he has "*never heard*

*anyone speak ill of Gary in any way*") (emphasis added); Letter of Lincoln Collins, Tab 9 ("Gary

has always been scrupulously fair and honest in all aspects of his dealings with me and has

always operated with the highest ethical standards.  I am proud to call him my friend."); Letter of

Eugenio Columbo, Tab 10 (describing how Gary "never points blame and is sympathetic to

everyone" and how Gary's "honesty, ethics and integrity have been of the highest standards.");

Letter of Letter of Michael O'Sullivan, Tab 32 ("I have always found [Gary] to be a thoroughly

decent and honorable man, both personally and in business. . . .").

D.      **Gary Tanaka's Career**

1.      **The Formation Of, And Success At, Amerindo**

After obtaining his PhD in mathematics, Gary embarked on a career in business and finance. In the 1980's, he and Alberto Vilar founded Amerindo. The two brought very different skills, qualities and personalities to the table. Vilar was the outgoing, attention-seeking, flamboyant salesman responsible for pitching and landing investment clients. Tanaka was the quiet genius who sat in the office glued to the computer trading screen studying market movements and making strategic investment decisions. The company grew throughout the 80's and 90's and went on to achieve dramatic successes. Indeed, Amerindo was consistently ranked as one of the top, if not the top investment manager year after year. (*See* tr. 269; Letter of Michael Tanaka, Tab 50.) The one public pension fund employee the government called to testify at the trial was direct and forceful in his opinion of Amerindo. (Tr. 2921) (Amerindo achieved an "extraordinary return.")

During a vast majority of Amerindo's history, its primary businesses were advising public pension funds and serving as the investment manager for mutual funds. Indeed, as of May 2005, investments for private individual clients comprised an infinitesimally small percentage of Amerindo's business. Even after the technology market crash of early 2000-2001, Amerindo still had over $1 Billion under management for public pension clients; every penny was returned to the rightful clients after the government closed Amerindo in 2005. (*See* tr. 3067-68 & 3077-78.)

2.      **Vilar And Tanaka Regularly Disagree**

Not surprisingly, people as different as the outgoing and often-times ostentatious Vilar and the quiet, understated Tanaka had their differences. Simply put, they did not always see eye to eye and often vehemently disagreed. Vilar and Tanaka would argue loudly, ending up literally

screaming at one another, an uncommon tone for the soft-spoken Tanaka.  (Tr. 3069.)  When

Tanaka did not do as Vilar asked, Vilar would take matters into his own hands.  (*See* GX 4077

(cut and paste of Gary Tanaka's signature sent to the Mayer family); *see also* tr. 4756-4760

(demonstrating that statements to Lily Cates originating from the London office where Gary was

stationed were whited out and altered in the New York office where Vilar was stationed).)

Moreover, Vilar went so far as to instruct investors to deal directly with him rather than with the

Tanakas.  (*See* tr. 1340.)  Finally, the Vilar and Tanaka disagreements even played out in front of

Lily Cates, when Tanaka refused to give Lily Cates one percent of the company.  (Tr. 2106.)

### E.    Gary Tanaka's Battle With Cancer

On September 18, 2003, Gary Tanaka received the chilling news that deep down we all

dread:  he learned he had cancer.  Specifically, doctors told him that he had cancer of the mouth.

The next year was a nightmare of surgeries, hospitalizations, treatment and constant fear of

death.  While doctors confirmed this diagnosis, and even before a treatment plan could be

formed and carried out, Gary underwent previously scheduled eye surgeries – one on each eye –

in October of 2003.  Then, in November 2003, Gary underwent cancer surgery at Memorial

Sloan Kettering Cancer Center ("MSKCC") in New York.  Unfortunately, the surgery, though

aggressive, was not successful.  The cancer returned.  On April 20, 2004, Gary underwent

dramatic surgery that included the resection of a substantial portion of his cancer riddled jaw,

removal of a portion of a bone in his leg, and the reshaping and eventual insertion of that

reshaped leg bone into the space previously occupied by the diseased jawbone.  Hospital records

describe an emotional roller coaster in the succeeding days as the family waited for Gary to show

signs of recovery and of being himself again.  Slowly, after months of treatment, Gary recovered

and began to resume his normal life.

It is a truism that the best measure of people is not what they do in good times, but how they behave and comport themselves in difficult and trying times. Gauged in this light, the words of Doctor Ernest Chiu speak volumes about Gary Tanaka:

> [I] befriended [Gary] while he was receiving cancer treatment at Memorial Sloan Kettering Cancer Center (MSKCC) in 2003 . . . . At that time, I was in my 9th year of post-medical school training as a microsurgery fellow. He sought treatment for a rare jaw (mandible) tumor which required tumor resection and jaw reconstruction using bone from his leg. . . . We tend to forget the great majority of patients . . . because they are angry, extremely demanding, and frequently ungrateful. On the contrary . . . Mr. Tanaka was a genuinely normal, courteous, respectful good-spirited, realistic patient from Day One!

Letter of Ernest Chiu, MD, Tab 6.

## F.     The Arrest And Pretrial Proceedings

Early in the morning of May 26, 2005, while Gary Tanaka was in New York for follow-up cancer treatment at MSKCC, he was arrested on a complaint charging alleged illegal acts with respect to horse racing activities – charges that the government later chose to abandon completely. On that same day, nineteen armed United States Postal Inspectors conducted a search of Amerindo's New York office – a search that this Court held violated Gary Tanaka's Constitutional rights in such a substantial way that no reasonable law enforcement officer would have conducted the search. In the next few days, the SEC jumped into the fray, seeking an order appointing a receiver to take over Amerindo. Judge Swain rebuffed that attempt, finding that the SEC failed to meet its burden. *See S.E.C. v. Amerindo,* 1:05-cv-05231 (LTS). However, the SEC was not deterred. Despite the fact that nothing had been proven to any neutral fact-finder, the SEC instructed Amerindo employees to fire the pension fund clients who had not already been scared away by the massive wave of negative publicity. (*See* tr. 3075-76.)

In July 2005, a federal grand jury indicted Alberto Vilar and Gary Tanaka. Gary, whose bail conditions prevented him from going home to England to see his wife and young child,

asserted his statutory and Constitutional rights to a speedy trial.  The government vehemently

objected, claiming that despite having arrested Gary two months earlier, they could not prove the

case at trial within the additional 70 days provided by the Speedy Trial Act.  Over Gary's fervent

objections, Judge Karas (to whom this case was originally assigned) granted the government

delay after delay as months turned to years of wait.  Throughout the painful and frustrating years

of waiting for his day in court and with the pain of being separated from his family, Gary acted

with complete dignity.  Veteran Pre-Trial Services Officer Leo Barrios made clear to the Court

time and again that throughout the ordeal, Gary was completely cooperative, followed

instructions, and acted as a model supervisee.  (*See* PSR 20.)

The Court is familiar with the tortured and lengthy pretrial history of this case.  Due to

government requested delays, law enforcement violations of the Constitution, and Vilar's merry-

go-round of lawyers (from Susan Nechless to Jeffrey Hoffman to Ivan Fisher to Herald Fahringer

and now to Jonathan Marks), Gary Tanaka was forced to wait 3 years, 4 months, and 4 days after

arrest until his trial even began.  Thus, for 3 years, 4 months and 4 days Gary was already being

punished.  Gary was unable to go home to hold his wife, prevented from seeing his son turn from

child to teenager, barred from earning a living at his life-long profession, and forced to miss

treasured family milestone events such as the marriage of his son Michael and the birth of his

grandson.  *See* Letter of Michael Tanaka, Tab 50.  Gary, who had just recently won a long and

courageous battle for his life against an insidious cancer, had already paid a substantial debt and

already served a substantial sentence under severely restricted liberty before his trial even

began.[2]

---

[2] Note that while Mr. Vilar also lived with restricted liberty, his situation was quite different.  He
was living in his luxurious United Nations Plaza home – the same home in which he lived prior
to his arrest.

### G.    The Long-Awaited Trial

The trial finally began on September 22, 2008 with jury selection and then proceeded for two months.  Despite the over 3.5 years that had passed since the beginning of the investigation and the approximately 25 years Amerindo had been in business, the government called only *one witness* who suffered a loss investing with Amerindo – the executor of the estate of Tara Colburn, Nicholas Ciriello.  Mr. Ciriello testified that Ms. Colburn, an opera friend of Alberto Vilar, had invested $1 Million but received payments of just $550,000.00.[3]  Each and every other investor witness to take the stand, either in person or through a representative, admitted making substantial profit investing with Amerindo.  (*See* tr. 168 (Robert Cox invested $60,000 and was at least paid $113,000); tr. 394 (Graciela Lecube Chavez invested $74,000 and was paid $152,000); tr. 4175 (Just Capital invested $3.7 Million and was paid $4.03 Million); tr. 4204-05 (Paragon Ventures invested $4 Million and was paid approximately $4.5 Million); tr. 4209 (Worldwide Tops invested $10 Million and was paid $11 Million); tr. 4222 (Pelican Trust invested $1.5 Million and was paid $2.25 Million); tr. 4237-42 (Binna Holdings invested $7.5 Million and was paid $8.6 Million); tr. 4255-57 (Nemo Holdings invested $2 Million and was paid that plus all interest due); tr. 10/14/08 (Mayer family invested $5.8 Million and was paid that plus all interest due; tr. 10/20/08 (Lily Cates invested $6.3 Million and was paid $7 Million).)

A substantial number of the witnesses who testified at the trial never even met Gary Tanaka, including Graciela LeCube Chavez, Gary Cox, Nicholas Ciriello, Vita Cusamano, Arthur Spivey, Hector Barreto, Robert Mundheim, Andrew Rembert, Thomas Lopez, and others. Those witnesses who did know Gary Tanaka were complimentary.  (*See, e.g.,* tr. 2307 (Lily

---

[3]  As detailed further in section II(A)(2)(b), *infra*, the estate of Tara Colburn had settled a lawsuit and would have been paid in full plus profit had the Government not closed down Amerindo before the final payment could have been made.

Cates describing Gary Tanaka as a "gentleman"); tr. 499 (Darren Leavitt stating that "Gary always worked hard and tried his best . . . to maximize results for his clients.").)

The trial also featured reams of evidence regarding payments directly to Alberto Vilar or payments made to satisfy obligations of Alberto Vilar. However, in the entire two-plus months of trial, not one shred of evidence was presented to show that Gary Tanaka personally took any investor money. The evidence demonstrated the opposite: Tanaka was lending substantial sums (or forgoing substantial sums) of money in order to keep Amerindo afloat and to save the jobs of many of the employees. (*See, e.g.*, GX 4037 (evidencing an $11 Million obligation from Amerindo to Tanaka – an obligation that is now quite unlikely to ever be paid); *see also* Letter of Katherine Salmon, Tab 39.)

After days of loud and argumentative jury deliberation so acute that the Court Security Officer charged with securing the jury had to intercede, the jury returned its verdict. While Alberto Vilar was convicted on all counts, Gary Tanaka was found not guilty on a substantial majority of the counts charged, including all mail fraud, wire fraud, money laundering, and obstruction of justice charges.

Undoubtedly, the guilty verdicts on one securities fraud count, the conspiracy count and the investment advisor fraud count are quite serious. Those three counts are the subject of the instant sentencing proceeding for Gary Tanaka.

### H.     The Preliminary Presentence Report

The United States Probation department issued its preliminary presentence report on Gary Tanaka on June 22, 2009 ("PSR"). In many ways, the PSR bears little or no resemblance to the actual trial that took place before this Court. Not once in its 30 single-spaced pages does the word "acquittal" or phrase "not guilty" appear in the PSR. Rather, the report completely ignores the results of the trial and blithely assumes proof that Mr. Tanaka committed *all* the acts

alleged in the indictment.  The PSR even assumes Mr. Tanaka committed the acts alleged in the complaint filed on May 25, 2005 – accusations now barred by the Speedy Trial Act and which the government never even attempted to prove.

In addition to ignoring the jury, the Sixth Amendment and the Speedy Trial Act, the PSR fails to recognize that all but one of the investor witnesses that testified at trial made a substantial profit.  The PSR also assumes proof of alleged loss amounts that could greatly increase the sentence without stating any factual basis therefore.  And, the PSR downplays the substantial health issues Gary Tanaka suffered in recent years and assumes, rather remarkably, that his ordeal of being born a prisoner solely because of his Japanese ancestry had little or no effect on Gary or his family.

The preliminary PSR provides little reliable help to the Court in carrying out the solemn and difficult task of performing the reasoned, thorough and constitutionally proper analysis that must be done (and we are confident the Court will do) when assessing whether to further deprive a person of his or her liberty.

## I.    REQUIRED SENTENCING CONSIDERATIONS FOLLOWING *BOOKER*, *GALL*, AND *KIMBROUGH*

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment.  Following *Booker*, district courts are no longer required to impose Guidelines-range sentences.  Rather, "*Booker* rendered the Guidelines 'effectively advisory' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns."  *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*quoting Booker*, 543 U.S. at 245), *cert. denied*, 129 S. Ct. 2735 (2009).  Although a district judge "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States,* 128 S. Ct. 586, 596 (2007), the advisory Guidelines are only one of the factors to be considered in imposing

- 19 -

sentence. *Id.* at 602. Under *Booker*, and as further explained in subsequent Supreme Court cases, the sentencing court is to apply the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by *Booker,* contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." *United States v. Kimbrough,* 128 S. Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)). The district judge must "make an individualized assessment based on the facts presented," and has "a broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant." *Gall,* 128 S. Ct. 586, 596-97 & n.6.

Indeed, the district court cannot even "presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors." *Cavera*, 550 F.3d at 189. The sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in 18 U.S.C. § 3553(a), but that such a sentence would be "greater than necessary" — that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. *Rita v. United States,* 127 S. Ct. 2456, 2465 (2007).

The court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough,* 128 S. Ct. at 577 (Scalia, J., concurring). Indeed, based on its evaluation of all of the § 3553(a) factors, the court may elect to impose a non-Guidelines sentence — including a sentence substantially deviating from the advisory Guidelines range — "based solely on policy considerations, including disagreements with the Guidelines." *Id.* at 570. Among other reasons, such a disagreement may be based upon the court's conclusion that a particular Guidelines analysis reflects an unsound

judgment (or no considered judgment at all) by the Sentencing Commission. *Gall,* 128 S. Ct. at 594.[4]

In this case, the Probation Office interprets "loss," as applied to the Guidelines' Section 2B1.1(b)(1) loss chart, in a way that, if accepted, would overwhelm all other guidelines facts and lead to the equivalent of a "life" sentence for Gary Tanaka, even though the trial evidence reflected minor, if any, losses to Amerindo investors resulting from Mr. Tanaka's offenses.  The Guidelines analysis here will require the Court to resolve disputes, among other things, as to how a "loss" should be determined for sentencing purposes. However, even if the Court were to accept the PSR's position on how, for example, the loss should be calculated, the advisory guidelines sentence resulting from that finding can -- and must -- be disregarded should the resulting number impose more than the minimum sentence required to accomplish the traditional goals of sentencing.

## II.   THE ADVISORY GUIDELINES CALCULATION

The PSR calculates an advisory guidelines sentence range of 262 to 327 months -- the equivalent of a life sentence for Mr. Tanaka -- based on a total offense level of 39, determined as follows:

- Base Offense Level:                                                                                   7

- Specific Offense Characteristic/$40 million loss caused by defendant              +22

- Specific Offense Characteristic/10 or more victims                                          +2

- Specific Offense Characteristic/offense committed outside U.S.                        +2

- Specific Offense Characteristic/investment advisor violating securities laws      +4

---

[4] Indeed, the Second Circuit has held that the power of a district judge to depart from a Guidelines sentence based solely on a policy disagreement with the Guidelines is so fundamental that a district judge's expressed belief that he could not depart on such grounds is reversible error. *See United States v. Seval*, 293 Fed. Appx. 834, 837 (2d Cir. 2008).

- Adjustment for Role in the Offense:  partner in Amerindo, decision-maker     +2

- Total Offense Level                                                      39[5]

(PSR, ¶¶ 85-96).

As in most financial fraud cases, the major driver of the advisory guidelines calculated sentence is the "loss amount" enhancement.  That is true of the PSR's calculation in this case as well.  However, the PSR's conclusion that Mr. Tanaka caused losses to investors that total more than $40 Million deviates completely from the evidence adduced at trial, improperly includes interest and profit, fails to credit repayments prior to offense detection, and includes purported losses for which there is no creditable or even stated evidence.  When the advisory guidelines sentence is calculated properly, based on record evidence and the relevant application notes to the advisory guidelines, the proper calculation of actual loss caused by Mr. Tanaka's conduct is zero, or at the very most $450,000.  This disagreement on loss amount alone affects the advisory guidelines sentencing range by as much as 20 years.

The PSR's other enhancements are also improper.  There should be no enhancement for ten or more victims; the evidence adduced at trial reflects that no investors -- or at the very most one -- incurred losses as a result of Mr. Tanaka's conduct that were not repaid.  And as for the four level enhancement for investment advisor status, the Court should exercise its discretion to disagree with the policy of the advisory guidelines as that enhancement overlaps with the seven levels attributable to Mr. Tanaka's offense, a violation of the Investment Advisors Act.

Given the trial record and the evidence of which we are aware, there is insufficient evidence for the Court to make the particularized findings it would have to make to support the PSR's total offense level of 39; not only can the government not meet its burden, but the

---

[5] While the government's written position on sentencing has not yet been formally presented, the government made no objection to the PSR and indicated, in a telephone conference with Mr. Tanaka's counsel, that it agreed with the Guidelines calculations contained therein.

evidence is to the contrary.  The advisory guidelines calculation supported by the evidence

directs a total offense level of 11:  7 (base offense level) + 2 (offense committed outside U.S.) +

2 (supervisor under 3B1.1(c)).  The sentencing range for a level of 11 is 8 to 14 months.

A.    **When The Trial Evidence Is Considered, And The
      Advisory Guidelines Followed, The Loss Caused
      By The Offense Is Zero, Or At The Most $450,000**

The PSR determines the loss amount allegedly resulting from Mr. Tanaka's offense to be

over $40 million, requiring the corresponding sentence enhancement of 22 levels under U.S.S.G.

§2B1.1.  (PSR, ¶ 86).  The PSR reaches that amount by including in its calculation alleged losses

as follows:

| | |
|---|---|
| Mayer family: | $11,066,713.44 |
| Graciella Lecube-Chavez | 48,434.12 |
| Robert Cox | 105,825.55 |
| Tara Colburn | 936,371.78 |
| Lily Cates | 9,770,133.85 |
| Dextra Holdings Ltd. | 19,774,431.18 |

(*Id.* at ¶ 79.)   The PSR also lists ten other individuals and companies without any loss amounts

(referred to herein as the "Other Investors"), for whom the PSR states that "actual losses are still

being determined."  (*Id.* at ¶¶ 79-80.)

These numbers are dramatically overstated.  The PSR provides no explanation as to how

they were determined, making no reference to the trial record, nor to any other source.  The trial

record reflects that the PSR improperly includes the purported "losses" of:  (i) investors whose

principal was repaid in full (Mayer, Lecube-Chavez, Cox, and seven of the ten Other Investors);

(ii) an investor whose loss would have been repaid had the government not closed Amerindo

(Colburn); (iii) an investor whose principal was paid in full <u>and</u> whose "loss," if there was one,

- 23 -

was caused by alleged conduct for which Mr. Tanaka was acquitted (Cates); and (iv) investors who the government strategically chose not to call at trial, and does not even intend to call at sentencing (Dextra and the remaining three Other Investors).

**1. The Trial Evidence Demonstrated That The Mayer Family, Ms. Lecube-Chavez, Mr. Cox, And Seven Of The Ten Other Investors Incurred No Losses Under The Guidelines**

The PSR lists alleged losses for investors the Mayer family, Ms. Lecube-Chavez, and Mr. Cox totaling $11,220,973.11.   While the Probation Office does not explain its numbers, they clearly do not reflect the difference between principal invested and payments received but do seem to include an estimate of interest or profit due.  Contrary to the view implied in the PSR, the advisory guidelines expressly exclude interest, or promised rates of return, from loss calculation and expressly credit against losses all money repaid before offense detection.[6]

The trial evidence -- exhibits and testimony -- reflects that all three of these investors (Mayer, Cates and Chavez), as well as seven of the ten "Other Investors" (for whom no loss amount is provided in the PSR), were repaid their investments in full, with interest.  For example, while PSR states that the Mayer family "lost" in excess of $11 million, the trial evidence shows that the Mayer family invested a total of $5.8 million and received *$10.5 million in return* – all of the principal invested, and interest that nearly doubled the investment. Characterizing these investors as having incurred over $11 million in losses is not only disingenuous, but is in direct contradiction with the advisory guidelines' explicit rules on how to

---

[6] Guidelines §2B1.1, Application Note 3(A) defines Loss as "the greater of actual loss or intended loss."  The PSR lists loss amounts without indicating whether they purport to be actual or intended losses.  Since there was no evidence at trial that Mr. Tanaka intended to cause investors to lose money, Amerindo made every GFRDA payment due for 16 straight years (and Mr. Tanaka made many efforts, despite his illnesses to work out payments for those owed money), and since the PSR does not describe any circumstances from which one could conclude that losses were intended, we assume that the losses discussed in the PSR, and the losses to be determined for sentencing purposes, are the alleged *actual* losses resulting from the offenses at issue.

calculate "loss."  When those rules are followed, it is clear that no losses to these investors resulted from Mr. Tanaka's offenses.

**a.**      **Returned Money Constitutes A Credit Against Loss**

The Application Notes to U.S.S.G. §2B1.1 define terms and otherwise describe how the loss amount under §2B1.1(b)(1) shall be determined.   These Application Notes are "to be treated as the legal equivalent of a policy statement[,]" and "[f]ailure to follow [them] could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal." U.S.S.G. § 1B1.7.  *See Stinson v. United States*, 508 U.S. 36, 42-43 (1993); *United States v. Sash*, 396 F.3d 515, 522-23 (2d Cir. 2005) (Guidelines commentary that is interpretive or explanatory in nature, as opposed to providing only background information, is binding on the sentencing court under *Stinson*).[7]

Application Note 3(E) interprets and explains how the definition of "loss" applies in circumstances involving returned money:

> Credits Against Loss. -- Loss shall be reduced by the following:
>
> (i)  The money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. §2B1.1, Application Note 3(E).

This Application Note was part of a November 1, 2001 Guidelines change, adopted as part of the 2001 "Economic Crime Package."  Prior to the change, the Guidelines definition of loss -- as the "value of property taken" – led to a circuit conflict over whether and how to credit payments made to victims.  The Sentencing Commission resolved that conflict with Application

---

[7] Of course "binding" does not mean that the guidelines are binding, just that the manner in which the Court is to perform the advisory guidelines calculation is binding.

Note 3(E) for stated policy reasons:  "This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not."[8]  U.S.S.G. App. C, Vol. II at 179; *See United States v. Anders*, 2009 WL 1649192, *5 (6th Cir. June 11, 2009) (reversing sentence imposed due to miscalculation of loss amount arising from district judge's failure to follow Application Note 3(E)); *United States v. Setser*, 568 F.3d 482, 497 (5th Cir. 2009) (pre-2001 common law rule on repaid money was superseded by the 2001 amendment); *United States v. Brownell*, 495 F.3d 459, 463-64 (7th Cir. 2007) (following Application Note 3(E)); *United States v. Nichols*, 416 F.3d 811, 819 (8th Cir. 2005) (same).

When credits required by Application Note 3(E) are applied to investors like the Mayer family, Ms. Lecube-Chavez, and Mr. Cox, the loss amount for each becomes zero.   The trial evidence plainly reflects that (1) the Mayer family invested $5.8 million and received $10.5 million in repayments, (2)  Ms. Lecube-Chavez invested $74,000 and received payments from Amerindo of $152,000, and (3) Mr. Cox invested only $60,000 and was repaid $116,000.  (*See* Statement of Facts, Section G, *supra*.)  The PSR completely ignores this trial evidence.[9]

The same analysis also would apply as well to seven of the ten Other Investors listed in the PSR (for whom the  Probation Office does not even supply a loss amount).  (*See* PSR, ¶ 80.) The trial evidence demonstrated that Binna, Just Capital, Lynx, Nemo, Paragon, Worldwide, and the Kaye family were all repaid in full, principal and interest.  While none of these investors testified at the trial, the attorney for the six of these seven, Stephen Gray, did testify and admitted on cross-examination that all of his clients had been repaid in full, principal and interest.  (Tr.

---

[8] Thus, the Commission rejected the rule previously espoused in the Second Circuit (*see United States v. Mucciante,* 21 F.3d 1228 (2d Cir. 1994)) that loss includes the value of all property taken, even though all or part of it was returned.
[9] This is not to say that additional interest or profit is not due, just that there is no "loss" as defined by the advisory guidelines.

4257.)  Whatever numbers the Probation Office or the government could attempt to offer for these seven investors would be defeated by the evidence that they were fully repaid.

### b.    "Loss" Cannot Include Agreed-Upon Rates Of Return

The PSR's stated losses significantly exceed the amounts that each party invested with Amerindo.  Thus, the PSR appears to include promised rate of return or interest on the actual amount invested in the "loss" calculation.  The advisory guidelines expressly exclude such amounts from "loss":

> Exclusions from Loss. -- Loss shall not include the following:
>
> (i)  Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

U.S.S.G. §2B1.1, Application Note 3(D).

Accordingly, the loss amounts in the PSR are wrong:  The Mayer family, Robert Cox and Graciela LeCuba Chavez all received their investment back plus profit.  To the extent they were owed additional profit, that amount cannot be included as a "loss."

### 2.    The PSR "Loss" Amount For Tara Colburn Is Wrong

### a.    The PSR Improperly Includes Expected "Rate Of Return"

With respect to Ms. Colburn, the PSR lists a loss of $936,371.  However, this includes the impermissible "rate of return" concept.  *See* U.S.S.G. §2B1.1, Application Note 3(D).  Ms. Colburn invested $1 million with Amerindo.  Pursuant to a signed settlement agreement executed before the offense had been detected, Amerindo executed a written agreement to pay the Colburn Estate the $1 million, plus interest, in three installment payments.  (Tr. 606 and 609-10.)  The first two principal  payments, totalling $550,000, were made on time in accordance with the agreement.  (Tr. 626.)  The third payment, $450,000 in principal and $486,371 in interest, was to

be paid on August 15, 2005. (Tr. 632.) Thus, the only amount not repaid that could constitute a loss under the Guidelines is $450,000, not $936,371. U.S.S.G. §2B1.1, Application Note 3(D).

### b.   Ms. Colburn's "Loss" Was Not Caused By The Offense

Even the $450,000 principal due should not be counted as a loss because the non-repayment was not "caused by" Mr. Tanaka's offense. Where factors other than the fraud at issue could have caused the loss, losses from causes other than the fraud must be excluded from the loss calculation. *See United States v. Rutkoske*, 506 F.3d 170, 178-180 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 2488 (2008); *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). In these cases, the Second Circuit held that swings in the price of stock attributable to factors other than the defendant's fraud must be considered and excluded in determining loss amount for Guidelines purposes. "The District Court's basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in NetBet share price requires a remand to redetermine the amount of the loss, both for purposes of the sentence and restitution." *Rutkoske*, 506 F.3d at 180.

The same rule should apply here. As discussed above, under Application Note 3(E), money repaid to the victim before the offense was detected is credited against the victim's loss. Here, Amerindo had undertaken to return that money before the offense was detected. In other words, Amerindo did not undertake to repay the Colburn Estate for fear of criminal prosecution. And the evidence shows that the Colburn estate would have been paid in full had the government not interfered with Amerindo's ability to pay. There were sufficient funds in Amerindo's Bear Stearns accounts to make the final payment when the government closed Amerindo in May 2005. (*See, e.g.,* tr. 3672.) And as Mr. Peterzcak testified, Bear Stearns would not release any money from Amerindo managed accounts without permission from the SEC and U.S. Attorney. (Tr. 3486.)

- 28 -

Amerindo had made the first two payments to the Colburn Estate, on time and pursuant to the settlement agreement.  Indeed, Amerindo also had made several other repayments to other investors during the same time period.  The fair conclusion from the evidence is that the Colburn Estate would have been repaid had the government not interfered.  On these facts, when the Court excludes losses caused by factors other than the fraud, Mr. Tanaka's offense should not be found to have caused the $450,000 loss. *Rutkoske*, 506 F.3d at 178-180.  The Court has a sufficient basis to exclude the Tara Colburn loss from the Guidelines loss calculation.  That is also the just thing to do.  Indeed, it would be against the goals of sentencing to impose a stiff enhancement -- in this case, 14 levels with a coordinate increase of roughly three years on Mr. Tanaka's advisory guidelines sentence.

> **3.     The Government Should Be Estopped From Seeking A Sentencing Enhancement For Alleged Losses Unless It Proves Losses Beyond The Amount Of The Accounts It Dubbed The "GFRDA Accounts"**

The government prosecuted Mr. Tanaka for participating in a scheme to falsely represent that 50-75% of the funds earmarked for the GFRDA would be put into "safe" investments.  The government argued at trial that these representations were false because the GFRDA funds were put into aggressive investments rather than the promised "safe" ones.  The defense argued that the government failed to prove falsity because the government did not show all accounts related to the GFRDA and did not show specific asset allocations.  Moreover, the defense argued that it was misleading to tell the jury that the four Bear Stearns accounts -- ATGF I, ATGF II, M26, and Techno Raquia -- were all GFRDA accounts when there was evidence that those accounts held funds related to other investments as well.  The Court overruled the defense objections and allowed the government to prove falsity of these representations by arguing that the general 1995-2000 asset allocation of the four Bear Stearns accounts alone could be construed as proof beyond a reasonable doubt of what percentage of GFRDA assets were invested in "safe"

investments over the alleged 19 years of the scheme.  (*See* GX 8202; tr. 5487-88.)  The jury

found Mr. Tanaka guilty of the offenses related to the GFRDA accounts, thus the government

prevailed on the convincing the jury that the four accounts were the GFRDA accounts.

The accounts the government contended at trial were the GFRDA accounts contained

more than $26.6 million at the end of May 2005.  (*See, e.g.,* tr. 3672.)  If those funds were indeed

GFRDA funds as the government argued, then those funds, although not distributed to those

investors, were sufficient to cover the alleged losses of those investors, even in the amounts

overstated in the PSR.  In other words, there would be *no* loss.

The government should be judicially estopped from contesting that the four Bear Stearns

accounts contain GFRDA funds:

> Where a party assumes a certain position in a legal proceeding, and
> succeeds in maintaining that position, he may not thereafter,
> simply because his interests have changed, assume a contrary
> position, especially if it be to the prejudice of the party who has
> acquiesced in the position formerly taken by him.

*New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (*quoting Davis v. Wakelee,* 156 U.S. 680,

689 (1895)).

> First, a party's later position must be "clearly inconsistent" with its
> earlier position.  Second, courts regularly inquire whether the party
> has succeeded in persuading a court to accept that party's earlier
> position, so that judicial acceptance of an inconsistent position in a
> later proceeding would create "the perception that either the first or
> second court was misled [.]" . . .  A third consideration is whether
> the party seeking to assert an inconsistent position would derive an
> unfair advantage or impose an unfair detriment on the opposing
> party if not estopped.

*Id.* at 750-51 (citations omitted).

> In the Second Circuit, a party invoking judicial estoppel must show
> that (1) the party against whom the estoppel is asserted took an
> inconsistent position in a prior proceeding and (2) that position was
> adopted by the first tribunal in some manner, such as by rendering
> a favorable judgment.

*Galin v. Goldfischer*, 2008 WL 5484318, *5 (S.D.N.Y. Dec. 3, 2008) (Sullivan, J.) (*citing Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)) (internal quotations omitted).

Here, the government argued that the funds in the four Bear Stearns accounts was GFRDA money. This was how it proved that the GFRDA funds were not invested as promised. Mr. Tanaka objected on the record, arguing that there was evidence that the Bear Stearns accounts were not solely GFRDA funds and that the government's argument was misleading. The Court overruled the objection. The government cannot now deny, at this later stage, that the Bear Stearns accounts did not contain the GFRDA money. The funds in those accounts should now be credited towards reducing any (and we claim all) "loss" arguably related to the GFRDA offenses.

### 4. There Are Multiple Grounds On Which To Exclude The Cates Loss

#### a. Cates Suffered No "Loss" As She Was Repaid More Than She Invested

The PSR includes roughly $9.8 million in alleged losses incurred by Lily Cates. The evidence at trial demonstrated, however, that Ms. Cates' investment was $6.3 million, and that she received more than that, $7 million, in repayments. For the reasons described above, there is no loss under the Guidelines' definitions.

#### b. Sentencing Mr. Tanaka On Acquitted Conduct Violates His Constitutional Right To Trial By Jury

The PSR includes Ms. Cates' alleged loss in its calculations without any discussion as to whether such losses were caused by the offenses for which Mr. Tanaka was convicted. The jury convicted Mr. Tanaka on only three of twelve counts. The nine counts Mr. Tanaka was acquitted of, counts 2, 5, 6, 7, 8, 9, 10, 11, 12, should not be considered part of Mr. Tanaka's "offense" for

sentencing purposes.  Subsumed in these acquitted counts are the allegations of wrongdoing

related to Ms. Cates' investments.

We respectfully submit that enhancing a sentence in reliance on facts relating to charges

as to which the jury acquitted -- in essence, ignoring the jury's verdict -- is a violation of Mr.

Tanaka's Sixth Amendment right to trial by jury.  Admittedly, the Second Circuit has held

otherwise to date.[10]   However, the time has come for this Court, and the Second Circuit, to

recognize that it makes no sense for mandatory Guidelines based sentences to be an impingement

on criminal defendants' jury trial rights while simultaneously countenancing judicial fact

findings at sentencing that directly contravenes an actual jury verdict.

As Judge Bright explained:

> Permitting a judge to impose a sentence that reflects conduct the
> jury expressly disavowed through a finding of 'not guilty' amounts
> to more than mere second-guessing of the jury -- it trivializes its
> principal fact-finding function.
>
> * * *
>
> In the last decade, the Supreme Court re-affirmed the jury's central
> role in the criminal justice system.  *See, e.g., Apprendi v. New
> Jersey; Ring v. Arizona; Blakely v. Washington; United States v.
> Booker.*  Rather than pretending as if these cases were never
> decided, we federal judges should acknowledge their clear
> implication:  A judge violates a defendant's Sixth Amendment
> rights by making findings of fact that either ignore or countermand
> those made by the jury and the relies on these factual findings to
> enhance the defendant's sentence.

*United States v. Canania*, 532 F.3d 764, 776 (8th Cir. 2008) (Bright, J., concurring) (internal

citations omitted).  Judge Bright also contended, and we agree and so argue here, that sentencing

on acquitted conduct violates the Due Process Clause of the Fifth Amendment because it

undermines the notice requirement at the heart of any criminal proceeding.  *Id.* at 777.

---

[10] *E.g., United States v. Jones*, 531, F.3d 163 (2d Cir. 2008).

Other federal judges around the country agree. *See United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, J., dissenting) ("Reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the Sixth Amendment"); *United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., specially concurring) ("I strongly believe … that sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment."); *United States v. Ibanga*, 454 F. Supp. 2d 532, 536 (E.D. Va. 2006) ("Sentencing a defendant to time in prison for a crime that the jury found he did not commit is a Kafka-esque result."), *vacated*, 271 Fed. Appx. 298 (4th Cir. 2008); *United States v. Pimental*, 367 F. Supp. 2d 143, 153 (D. Mass. 2005) ("To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense -- as a matter of law or logic."). This Court should follow suit, and decline to impose a sentence on Mr. Tanaka that relies on alleged conduct relating to the Cates SBIC loss, for which Mr. Tanaka was acquitted.

### c.    The Government Cannot Prove By A Preponderance Of The Evidence That Mr. Tanaka Caused Cates's SBIC Loss

Even if found to be constitutional, the use of acquitted conduct in sentencing is only permitted where the conduct underlying the acquitted charge has been proved by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam) (pre-*Booker* holding regarding evidentiary standard for use of acquitted conduct). Not only did the government fail to meet its burden to convict Mr. Tanaka at trial of the allegations relating to Cates SBIC investment, it also failed to meet the preponderance of the evidence standard, and cannot do so now.

The government produced no evidence that Mr. Tanaka made any specific representations to Ms. Cates about the SBIC program. Nor is there any evidence that Mr.

- 33 -

Tanaka put any of Ms. Cates' money to his personal use.  Nor did any of the evidence the government presented support that Mr. Tanaka knew where Ms. Cates' money was to be invested.  To the contrary, that evidence implicated Mr. Vilar and the New York office of Amerindo in a way that demonstrates that the London office and Mr. Tanaka did not know until much later that the Cates money was earmarked for the SBIC.  (*See* GX 3350-8.)  Nor was there any evidence that Mr. Tanaka knew that the SBIC process had failed, information he would have to know for any of his own conduct to be viewed as causing a loss to Ms. Cates.

In an email sent from New York in June 2002, Mr. Vilar's assistant, Johanna Olsher, gave instructions for the "transfer [of] monies into the Amerindo SBIC fund." (GX 5854-R.)  However, Ms. Olsher admitted that nothing she received from London -- from Mr. Tanaka or anyone else -- prior to sending that email that referenced SBIC at all.  (Tr. 2801.)  And eight months later, when a question arose in London as to what the Cates investment was for, Mr. Vilar wrote a memo stating: "Let me state unequivocally that Lily's latest investment was expressly for the SBIC."  (Govt. Ex. 3350-8.)  No such statement would have been required had Mr. Tanaka known the investment was to be for the SBIC.  And, when financial statements were given to Ms. Cates, instead of using the form the way the London office produced them, the statements were whited out in New York and typed in a different type face from the one used in London.  (*See* tr. 4756-60.)  This evidence was insufficient for the jury and should be insufficient for this Court to use in determining a sentence for Mr. Tanaka.

     **5.**      **Including Alleged Losses By Investors Who Did Not Testify
At Trial Violates Mr. Tanaka's Right To Trial By Jury
And Right To Confront Witnesses**

The PSR includes a $19.8 million loss allegedly incurred by Dextra Holdings, Ltd., purportedly based on mystery "additional information" received by the Probation Office.  (PSR. ¶ 62.)  The government presented no evidence at trial to support the notion that Dextra Holdings

- 34 -

lost anything as a result of Mr. Tanaka's offenses.  No witnesses testified as to any representations purportedly made to Dextra, as to who or what Dextra relied upon, nor as to whether they were or were not repaid.  The government had over three years and one half years to prepare its case for trial and, apparently, made the strategic choice not to call any witness from Dextra despite having one or more on its witness list.[11]

This belated attempt to try to include any such alleged conduct as a basis for an enhanced sentence is a violation of Mr. Tanaka's Sixth Amendment right to trial by jury and to confront the witnesses against him.  We recognize that current authority holds that the right to trial by jury and confrontation of witnesses does not prevent the court from finding related conduct by a preponderance of the evidence.  However, we submit that the trend is clearly toward strengthening the 6th Amendment rights to a jury trial and confrontation.  *See Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2542 (2009); *Booker*, 543 U.S. at 244-45; *Crawford v. Washington*, 541 U.S. 36, 38 (2004)**.**  Further, we believe that the Supreme Court will eventually apply those 6th Amendment rights to sentencing fact-finding.  That said, this case differs dramatically from the run of the mill government attempt to increase a sentence through judicial fact finding.   Here, the government made a conscious strategic choice to refrain from presenting evidence from its alleged largest victim.  It should be forced to live with that choice rather than end-run the 6th Amendment.

Even if the Court decides to entertain evidence the government consciously chose to keep from the jury, the process by which the government has indicated it will attempt to prove the Dextra (and other non-testifying investor) alleged loss – through documents on submission, without witnesses or an evidentiary hearing – should not be allowed.  We submit that the Court

---

[11] The same analysis applies to Other Investors Hrytsyk, Pavloskyy, and the Urich's.  While the PSR provides no loss amount for these Other Investors, even if one is provided, no evidence was presented at trial to support the notion that these investors incurred losses caused by Mr. Tanaka's offenses.

should, at a minimum, force the government to put its proof to the test of cross examination if it persists in attempting to increase its already overstated loss amount by $20 million – an advisory guidelines sentence increase of 18 levels, or as much as ten years.  Any other result would be, at a minimum, a violation of fundamental fairness, if not a denial of procedural due process under the Fifth Amendment.

**B.      The Number Of Victims Enhancement Does Not Apply;
At Most, No More Than One Victim Suffered A Loss**

The PSR advisory guidelines calculation includes a two level enhancement for the Specific Offense Characteristic of 10 or more victims.  (PSR, ¶ 87).  The Probation Office seeks this enhancement without even presenting the amount of the alleged losses for ten victims -- the PSR provides loss amounts for only six, claiming that losses for the others have not yet been calculated.  (*Id.* at ¶ 87).  On that basis alone, the number of victims is less than ten and no enhancement is supported.  Application Note 1 to section 2B1.1 defines the "victims" of a fraud or theft offense to include "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. §2B1.1, Application Note 1.  As discussed above, there is no actual loss under subsection (b)(1) when the money constituting the potential loss is repaid before detection of the offense.  The PSR wholly ignores the repayments to alleged victims in this case.  For all of the reasons stated herein, the loss calculation in this case is zero, or at the very most the $450,000 non-payment to the Colburn Estate.  Under that loss calculation, there is either no victim or, at the very most one victim.  Counting victims who are not part of the loss calculation's actual loss is improper.  *See United States v. Abiodun*, 536 F.3d 162, 171 (2d Cir. 2008)(reversing sentence determination due to inclusion of victims who were not included in the loss calculation).[12]

_____

[12] The *Abiodun* court engaged in a lengthy discussion about whether individuals who are ultimately reimbursed by their banks for credit card fraud can be considered victims, even

**C.    An Enhancement For Being An Investment Advisor Is Improper When Investment Advisor Act Fraud Is The Underlying Crime**

Mr. Tanaka was found guilty of Investment Advisor Fraud, leading to a Base Offense Level of seven.  The Probation Office seeks to impose an enhancement of four levels under §2B1.1(b)(16) because Mr. Tanaka was an investment advisor at the time of the offense.  Such double counting should be rejected.  As the court put it in *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003), in finding that the "careful planning," "sophisticated techniques," and "extensive" enhancements substantially overlapped, "[m]ost fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive."  It would be hard to dispute that *all* Investment Advisor Act violations, as opposed to other frauds or securities laws violations, involve circumstances where the defendant was an investment advisor.  Moreover, the GFRDA-related counts for which Mr. Tanaka was convicted did not relate to his alleged role as a United States registered investment advisor, so even if one could argue that the enhancement should be applied to those counts, that argument would fail.

**D.    Summary Of Mr. Tanaka's Guidelines Calculation**

For the reasons set forth above, Mr. Tanaka contends that the proper Guidelines calculation for his offenses is as follows:

- Base Offense Level:                                                                              7

- Specific Offense Characteristic/offense committed outside U.S.        +2

- Specific Offense Characteristic/supervisor under 3B1.1(c)                +2

---

though they suffered no ultimate loss in their credit card accounts.  The Second Circuit held that under such circumstances, the individuals could be victims if, as a practical matter, if they suffered (1) an adverse effect (2) as a result of defendant's conduct that (3) can be measured in monetary terms.  536 F.3d at 168-69.  Specifically, the decision focused on the time it took individuals to obtain reimbursement from their banks.  The need for that analysis is not present in the instant case.  Unlike *Abiodun*, the investors here were repaid principal and even profit by Amerindo before detection of the offense, negating any "actual loss" suffered.  In any event, no evidence was presented at trial as to the dollar value of the time any alleged victim took to recover their investments -- principal or profit.

- Total Offense Level                                                    **11**

A total offense level of 11 in Criminal History Category I translates to a Guidelines sentence of from 10 to 14 months.

### III.    ANALYSIS OF SECTION 3553(A) FACTORS

The legal landscape of federal sentencing is detailed in Section I, *supra*.  There is no need to repeat the analysis here.  Suffice it to say the Supreme Court has made clear that this Court, after analyzing the 3553(a) factors, has the discretion to fashion whatever sentence it deems is just so long as it is no greater than necessary to accomplish the purposes of the sentencing statute.  There is no doubt that while he was acquitted of a vast majority of the charges against him, Gary Tanaka stands before the Court convicted of serious offenses.  However, as detailed below, we respectfully submit that Gary Tanaka has been punished enough over the last four and one half years -- separated from his wife and child, living with the severely restricted liberty of house arrest, wearing an electronic monitor a continent away from home, and being forced to stand trial for numerous crimes he did not commit.  In light of the punishment that he has already endured, the just sentence that will accomplish the goals of the sentencing statute is to impose a lengthy term of probation with severe restrictions, including but not limited to, the requirement that Gary provide substantial assistance to the investors he, the government and the Court all seek to aid.  *See* Letter of Paul Marcus, Tab 29 (Amerindo investor asking the Court to impose a probationary sentence so Gary Tanaka could help investors by both marshalling assets and investing those assets for the benefit of investors).

### A.    Section 3553(a)(1):  History and Characteristics of Gary Tanaka

Gary Tanaka's history and personal characteristics are detailed in the Statement of Facts, *supra*.  We highlight some of those here.  Specifically, we draw the Court's attention to Gary's life of devotion to his family, Gary's numerous and repeated acts of kindness and support for

those in need, and the fact that the people he has touched throughout all points in his life,

including the very investors he is alleged to have harmed, describe him in a warm, positive and

complimentary manner that bespeaks a life lived in which the good far, far outweighs and

outdistances the bad.  When that is combined with his ill health, advancing years, and complete

lack of any danger to the community, this factor weighs strongly in favor of a probationary

sentence.

### 1.    Gary Tanaka's Devotion To His Family

The letters submitted herewith paint a telling picture of a man completely devoted to

family.   Gary's mother, Janette Tanaka, describes how Gary looked after his sick father in a way

that allowed his father to save face:

> His father at age 84 developed kidney failure in early 1999.  Gary found
> out that his father had squandered all his funds, so he periodically
> deposited funds to his father's account without his knowledge. . . . When
> his father could no longer care for himself, Gary hired two live-in nurses
> to care for him.  His father was under the impression that Medicare
> covered all of his needs.  He passed away on December 15, 1999 never
> knowing that Gary was his benefactor, taking care of all of his
> requirements.

Letter of Jannette Tanaka, Tab 44.  She also describes how Gary came to her aid while he

himself was suffering from potentially terminal cancer:

> [I] was diagnosed with stage 3 colon cancer.  Gary always found time to
> fly to Los Angeles from London to check my condition and research the
> most advanced medical techniques.

*Id.*; *see also* Letter of Carl Cerrudo, Tab 4 (describing how Gary helped him through cancer

while literally being on trial for his own life).

Gary's children, grandchildren, sisters, and daughter-in-law all wrote tributes to the man

Gary's son Mark calls the "hub" that keeps the family together.   In their letters, friends,

colleagues and associates all speak of Gary's devotion to his family and to the pain and suffering

he has endured being separated from his wife and youngest child for so very long.  *See, e.g.,*

Letter of Annelies Glen-Teven, Tab 18; Letter of Tidu Maini, Tab 27.

**2.     Gary Tanaka's Numerous Acts Of Kindness For Those In Need**

As detailed in the statement of facts section, *supra*, time and time again, Gary showed his

kindness and compassion for those around him, and not just for family.  Jim Furlong details how

Gary put aside his own medical woes to help him:

> I was diagnosed with leukaemia [sic] in 2003 and Gary made himself
> available to talk to me about his own experiences enduring cancer
> treatment and was a source of total encouragement and support through a
> difficult treatment programme which lasted for several years. . . . I think
> this clearly shows Gary's caring nature and sympathy for others . . . .  I
> cannot speak highly enough of Gary Tanaka.

Letter of Jim Furlong, Tab 16; *see also* Letter of Katherine Salmon, Tab 39 (describing how

Gary supported her and her family through her father's terminal illness); Letter of John Nardello,

Tab 31 (MIT classmate who relates "at a time when I seriously considered giving up . . . [Gary]

counseled me.  By his example and his words, he persuaded me to persevere."); Letter of James

Stableford, Tab 42 (describing Gary's support when his father died unexpectedly); Letter of

Anneliese Glen-Teven, Tab 18 (describing how Gary was a "tremendous shoulder to lean on

during a very trying time in my life").

Gary's kindness also extended to those he barely knew:

> I would put Gary Tanaka at the top of my list in terms of honorable people
> I have met . . . [I] have witnessed Gary give a young rider who was injured
> while working the horses *a gift to help with his hospital and medical bills*
> *as well as keep his family together during very tough times for the boy*.

Letter of Mervin Marks, Tab 30.

- 40 -

### 3. Gary Tanaka's Lifelong Reputation For Honesty And Integrity

As detailed in the statement of facts and in the letters submitted herewith, those from every phase of Gary's life praise his integrity.  Lester Young, Gary's college roommate, illustrates the point:

> I got to know [Gary] well and can attest to his high moral character.
> During those years, Gary had been consistently trustworthy, honorable,
> diligent, loyal and ethical, in fact several levels above our fellow students
> in those regards.  Just one example makes the point:  it was common for
> the students to compare homework answers in order to improve grades
> and reduce the amount of sheer work.  Gary never did this because he
> considered it cheating. . . .  Gary is still the same dependable, trustworthy
> and trusting Gary.

Letter of Lester Young, Tab 56; *see also* Letter of Vinod Garga, Tab 17 ("I have always found Gary to be a man of integrity, with a brilliant mind, hard working and a good friend");  Letter of Robert Clay, Tab 7 (describing him as a "complete gentleman" who always "acted above board" and noting that he has "*never heard anyone speak ill of Gary in any way*") (emphasis added); Letter of Lincoln Collins, Tab 9 ("Gary has always been scrupulously fair and honest in all aspects of his dealings with me and has always operated with the highest ethical standards.  I am proud to call him my friend."); Letter of Eugenio Columbo, Tab 10 (describing how Gary "never points blame and is sympathetic to everyone" and how Gary's "honesty, ethics and integrity have been of the highest standards."); Letter of Letter of Michael O'Sullivan, Tab 32 ("I have always found [Gary] to be a thoroughly decent and honorable man, both personally and in business. . . .").

These letters make clear that the history and characteristics of this defendant, who has already suffered so much, weigh heavily in favor of a probationary sentence.  Simply stated, the world will not be a better place with Gary Tanaka wasting away behind bars.  The opposite is clearly true.

B.      **Section 3553(a)(1):  Nature And Circumstances Of The Offense**

As the Court is all too aware, in the last few years, there have been a number of sensational frauds that have catapulted into the national consciousness, including the $65 Billion fraud run by Bernard Madoff and the $400 Million fraud perpetrated by Marc Dreier.  Unlike the complete shams of Madoff and Dreier, Amerindo was a real business that offered real valuable and appreciated services to real clients over a lengthy period.   Amerindo, with Tanaka making investment decisions, achieved spectacular results for pension fund clients throughout the country – pension funds that received every single penny entrusted to Amerindo after the arrests of 2005.  (*See* tr. 2921 & 3067-68 & 3077-78.)

While the SBIC investment Alberto Vilar sold to Lily Cates might well have been a sham, it was not a sham perpetrated by Gary Tanaka.  The jury made that crystal clear when they acquitted Gary of all the counts that specified SBIC or that related to any of the funds procured from Lily Cates purportedly for the SBIC.  That leaves the GFRDA-related offenses for which Gary was convicted – serious offenses, but offenses that should be viewed in the overall context of the evidence and other offenses under the related statutes.

Gary Tanaka has never denied that the Amerindo GFRDA program has left some investors owed additional profits and interest.  However, the GFRDA program was nothing like the many frauds and ponzi schemes that come before this Court that have left many innocent victims with crushing **out of pocket losses**.  Certain salient facts about the GFRDA and its investors were made clear at the trial and should be highlighted:  **First**, every GFRDA investor from 1986 through 2002 received the principal and interest that was due and owing – 16 years of success.  **Second**, even after difficulties arose in or around 2003, Amerindo made approximately $8 Million to $9 Million in payments, including approximately $2 Million to the Mayer family.  (*See* tr. 10/14/08.)  **Third**, payments were being made to investors up until the Government shut

down Amerindo in May 2005.  (*See, e.g.,* tr. 3690 (payment of $600,000 to Jenny Zanzuri on April 27, 2005).)  **Fourth**, in February 2004, Gary Tanaka, despite being stricken with cancer and in between the major cancer surgeries of November 2003 and April 2004, demonstrated his full desire to repay investors in full when he played a role in offering to pay the Mayers in full over time.  (*See* DX FY-1.)[13]  **Fifth**, all but one of the investors that testified at trial whether themselves or through representatives made substantial profits in the GFRDA program, including Robert Cox, Graciela LeCube Chavez, the Mayers, Worldwide Tops, Binna Holdings, Just Capital, Nemo Holdings, Paragon Ventures and the Pelican Trust.  **Sixth**, while Alberto Vilar was withdrawing substantial sums to pay for personal expenses and to meet personal obligations, Gary Tanaka was lending money to the company to keep it afloat.  (*See* GX4037; Letter of Katherine Salmon, Tab 39.)

### C.   Section 3553(a)(2):  The Purposes Of Sentencing

In Section 3553(a), Congress made it clear that "the Court shall impose a sentence sufficient, but not great than necessary" to insure that the sentence:  (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; (2) affords adequate deterrence to criminal conduct; (3) protects the public from further crimes of the defendant; and (4) provides the defendant with needed training or treatment.

### 1.   Seriousness Of The Offense

This category is addressed in Section B, *supra*.  As noted, the offenses for which Gary was convicted are serious, but pale in comparison to the harms caused by the white collar fraudsters that come before this Court for sentencing.   It is quite telling that after 3.5 years of investigation and 2-plus months of trial, the government could call only one witness who was not

---

[13] That the Mayer family chose to reject the offer is of no moment for this analysis. It is true that they were under no obligation to accept a longer term workout.  However, the key fact remains that Gary Tanaka remained committed to seeing investors repaid in full.

paid a profit investing with Amerindo.  We respectfully submit that when assessing punishment, as opposed to restitution to investors, the key factor should be real out-of-pocket losses.   Here, that amount was $450,000 and would have been zero but for the government's decision to close Amerindo a few months before the last of three agreed-upon payments to Tara Colburn's estate was made.  As such, this factor weighs heavily in favor of a probationary sentence.

### 2.        Respect For Law, Adequate Deterrence, Just Punishment

Gary Tanaka has already lost everything.  He already has been severely punished.  His marriage has been destroyed. *See* Letter of Janette Tanaka, Tab 44.  He has been separated from his young son and been prevented from watching him grow up.  The business that took a lifetime to build lays in tatters despite the fact that the overwhelming percentage of that business – the mutual fund and pension fund management business – was indisputably legitimate and successful.  Gary's reputation has been shredded.  He has been forced to stand trial for a vast array of crimes he did not commit.  And last, but not least, Gary has already spent 4.5 years living with his liberty severely restricted, largely on house arrest with the government electronically monitoring his whereabouts.

Given all of these harms, it is incomprehensible that an onlooker would think he got off easy or escaped serious consequences.  Who would want to be Gary Tanaka over the last 4.5 years?  Who would look at what he suffered and think crime pays?  The answer is simple – no one.  What Gary lost over the last 4.5 years would cause any rational person to be deterred from risking suffering Gary Tanaka's fate.  The imposition of a sentence of imprisonment on top of all of the harms already suffered would not further promote respect for the law or deterrence.

### 3.        Protecting The Public From Future Crimes Of The Defendant

This factor also weighs heavily in favor of a probationary sentence.  Gary has been living under charges and substantial government supervision for almost 4 and one half years.  As the

Court recognized when it granted Mr. Tanaka bail pending sentencing, he simply poses no danger to society. Moreover, Pre-Trial Services Officer Leo Barrios, who is responsible for supervising Gary, has made clear to the Court on many occasions that Gary has always followed instructions and has caused no problems at all. That Gary poses no danger of committing future crimes is further supported by his advanced age. Numerous courts have noted that recidivism is highly unlikely among older defendants. *See, e.g., United States v. Hodges*, 2009 WL 366231, *8 (E.D.N.Y. 2009) (collecting cases); *United States v. Sanchez*, 2007 WL 60517, *4 (S.D.N.Y. Jan. 08, 2007). Moreover, the Second Circuit has held that a sentencing court should consider the dramatically lowered chances of recidivism for someone of Gary's age. *See United States v. Hamilton*, 323 Fed. Appx. 27, 30-31 (2009).

### 4. Providing Gary With Needed Treatment

When addressing the need for training or treatment, it is clear that a probationary sentence best accomplishes this goal. Gary is an man of advance age who has already suffered two serious bouts with cancer. Clearly, he can receive better treatment at MSKCC or other private institutions than he can in prison. As Dr. Chiu points out, "It was a pleasant surprise that Mr. Tanaka did well after surgery . . . however . . . cancer can recur at any given time." Letter of Dr. Ernest Chiu, Tab 6. Thus, this factor weighs heavily in favor of a probationary sentence.

### D. Section 3553(a)(3): The Kinds Of Sentences Available

18 U.S.C. § 3561 provides that a "defendant who has been found guilty may be sentenced to a term of probation unless (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded . . ." 18 U.S.C. § 371 and 15 U.S.C. § 806-17 carry maximum term of imprisonment of 5 years and thus are Class D felonies. *See* 18 U.S.C. § 3559 (a)(4). 15 U.S.C. § 78ff carries a maximum term of imprisonment of 20 years and thus is Class C felony. *See* 18 U.S.C. § 3559 (a)(3).

Therefore, under 18 U.S.C. § 3559(a), none of the offenses of which Mr. Tanaka was convicted are either Class A or Class B felonies. Moreover, none of the statutes under which Mr. Tanaka was convicted preclude the imposition of a probationary sentence. Therefore, a probationary sentence is an available option for the Court.

E. **Section 3553(a)(4) and (a)(5): The Advisory Guidelines Calculation**

As detailed above, the proper advisory guidelines calculation, when (1) giving effect to the reality that only one trial witness lost money, (2) the guidelines' prohibition on counting expected return as "loss, and (3) refusing to countenance double counting, Mr. Tanaka's role as an investment advisor, is offense level 11, yielding a recommended sentence of 8-14 months. Therefore, we respectfully submit that 8-14 months is the appropriate starting point.

The PSR and the government argue that the court should start its analysis at advisory guidelines level 39, yielding a veritable life sentence of 262-327 months for a man of 66 years. As detailed in Section II, *supra*, this calculation is simply wrong. However, even if the court were to calculate such a draconian advisory guidelines range, it should follow the lead of the *Adelson* and *Parris* courts and reject the starting point. *See United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (noting that the "calculations under the guidelines have run amok . . ."); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) ("it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance.").

F. **Section 3553(a)(6): The Need To Avoid Unwarranted Disparities**

As detailed throughout this submission, it is clear that Gary Tanaka is very differently situated than most, if not all white collar defendants who come before this Court, including the fact that (1) the vast majority of investors who testified at trial made substantial profit, (2) even after conviction on certain counts, investors want to trust their money to Gary, *see infra* at

Section G, and (3) an overwhelming portion Gary's business was legitimate, successful, and

served the clients with distinction.   Thus, we submit, that there **should be** a disparity between

the treatment accorded Gary and that applied to the likes of Bernard Madoff and Marc Dreier.

Stated another way, disparity from the mechanical application of the guidelines to Gary is very

much a **warranted** disparity.

### G.    Section 3553(a)(7):  The Need To Provide Restitution

Of the many things not in dispute in this sentencing proceeding are the following:  (1)

certain GFRDA investors are still owed additional profits and interest; (2) as of May 2005, what

the government called the "GFRDA Accounts" contained over $26 Million available for

repaying investors; (3) Amerindo oversaw an investment called the Amerindo Technology

Growth Fund ("ATGF"); (4) the government in this criminal prosecution and sentencing has not

alleged any wrongdoing in ATGF, however, the SEC has filed civil charges with respect to that

investment.  The most important inarguable and indisputable fact is that incarcerating Gary

Tanaka will not only fail to help provide restitution for investors, it will have the opposite effect.

Amerindo investor Paul Marcus says it best:

> I  . . . have substantial investments in ATGF Amerindo . . . .  It is my goal
> to recoup those investments.  I believe that Mr. Tanaka, if allowed by the
> Court, could be very helpful to me and my fellow investors in that effort.
> Not only could Mr. Tanaka work to identify assets, he could invest
> whatever assets do remain in order to help them grow so that investors
> could recoup a greater percentage.  **Simply put, I ask that the Court
> require Mr. Tanaka to work for the benefit of the investors rather
> than be sentenced to a prison term – a result that will not help me or
> my fellow investors**.

*           *           *           *           *

> Judge Sullivan, I am sure that sentencing someone is a difficult decision
> with many considerations.  **In addition to knowing Gary for a long time,
> I sat through a good portion of the trial.  I have heard and seen both
> the good and the bad.  Knowing all I know, I am firmly convinced
> that Gary is the right man to help me and other investors.  Therefore,**

- 47 -

> **I ask that you use your discretion and create a sentence that helps me and other investors.  Please sentence Gary to probation with the condition that he work full time with investors to locate, recoup and grow their assets.**

Letter of Paul Marcus, Tab 29 (emphasis added).

Today, after years of constraint, United States District Judges once again have the tools to fashion sentences that make sense, that address the unique circumstances of cases, defendants and victims with which they are most familiar.  In this case, Paul Marcus is absolutely right. Given all that Gary has suffered and given all that he could help (and investors trust him to help), the just result is to do exactly as Paul Marcus asks – impose a sentence of probation conditioned upon Gary working for the benefit of investors.[14]

---

[14] Because it is difficult, if not impossible, to know the government's position on forfeiture and/or restitution with respect to specific amounts and/or precise property or investors involved, we will address those issues in a later submission.

## **CONCLUSION**

For the reasons stated herein, we respectfully request that the court impose a probationary sentence with conditions that will ensure that the goals of the sentencing statute are fulfilled.

Dated: September 1, 2009
      New York, New York

SONNENSCHEIN NATH & ROSENTHAL LLP

By:   s/  Glenn C. Colton
         Glenn C. Colton (GCC-2493)
         Gary Meyerhoff (GM - 8267)
     1221 Avenue of the Americas
     New York, New York 10020-1089
     Telephone:  (212) 768-6700
     Fax:  (212) 768-6800
     *Counsel for Defendant Gary A. Tanaka*

17652599