UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

      -v.-                                        :          S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,                       :
      a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                            :

                Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*

Marc Litt
Joshua Klein
Benjamin A. Naftalis
*Assistant United States Attorneys*
     *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The GFRDA Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The $5 Million SBIC Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    The Defendants' Unauthorized Wire Transfers Of Monies
          Out of Cates' Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.    False Statements To The Securities And Exchange Commission . . . . . . . . . . . 11

    APPLICABLE SENTENCING PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Point I:    The Applicable Guidelines Sentencing Ranges . . . . . . . . . . . . . . . . 15

        A.    The Probation Office Appropriately Used The 2008 Edition
            Of The Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    The Base Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.    The Defendants Are Responsible For Losses
            In Excess Of $40 Million . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                a.    Lily Cates . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                b.    The Mayers . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                c.    Tara Colburn . . . . . . . . . . . . . . . . . . . . . . . . . 21

                d.    Graciela Lecube-Chavez and Robert Cox . . . . . . . . . . . 21

i

       e.      Dextra . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    Applicable Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Discussion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       a.      Payments To Investors On Earlier Investments
               Do Not Reduce Losses Sustained By Those
               Investors On Subsequent Investments . . . . . . . . . . . . . . 29

       b       Interest Payments Made To The Victims Do Not
               Offset The Loss Of Principal . . . . . . . . . . . . . . . . . . . . . 32

       c.      The Court Should Reject Defendants' Argument
               That The Value of The Four Bear Stearns
               Accounts Should Be Credited Against Any Loss
               Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

              i.      Contrary To Tanaka's Claims, The Four
                       Bear Stearns Accounts Do Not Contain
                       Solely GFRDA Money . . . . . . . . . . . . . . . . . . . . 32

              ii.     The Funds In The GFRDA Accounts
                       Should Not Be Credited Agains Loss  . . . . . . . . 34

       d.      Tanaka's Guidelines Calculations Should
               Reflect Offense Conduct Related To The
               Fraud Perpetrated On Lily Cates  . . . . . . . . . . . . . . . . . . 35

              i.      Tanaka Was Convicted of Two Counts
                       Fraud Perpetrated Against Lily Cates  . . . . . . . . 36

              ii.     Even Were Tanaka Acquitted Of All
                       Conduct Related To Cates, The Law
                       Permits The Court To Consider That
                       Conduct In Sentencing Tanaka  . . . . . . . . . . . . . 40

iii.    Even Were The Court To Find That
Tanaka Was Acquitted Of Conduct
Related To The Fraud Perpetrated On
Cates, There Was Ample Evidence
At Trial From Which The Court Should
Conclude That Tanaka Did Participate
In That Offense Conduct . . . . . . . . . . . . . . . . . . . 43

D.    The Multiple Victim Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

E.    A Substantial Part Of The Fraudulent Scheme Was Committed
Outside The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

F.    The Investment Adviser Enhancement Should Be Added
To The Offense Level Of Both Defendants . . . . . . . . . . . . . . . . . . . . . . . 48

    1.    By Its Terms The IA Enhancement Applies To
Investment Adviser Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    2.    Defendants' Argument Is Illogical And Is Not
Supported By The Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    3.    The Court Should Reject Tanaka's Argument That
The IA Enhancement Does Not Apply To His
Securities Fraud Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

G.    Vilar And Tanaka's Conduct Warrants An Aggravating Role
Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

H.    Vilar's Offense Level Should Be Increased Because He Is Subject
To An Enhancement Under U.S.S.G. § 3C1.1 For Obstruction
Of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    1.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I.    Both Vilar And Tanaka Should Be Placed In Criminal History
Category I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Point II:    Application Of The Section 3553(a) Factors . . . . . . . . . . . . . . . . . . . . . . 57

A.  The Nature And Circumstances of The Offenses And The History
    And Characteristics Of The Defendants ........................ 57

    1.  Nature And Circumstances Of The Offenses ................ 57

    2.  History And Characteristics Of The Defendants ............ 58

        a.  Alberto Vilar ................................... 59

            i.  Vilar's Character ......................... 59

            ii. Vilar's "Philanthropy" Is Far Outweighed By
                The Damage He Caused To Victims And
                Others .................................... 60

        b.  Gary Tanaka .................................... 64

            i.  Tanaka's Purportedly Upstanding Conduct
                In His Horse Racing Affairs Is Further
                Evidence Of His Lack Of Character .......... 65

            ii. Tanaka's Birthplace Is Irrelevant
                To Sentencing ............................. 67

B.  The Purposes Of Sentencing ................................... 68

    1.  The Seriousness Of The Offenses ........................ 68

    2.  Promotion Of Respect For The Law, Deterrence, And
        Just Punishment ..................................... 72

C.  Tanaka's Arguments In Support Of A Probationary Sentence
    Are Unavailing .............................................. 73

    1.  Tanaka's Offer To Help Amerindo Investors Other Than
        Cates And The GFRDA Investors If Sentenced
        To Probation Should Be Given Little Weight .............. 74

    2.  Tanaka's Effort To Use His Pretrial Litigation Strategy
        As Both A Shield And A Sword Should Be Rejected ......... 76

D.  The Sentencing Guidelines And The Need To Avoid
    Unwarranted Sentencing Disparities .......................... 78

E.        The Need To Provide Restitution To Victims . . . . . . . . . . . . . . . . . . . . 79

Point III:   The Court Should Order Each Defendant To Forfeit $80,473,840 . . . . . 83

A.        Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

          1.    In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

          2.    Burden Of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

          3.    Property Subject To Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . 85

          4.    Substitute Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

B.        Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

          1.    The Proposed Money Judgment . . . . . . . . . . . . . . . . . . . . . . . . . 91

          2.    The Specific Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

# TABLE OF AUTHORITIES

## CASES

*Libretti v. United States*, 516 U.S. 29 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Alfonso*, 479 F.3d 570 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 23, 27, 28

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Aptt*, 354 F.3d 1269 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907
(S.D.N.Y. Oct. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 86

*United States v. Bellomo*, 176 F.3d 580 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Ben-Shimon*, 249 F.3d 98 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Benevento*, 836 F.2d 129 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 89, 93

*United States v. Boesen*, 473 F. Supp. 2d 932 (S.D. Iowa 2007) . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Booker*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 41

*United States v. Bove*, 155 F.3d 44 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Boyd*, 222 F.3d 47 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Cianci*, 218 F. Supp. 2d 232 (D.R.I. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Coghill*, 204 Fed. Appx. 328 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Coleman Commercial Carrier, Inc.*,
    232 F. Supp. 2d 201 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 93

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Cummings*, 189 F.Supp. 2d 67 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . 80

*United States* v. *Davis*, No. 00 Civ. 8296 (SHS), 2001 WL 47003
    (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States* v. *Davoudi*, 172 F.3d 1130 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 81

*United States* v. *Day*, 524 F.3d 1361 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States* v. *DeFries*, 129  F.3d 1293 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Dunnigan*, 507 U.S. 87 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States* v. *Ebbers*, 458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . 79

*United States* v. *Fruchter*, 411 F.3d 377 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 89, 93

*United States* v. *Gordon*, 393 F.3d 1044 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 82

*United States* v. *Hall*, 434 F.3d 42 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States* v. *Hartstein*, 500 F.3d 790 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 25, 30

*United States* v. *Hasson*, 333 F.3d 1264 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 88, 93

*United States* v. *Hirsch*, 239 F.3d 221 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Horak*, 833 F.2d 1235 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Huber*, 404 F.3d 1047 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 86, 87

*United States* v. *Ismail*, 219 F.3d 76 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States* v. *Ivanchukov*, 405 F. Supp. 2d 708 (E.D. Va. 2005) . . . . . . . . . . . . . . . . . 86

vii

*United States v. Johnson*, 558 F.3d 193 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Jones*, 460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42, 43

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Kelley*, Fed. Appx. 705 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Lincecum*, 220 F.3d 77 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*United States v. Lowder*, 5 F.3d 467 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Maaraki*, 328 F.3d 73 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Maurer*, 226 F.3d 150 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. McCarthy*, 271 F.3d 387 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Morgan*, 376 F.3d 1002 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Napoli*, 179 F.3d 1 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Nolan*, 136 F.3d 265 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Ofchinick*, 883 F.2d 1172 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Partow*, Fed. Appx. 476 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30

*United States v. Phillips*, 434 F.3d 913 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Porter*, 145 F.3d 897 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Reiner*, 397 F. Supp. 2d 101 (D. Me. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Roberts*, 442 F.3d 128 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Rubenstein*, 403 F.3d 93 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Ruggiero*, 100 F.3d 284 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Schlesinger*, Fed. Appx. 355 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Scott*, Fed. Appx. 71 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82

*United States v. Shepard*, 269 F.3d 884 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Shumard*, 120 F.3d 339 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Szeja*, Fed. Appx. 890 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*United States v. Szur*, 289 F.3d 200 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Uddin*, 551 F.3d 176 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States v. Williams*, 79 F.3d 334 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

      -v.-                              :          S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,                        :
    a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                             :

                      Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

### PRELIMINARY STATEMENT

      The Government respectfully submits this sentencing memorandum in opposition

to the memoranda submitted by defendants Alberto Vilar and Gary Tanaka and in anticipation of

the sentencing proceedings in this case.

      Defendants had all the benefits that come with the educational opportunities and

the wealth they developed from successful investments in high technology and biotechnology

stocks in the 1980s and 1990s.  They ran a legitimate business that provided spectacular returns

to institutional investors and they used their wealth to pursue expensive hobbies like

thoroughbred horse racing and outsized philanthropy.  To friends, family and business associates,

they seemed to have integrity; however, if this case shows anything, it shows the truth of the

maxim:  you can't judge a book by its cover.

      Beneath the surface, the defendants, for decades, were running a fraud scheme, the

purpose of which was to defraud some of their earliest clients and purported friends out of

millions of dollars.  In furtherance of their scheme the defendants created phony shell

corporations in Panama, employed confusing corporate names (differing from each other by only

the presence or absence of a comma) to mislead investors, lied to GFRDA investors about how

their funds would be invested, brazenly stole $5 million from Lily Cates through

misrepresentations made to her face and used the funds to directly benefit themselves and their

firm, stole an additional $425,000 from Cates by cutting and taping her signature on wire transfer

authorizations without her knowledge or permission, and used those funds to directly benefit

themselves and their firm.  The culmination of the scheme involved the defendants lying to the

U.S. Securities and Exchange Commission ("SEC") in an effort to cover up and avoid

responsibility for their conduct.  The actions of the defendants represented a gross breach of their

fiduciary duties to their clients, and the jury so found in its verdict convicting Vilar of twelve

felonies (with maximum combined sentences of 125 years),[1] and Tanaka of three felonies (with

maximum combined sentences of 30 years).

> The advisory U.S. Sentencing Guidelines recommend lengthy sentences for the

defendants, and rightly so.  This Court should adopt the Guidelines calculations set forth in the

defendants' respective Presentence Investigation Reports, with one exception discussed in Point

I.D, *infra*, and sentence the defendants within the applicable Guidelines ranges to reflect the

seriousness of their offenses, to treat them comparably to other defendants who commit similar

---

[1]     The Government notes here its disagreement with ¶¶ 135 and 136 of the Vilar
Presentence Investigation Report dated June 25, 2009 ("Vilar PSR").  Paragraph 135 should refer
to one count of Mail Fraud (Count 5), with a statutory maximum term of imprisonment of 20
years.  Paragraph 136 should refer to two counts of Wire Fraud (Counts 5 and 6), with a statutory
maximum term of imprisonment of 5 years each, rather than 20 years each, because the conduct
occurred prior to the enactment of the Sarbanes-Oxley Act of 2002, which increased the statutory
maximum term of imprisonment for Wire Fraud to 20 years.

offenses, and to properly account for the considerations of 18 U.S.C. § 3553(a).

## BACKGROUND

Superseding Indictment S3 05 Cr. 621 (RJS) was filed on August 15, 2006, in 12 counts, charging defendants Vilar and Tanaka, with:   (a) conspiracy to violate the federal criminal law prohibiting (i) securities fraud, (ii) investment adviser fraud, (iii) mail fraud, (iv) wire fraud, and (v) money laundering, in violation of Title 18, United States Code, Section 371 (Count One); (b) substantive securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (Counts Two and Three); (c) substantive investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-7 (Count Four); (d) substantive mail fraud, in violation of Title 18, United States Code, Section 1341 (Count Five); (e) substantive wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Six and Seven); substantive money laundering, in violation of Title 18, United States Code, Section 1957 (Counts Eight through Eleven); and (f) the making of false statements, in violation of Title 18, United States Code, Section 1001 (Count Twelve).

The trial of Vilar and Tanaka on Indictment S3 05 Cr. 621 (RJS) began on September 22, 2008, and concluded on November 19, 2008, when the jury convicted Vilar on all twelve counts in the Indictment and Tanaka on Counts One (conspiracy), Three (securities fraud), and Four (investment adviser fraud) in the Indictment.

## STATEMENT OF FACTS

### A.    Background

The defendants perpetrated a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and

misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors. To execute the scheme, the defendants solicited and caused others to solicit victims to invest in fraudulent investment products, including a product called the "Amerindo SBIC Venture Fund LP" and the "Guaranteed Fixed Rate Deposit Account Program." The defendants induced victims to invest in these products by, among other things, promising high rates of return, with little or no risk. In truth, as the defendants well knew, these investment opportunities were fraudulent. The defendants failed to fulfill their promises to the investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, and failing to redeem the investments upon the investors' requests.

Vilar and Tanaka co-founded and were the sole shareholders of Amerindo Investment Advisors Inc. ("Amerindo U.S."), an investment adviser registered with the United States Securities and Exchange Commission ("SEC"). (Tr. 4728; GX 1316).[2] Amerindo U.S. was a California corporation with its principal offices in San Francisco and New York City, which managed assets of institutional clients and at certain times was the investment adviser to one or more U.S. mutual funds. (Tr. 465, 4728; GX 1316-R).

Vilar and Tanaka were also the sole shareholders of Amerindo Investment Advisors, Inc. ("Amerindo Panama"), a corporation organized under the laws of Panama. Amerindo Panama was, among other things, purportedly the investment manager of the

---

[2]     "Tr." refers to the transcript of the trial; "GX" refers to exhibits admitted in evidence at trial by the Government; the suffix "NA" is used to refer to Government exhibits that were not admitted in evidence at trial; "DX" refers to exhibits admitted in evidence at trial by Tanaka; "Vilar Mem." refers to the sentencing memorandum filed by defendant Vilar; "Tanaka Mem." refers to the sentencing memorandum filed by defendant Tanaka.

4

Amerindo Technology Growth Fund ("ATGF"), an off-shore, Panamanian investment fund offered to U.S. investors. (Tr. 4728-31). Vilar and Tanaka gave Amerindo Panama substantially the same name as Amerindo U.S. in order to confuse investors about the identity of the investment adviser with which they were dealing. The only difference between the name of Amerindo Panama and that of Amerindo U.S. was the presence of a comma between the words "Advisors" and "Inc." in the name of Amerindo Panama and the absence of the comma in the name of Amerindo U.S.

Vilar and Tanaka were also the sole shareholders of Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."), which managed portfolios of U.S. emerging growth stocks for U.K.-based clients. Amerindo U.K. had an office in London where the founders of Amerindo worked (Tr. 470; GX 1-T), and where certain administrative and other functions related to Amerindo Panama were performed, including meeting with and corresponding with investors, preparation of client account statements, processing investor redemption requests, and directing equity trades and financial transactions involving investor funds.[3] (GX 1-T).

B.  **The GFRDA Fraud**

Beginning in or about July 1986 to on or about May 26, 2005, Vilar and Tanaka fraudulently induced clients to invest in the Guaranteed Fixed Rate Deposit Account Program ("GFRDA"). The GFRDA was offered to a select group of individual clients by Vilar and Tanaka, who promised investors high rates of return, with little or no risk, within short periods of time. (*See, e.g.*, GX 679, 3308-20). Investors were told that the GFRDA would provide a

---

[3]     Amerindo U.S., Amerindo Panama, Amerindo U.K., and subsets of that group of entities and their predecessors, are collectively referred to hereafter as "Amerindo."

fixed-rate of interest for a fixed-term, and that the majority of the GFRDA funds would be invested in high quality, short-term deposits, including United States Treasury bills and other safe debt securities. (*Id.*). Vilar and Tanaka further promised the investors that the balance of their funds in their GFRDA accounts – generally no more than 25 percent of the account value – would be invested in publicly traded emerging growth stocks. (*See, e.g.*, Tr. 652). Contrary to these representations, Vilar and Tanaka invested all of the GFRDA investors' funds in risky, volatile high technology and biotechnology stocks. (*See* Vilar Mem. at 1 (Vilar "falsely represented how GFRDA funds were invested . . . ."); Vilar Mem. at 4 ("It is conceded that the manner in which the GFRDA accounts were invested was contrary to the representations made in the various Offering Circulars."); Vilar Mem. at 7 ("In Offering Circulars and in correspondence with clients, Amerindo claimed that the GFRDA funds were to be invested primarily in safe, short-term, liquid debt instruments . . . . These statements were false. In fact, the money was invested primarily in technology stocks.")). Following the "bursting" of the Internet bubble in the fall of 2000, Vilar and Tanaka were unable to repay GFRDA investors. As a consequence, several investors lost millions of dollars.

## C.   The $5 Million SBIC Fraud

In June 2002, desperate for cash to meet Vilar's personal needs and the needs of the defendants' jointly owned companies, Vilar and Tanaka fraudulently induced one of their long-time investors, Lily Cates, to invest $5 million in a small business venture they formed called a Small Business Investment Company ("SBIC"). This type of investment vehicle, which had to meet certain criteria set forth by the Small Business Administration (the "SBA"), was eligible to apply for a license from the SBA that would allow the vehicle to obtain matching

investment funds from the SBA for investments that it planned to make.  (Tr. 1512-36).

Vilar falsely represented to Cates that he and Tanaka had been approved for the SBA license.  Vilar recommended that Cates invest $5 million in the venture, and promised that if Cates made the investment she would make a substantial profit, and, moreover, would receive payments from Amerindo of approximately $250,000 each quarter in lieu of the interest payments Cates would be foregoing by committing the $5 million to the SBIC venture.  (Tr. 2101-02; Vilar Mem. at 1 (Vilar "misled Lily Cates as to the disposition of her funds."); Vilar Mem. at 8 ("He told Cates that he was holding her money in escrow and that it was to be invested in an SBIC fund.  He misled her on both counts.  The money was not being held at all, and there was no SBIC fund."); Vilar Mem. at 12 (Vilar "misled clients and, in the case of Lily Cates, told her that her money was in escrow when it had been spent . . . .").

In fact, Amerindo had never been approved for an SBIC license.  Amerindo first submitted an application for such a license in or about January 2000.  The application, called a "Management Assessment Questionnaire" ("MAQ"), requires applicants to provide information about themselves, their firm, and their investment experience.  (Tr. 1523-25).  On or about April 18, 2000, Amerindo's MAQ was rejected.  (Tr. 1667).  Amerindo submitted a second, and subsequently a third MAQ, in or about May and September 2002, respectively.  (Tr. 1667-68).  All of these applications were rejected and Vilar was apprized of this fact.  Although Amerindo also filed a fourth MAQ in January 2004, it was never approved for an SBIC license.

Nevertheless, despite the fact that Amerindo was never approved for an SBIC license, Vilar represented to Cates that Amerindo had been approved for such a license and invited Cates to join in the venture -- which would purportedly invest in small businesses,

7

including biotechnology companies -- as the defendants' only outside partner.  (Tr. 2101-02).

On or about June 20, 2002, Cates invested $5 million in the Amerindo SBIC, as Vilar recommended.  (Tr. 2100-04; GX 701; GX 2199).  Her funds were deposited into an Amerindo bank account at Bear, Stearns & Co. in the name of a Panamanian corporation named "Amerindo Management Inc." (the "AMI Account") that was controlled by Vilar and Tanaka. (Tr. 3641; GX 709).

During the days and weeks after Cates' $5 million was transferred into the AMI Account, Vilar and Tanaka misappropriated these funds in order to meet personal and corporate obligations.  Specifically, on June 25, 2002, Tanaka transferred $1 million to a personal bank account held by Vilar, and Vilar used that money for a variety of personal expenses including a $540,000 charitable contribution to Vilar's college alma mater.  (Tr. 4609; GX 8203).  On June 26, 2002, Vilar and Tanaka transferred approximately $650,000 from the AMI Account to pay for various Amerindo U.S. business expenses.  (Tr. 4609; GX 8203).  On July 9, 2002, they wired approximately $2.85 million from the AMI Account to an account in Luxembourg to repay a GFRDA investor, named Beulah Birrd, with whom Vilar and Tanaka, personally and on behalf of Amerindo, had entered into a settlement agreement involving the repayment of her $6 million investment in an Amerindo GFRDA.  (Tr. 4609; GX 8203).

After receiving and spending -- not investing, as promised -- Cates' $5 million, Vilar repeatedly lied to Cates about her investment:

a.      On or about March 13, 2003, Vilar wrote Cates a letter in which he assured her that her $5 million investment was in an escrow account awaiting investment: "the monies put into escrow for the new SBIC fund remain at full value."  (GX 270-R; GX 2148).

8

Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon."  In fact, as described above, Amerindo had never received an SBIC license; Cates' funds were never placed in escrow; and Vilar and Tanaka had long since spent Cates' $5 million investment.  (*Id.*).

        b.      On or about March 25, 2004, Vilar sent Cates a letter in which he told her that he had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license.  (GX 278; Tr. 1805).  In that letter, Vilar also stated that, while waiting for the license:

> the prices of technology private-placements continued to decline . . . . This means that we did not use a single penny of [Cates'] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based venture capital.

In fact, (i) there was no requirement that Amerindo have capital on deposit given where it stood in the SBIC application process, and (ii) Vilar and Tanaka had long since spent her $5 million investment.

        c.      On or about October 25, 2004, Vilar sent Cates' lawyer a memo in which he (again) lied about the status of her $5 million investment, claiming it represented "an escrow deposit for a technology-based SBIC" and that the funds were invested in a new fund "that has been approved for investment."  (Tr. 2647-48; GX 285, 4941).  At the time of that memo, Vilar knew: (i) Cates' $5 million investment in the Amerindo SBIC was never on deposit with the SBIC and was never in escrow; (ii) Amerindo had never received an SBIC license and was not likely to receive such a license in the near future; and (iii) Vilar and Tanaka had long

since spent her $5 million investment.

**D.     The Defendants' Unauthorized Wire Transfers Of Monies Out Of Cates' Account**

        In addition to inducing Cates to invest $5 million in a non-existent Amerindo SBIC, and then spending her $5 million on personal and business expenses, Vilar and Tanaka stole additional monies from one of Cates' investment accounts.  On September 25, 2003, Tanaka, sent a letter of authorization to Bear, Stearns that bore the forged signature of Cates and that directed the transfer of $250,000 from Cates' account to an Amerindo account.  (GX 1-T at 30-31; GX 3350-17; GX 4955).  Tanaka ordered his assistant, Maxine Rye, to cut-and-tape the signature of Cates from one document onto another document, in order to make it appear as if Cates had authorized the transfer of $250,000 from her account into an account controlled by the defendants.  (GX 1-T at 30-31; GX 3350-17, 4955).

        The very next day Tanaka transferred that $250,000 into one of Vilar's personal bank accounts.  (Tr. 2428-34, 3496; GX 1-T at 30-37).  During an approximately one-month period following that transfer, Vilar spent the funds on personal expenses, including the repayment of a mortgage obligation in the amount of approximately $53,042.83.  (Tr. 2428-34, 3496; GX 51-A, 52-A).

        In August 2004, Vilar and Tanaka executed another unauthorized wire transfer of monies out of Cates' Bear, Stearns account.  In that instance, they stole an additional $175,000 from Cates, the proceeds of which were used to pay down a margin call on a trade that occurred in another Amerindo account.  (GX 5851 at 2; Tr. 2181-86).

E.      **False Statements To The Securities And Exchange Commission**

In early 2005, Lily Cates decided that she no longer wanted Vilar to manage her money, and she directed Vilar and Tanaka to close her Amerindo account.  After 18 years of managing her money, Vilar told Cates -- for the first time -- that she would have to deal with a company based in Panama if she wanted to close her account.  (Tr. 1816-20; GX 276). Thereafter, Cates notified the SEC of her problems with Vilar and Amerindo, and the SEC commenced an investigation.  (Tr. 2642; GX 2237-A).

In a letter dated April 8, 2005 (the "SEC Letter"), the SEC notified Amerindo U.S. that the SEC had received a complaint letter sent on behalf of Cates  ("Cates' Complaint Letter"), and requested a response to the issues raised in that letter.  (Tr. 2643-44, 4724; GX 1362).  Cates' Complaint Letter stated in substance that: (a) Amerindo had ignored written instructions from her to transfer all securities and funds in her Amerindo account to an account she had designated; (b) Vilar had responded to her request by contending that she needed to send a letter to the Amerindo office in Panama; and that (c) Amerindo would first deduct unspecified fees that had accrued during the approximately 18 years that her Amerindo account had been in existence.  The SEC Letter stated, "Please analyze the complaint carefully and prepare a written report addressing all the issues raised in the complaint.  Your report should describe clearly the actions you are taking in response to the complaint.  If appropriate, provide us with complete documentation supporting your findings."  (GX 1362).

Vilar and Tanaka prepared a letter on behalf of Amerindo, responding to the SEC Letter and Cates' Complaint Letter (the "Response").  (Tr. 1842-51; GX 921).  The Response contained numerous false statements made for the purpose of deceiving the SEC and hiding Vilar

11

and Tanaka's unlawful conduct.  Among other things, the Response falsely stated that: (a) Cates

had always been a client of Amerindo Panama; (b) Amerindo Panama had previously been

owned by Vilar and Tanaka, but had been sold in or about 2001 to unrelated third parties; (c) as

of on or about May 20, 2005, there was no common ownership of Amerindo U.S. and Amerindo

Panama; and (d) as of on or about May 20, 2005, there was no overlap between the directors,

officers and employees of Amerindo U.S. and Amerindo Panama.  (Tr. 1842-51; GX 921).

        In truth, Vilar and Tanaka had never sold Amerindo Panama.  To buy himself

time and put off Cates, Vilar had a Panamanian attorney, Fernando Berguido, Esq., fax him

phony contracts purportedly representing the sale of Amerindo Panama to a company called

"Morton Financial" in 1999.  (Tr. 4738-43; GX 4046).  A review of those purported contracts

make plain that there was no sale in 1999, in 2001, or ever.  Rather, in 2004, Mr. Berguido faxed

Vilar copies of un-executed contracts between Amerindo Panama and Morton Financial that

purported to reflect a sale of Amerindo Panama to Morton Financial in 1999.  (*Compare* GX

4046 *with* GX 4075; Tr. 4738-43).  However, Vilar signed these documents only in 2004, thus

evidencing that the purported 1999 sale was a sham.  (*Id.*).

        Vilar's lies regarding the true ownership of Amerindo Panama were further

highlighted by the fact that neither Morton Financial nor Amerindo Panama had any substantial

assets or operated independently of Amerindo.  (Tr. 3180-92).  Amerindo Panama's "office" was

a small windowless office within the law firm of Mr. Berguido that could fit no more than two

people.  (Tr. 3180-84).  Morton Financial's "president" was actually Mr. Berguido's high school-

educated paralegal.  (Tr. 3204-05, 4072-73).  Morton Financial had no employees or clients, or

even a single chair.  (Tr. 3192-96).  Furthermore, Vilar and Tanaka paid Mr. Berguido to

maintain this "office" and to keep "Morton Financial" properly registered as a shell-company in Panama. (Tr. 3193-96). The bills for both Amerindo Panama and the Morton Financial shell company were sent to Tanaka's wife, an Amerindo U.K. employee, long after the purported sale of Amerindo Panama to Morton Financial. (Tr. 3154, 3180).

## APPLICABLE SENTENCING PRINCIPLES

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 125 S. Ct. 738, 760 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005*)*. The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *United States* v. *Booker*, 125 S. Ct. at 764 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

(A) to reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to

consider:  (1) the nature and circumstances of the offense and the history and characteristics of

the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the

kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the

Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing

disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. §

3553(a).

The Second Circuit has instructed that district courts should engage in a three-step

sentencing procedure.  *See United States* v. *Crosby*, 397 F.3d at 103.  First, the Court must

determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge

will be entitled to find all of the facts that the Guidelines make relevant to the determination of a

Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines

sentence." *Crosby*, 397 F.3d at 112.  Second, the Court must consider whether a departure from

that Guidelines range is appropriate.  *Id.*  Third, the Court must consider the Guidelines range,

"along with all of the factors listed in section 3553(a)," and determine the sentence to impose.

*Id.* at 113.  In so doing, it is entirely proper for a judge to take into consideration his or her own

14

sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460

F.3d 191, 195 (2d Cir. 2006).

## ARGUMENT

## I.

## THE APPLICABLE GUIDELINES SENTENCING RANGES

The Probation Office calculates Vilar's offense level at level 41, and the

corresponding Guidelines range to be 324 to 405 months. (Vilar PSR ¶ 139). The Probation

Office calculates Tanaka's offense level at level 39 and the corresponding Guidelines range to be

262 to 327 months. (Tanaka PSR ¶ 133). Using the 2008 edition of the Guidelines, the

Probation Office arrived at those conclusions as follows. First, the twelve counts of which Vilar

was convicted, and the three counts of which Tanaka was convicted are grouped for each

defendant, respectively, for purposes of the Guidelines analysis. (Vilar PSR ¶ 84; Tanaka PSR ¶

84). The applicable Guidelines provision is Section 2B1.1 which carries a base offense level of 7

pursuant to Section 2B1.1(a)(1). (Vilar PSR ¶ 85; Tanaka PSR ¶ 85). Second, the loss

attributable to each defendant is greater than $40 million, which results in a 22-level

enhancement to the offense level pursuant to Section 2B1.1(b)(1)(K). (Vilar PSR ¶ 86; Tanaka

PSR ¶ 86). Third, because the offense involved 10 or more victims, an additional 2-level

enhancement applies pursuant to Section 2B1.1(b)(2)(i). (Vilar PSR ¶ 87; Tanaka PSR ¶ 87).

Fourth, because a substantial portion of the offense was committed outside the United States, a 2-

level enhancement applies pursuant to Section 2B1.1(b)(9)(B). (Vilar PSR ¶ 88; Tanaka PSR ¶

88). Fifth, because the defendants were investment advisors at the time they violated various

securities laws, a 4-level enhancement applies pursuant to Section 2B1.1(b)(16). Finally,

15

because the defendants were principals of Amerindo and were responsible for making all decisions relating to the fraud, an additional 2-level enhancement for aggravating role applies pursuant to Section 3B1.1(c).  (Vilar PSR ¶ 91; Tanaka PSR ¶ 91).  In addition, because Vilar obstructed justice in connection with his motion to suppress his post-arrest statement, an additional 2-level enhancement applies to Vilar pursuant to Section 3C1.1.  (Vilar PSR ¶ 92).

The defendants contest nearly all the Guidelines calculations set forth in the PSRs and challenge the applicability of most of the enhancements recommended by the Probation Office.  As discussed further below, the defendants' challenges to the PSRs are unavailing. Consequently, the Court should reject the defendants' claims and adopt the Guidelines calculations set forth in the PSRs, with the exception of the enhancement for ten or more victims, as discussed in Point I.D., *infra*.

A.      **The Probation Office Appropriately Used The 2008 Edition Of The Guidelines**

Vilar argues that the Probation Office erred in using the 2008 edition of the Guidelines, and that the 2005 edition should have been used instead because the defendants' offense conduct took place in and before 2005.  (Vilar Mem. at 2, n. 1).  Vilar is mistaken.

The Guidelines instruct courts to use the version of the Guidelines in effect on the date of the defendant's sentencing unless doing so would violate the *Ex Post Facto* Clause of the Constitution.  *See* U.S.S.G. §§ 1B1.11(a), (b)(1).  In *United States* v. *Kilkenny*, the Second Circuit held that "[t]he application of a particular version of the Guidelines is retrospective [in violation of the *Ex Post Facto* Clause] if the version went into effect after the last date of the offense of conviction."  *Kilkenny*, 493 F.3d 122, 127 (2d Cir. 2007).  The Second Circuit has subsequently noted, however, that the Court in *Kilkenny* had not considered the fact that, since

16

the decision in *United States* v. *Booker*, 543 U.S. 220 (2005), the Guidelines are advisory rather than mandatory, that other courts have found that *ex post facto* considerations do not apply given the advisory nature of the Guidelines, and that it is an open question in the Second Circuit as to whether retroactive application of Guidelines violates the *Ex Post Facto* Clause. *See United States* v. *Johnson*, 558 F.3d 193, 194 n. 1 (2d Cir. 2009) ("In *Kilkenny*, this Court did not consider whether the transformation of the Sentencing Guidelines from a mandatory regime to one that is purely advisory affected its ex post facto analysis. Because we need not reach that issue to resolve this appeal, it remains an open question to be decided in the appropriate case.") (citing *United States* v. *Demaree*, 459 F.3d 791, 795 (7th Cir.2006)). "Where [] there is no *ex post facto* concern, it is plain error to fail to apply the version of the Guidelines in effect at the time of sentencing." *United States* v. *Roberts*, 442 F.3d 128, 130 (2d Cir. 2006) (citing *United States* v. *Keigue*, 318 F.3d 437, 442 (2d Cir. 2003).

Here, Vilar concedes that there is no *ex post facto* concern because "the relevant provisions are substantially the same" in the 2005 and 2008 editions of the Guidelines. (Vilar Mem. at 2, n.1). Accordingly, following *Roberts*, there is no need for the Court to resolve the open question identified in *Johnson* -- whether there can ever be an *ex post facto* concern with respect to application of the Guidelines because they are no longer mandatory -- and the Court should apply the 2008 edition of the Guidelines in sentencing the defendants.

## B.    The Base Offense Level

The defendants agree with the Probation Office that the applicable base offense level for both defendants is 7 because each defendant was convicted of at least one Count referenced to U.S.S.G. § 2B1.1 that carries a statutory maximum term of imprisonment of 20

years or more.  (*See* U.S.S.G. § 2B1.1(a)(1); Vilar Mem. at 6; Vilar PSR ¶ 85; Tanaka Mem. at 37; Tanaka PSR ¶ 85).

**C.**     **The Defendants Are Responsible For Losses In Excess Of $40 Million**

      **1.**     **Relevant Facts**

As indicated in the PSRs, the defendants are responsible for causing losses in excess of $40 million to the following victims: Lily Cates ($9,770,133.85), the Mayer family ($11,066,713.44), Tara Colburn ($936,371.78), Graciela Lecube-Chavez ($48,434.12), Robert Cox ($105,825.55) and Dextra Holdings Ltd. ($19,774,431.18).  (Vilar PSR ¶ 79; Tanaka PSR ¶ 79).  Accordingly, the total aggregate losses amount to $41,701,909.92.  These losses consist of the following.

      **a.**     **Lily Cates**

Initially, Lily Cates invested approximately $1.3 million with Amerindo in or about 1987.  (Tr. 2044; GX 104).  Subsequently, Cates invested $1 million of profits earned from her initial investment into an investment vehicle called "Rhodes Capital."  (Tr. 2063-64, 2267-68; GXs 128, 129).  In addition, according to the defendants, Cates' "accumulated dividends + interest account" at Amerindo, which consisted of reinvested dividends and unpaid interest earned, originally, through the Rhodes Capital investment, grew to $3,120,133.85.  (GXs 1252, 285).  In 2002, Cates withdrew $5 million from her personal account at Bear Stearns and made a separate investment in the Amerindo "SBIC" vehicle.  (Tr. 2103-04).  As of September 30, 2004, according to Cates' Amerindo account statement, her SBIC investment, which was purportedly maintained in an escrow account, had generated interest in the amount of $225,000, that was being maintained in her Amerindo account.  Finally, the defendants pilfered a total $425,000

from the Bear Stearns account they managed for Cates.  (GX 1252, 3350-17, 5851; 1-T at 30-37; Tr. 2181-86).

The Government does not seek to include in the Guidelines loss analysis Cates' original $1.3 million investment because it appears that these funds (along with substantial profits) were returned to Cates.  (Tr. 2061-62).  However, Cates' $1 million investment in Rhodes Capital, which consisted of profits she earned on her original $1.3 million investment, constitutes part of the loss attributable to the defendants under the Guidelines.

Although the Indictment did not charge the defendants with fraud relating to Rhodes Capital, Cates was, in fact, defrauded in connection with her Rhodes Capital investment, and the Court admitted evidence of the foregoing on grounds that the Rhodes investment was inextricably intertwined with the charged fraud.  *See* Memorandum and Order, dated September 4, 2008 ("the Court finds that the Rhodes Capital Investment evidence is both inextricably intertwined with the charged crimes as well as sufficiently similar to them so as to be "necessary to complete the story of the crime on trial." (citing *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  Specifically, the Court admitted an April 10, 2003 memorandum from Vilar to Tanaka in which Vilar, discussed the Cates account statement and stated the following: "Because of the Bear Stearns losses, I do not believe we should make any adjustment in Rhodes at this time.  If the Bear Stearns account does well, we can subsequently make an adjustment on Rhodes."  (GX 4607).

Given this discussion about using a "plug" number on Cates' Amerindo account statement for the Rhodes Capital investment, as well as the fact that the defendants refused to return the Rhodes Capital investment to Cates when she requested that they do so, it is clear,

19

beyond a preponderance of the evidence that the defendants defrauded Cates in connection with her Rhodes Capital investment, and that this fraud constitutes relevant conduct that should be considered in calculating loss under the Guidelines.

Similarly, Cates' "accumulated dividends + interest" of $3,120,133.85, which the defendants refused to return to Cates upon her request, also constitute part of the loss properly ascribed to the defendants as relevant conduct. In addition, Cates' subsequent $5 million investment in the SBIC, the $225,000 in interest that was paid into her Amerindo account, and the $425,000[4] that the defendants stole from her also constitute losses under the Guidelines. In the aggregate, these losses total $9,770,133.85.

### b.   The Mayers

The Mayers began investing with Amerindo in 1988, at which time they invested $700,000 in the "GFRDA" program. (Tr. 839-42). In total, over the course of several years, the Mayers invested nearly $6 million with the defendants. (Tr. 878; Tanaka Mem. at 24). Over the course of the next 16 years the Mayers received interest payments totaling several million dollars. Also, in 1998 the Mayers withdrew approximately $4 million in funds from Amerindo (Tr. 901-04), which they subsequently reinvested with Amerindo in 1998. (Tr. 908-09). Finally, in January 2001, the Mayers made an $11,066,713.44 principal investment in the GFRDA program at an interest rate of 11% per annum. (Tr. 922-24; GXs 346, 2112). The investment was due to mature on December 31, 2003. (GX 346).

The loss amount relating to the Mayers that is attributable to the defendants

---

[4]      The unauthorized transfer of Cates' $250,000 was charged as an overt act in the conspiracy alleged in Count One. The $175,000 theft, about which Ms. Cates and Eugene Ross testified at length should be considered relevant conduct.

consists of the $11,066,713.44 that the Mayers invested in Amerindo's GFRDA program in January 2001.

### c.    **Tara Colburn**

Tara Colburn invested $1 million in the Amerindo GFRDA program in 2000. (Tr. 557; GX 475, 479, 481). The investment paid an interest rate of 9.5% per annum for the first two years and matured on February 10, 2003. (Tr. 557). The interest that accrued was reinvested by the defendants on Ms. Colburn's behalf. (Tr. 557-58). After accounting for the accrued interest that was reinvested with Amerindo, and certain payments made by the defendants to Ms. Colburn, there remained an unpaid balance owing to Ms. Colburn's estate, as of December 31, 2004, of $936,371.78 (Tr. 609-10), which constitutes the loss amount relating to Ms. Colburn.

### d.    **Graciela Lecube-Chavez and Robert Cox**

Graciela Lecube-Chavez invested $74,000 in Amerindo in 1989. (Tr. 300; GX 3308-20). At various times Lecube-Chavez withdrew funds from Amerindo. (See e.g., Tr. 320-21). Ultimately, an unpaid balance of $48,434.12 was left in her account (Tr. 352), which constitutes the loss amount relating to Ms. Lecube-Chavez.

Robert Cox invested approximately $60,000 with Amerindo. (Tr. 123). Although Cox received remunerations consisting of principal and interest payments over the years, the remaining unpaid balance in his Amerindo account, which included reinvested principal and interest, was $105,825.55. (Tr. 106-07; GX 667). Consequently, the loss amount relating to Robert Cox is $105,825.55.

### e.    **Dextra**

The evidence at trial demonstrated that Dextra invested a total of $21,242,288.86

21

with Amerindo in 1997 and 1998. (GX 8202-B). Although the trial evidence is insufficient to assess the remaining balance owed to Dextra by the defendants, this information is readily ascertainable from other documents in the Government's possession. Thus, based on a document signed by both Vilar and Tanaka, as of May 1, 1998, Dextra's GFRDA investment totaled $25 million. (*See* attached Ex. A (GX 3363-2-N/A)).[5]  According to another document, authored by Renata Tanaka and dated December 8, 1999, Dextra's total principal investment in the GFRDA had declined to $23 million due to "quarterly interest earned withdrawals [] from the $14 million and $5 million sub-accounts." (*See* attached Ex.B (AUK-36-04752-N/A)).[6]  According to this document, Dextra's sub-accounts consisted of three accounts in the amount of $14 million, $5 million, and $4 million, respectively. Based on a fax from Dextra to Renata Tanaka, dated June 16, 2005, demanding that Amerindo repay to Dextra the remaining balance in its account, it is clear that Dextra's GFRDA investment on that date totaled $19,774,431.18. (*See* attached Ex. C (GX 3362-11-N/A)).[7]

This evidence is further corroborated by various notes made by Renata Tanaka on May 25, 2005 and other dates that were found in the Dextra client files. These notes reflect a calculation of 3.2165% of $14 million ($450,000), and a calculation of 3.2165% of $5,204,738.91 under the heading "Accumulated Interest A/C." In relevant part, the notes reflect:

---

[5]     This document, signed by both Vilar and Tanaka has an "AUK-" bates prefix, was covered by the GX 9006 stipulation, and would have been admissible at trial.

[6]     The "AUK-" prefix on this document indicates that it was recovered from the documents maintained by Amerindo UK. The document is signed by Renata Tanaka, a co-conspirator, and would have been admissible as a statement in furtherance of the conspiracy.

[7]     This document, signed by both Vilar and Tanaka has an "AUK-" bates prefix, was covered by the GX 9006 chain-of-custody stipulation.

22

principal of $14 million, accumulated interest of $5,204,738.91, and an additional $561,918.59 "to pay." Those figures total $19,766,657.50, which is nearly identical to the unpaid balance that Dextra claimed was owed per attached Ex. C, discussed above. These notes also comport with the references to the $14 million and $5 million sub-accounts in attached Ex. B, also discussed above. Taken together, and in light of the trial evidence which demonstrated that Dextra invested approximately $21 million in the GFRDA, these documents provide persuasive evidence that the loss amount relating to Dextra consists of the unpaid balance of $19.7 million.[8]

### 2. **Applicable Law**

Application Note 3(E) to Section 2B1.1 provides, in relevant part, that "loss shall be reduced by . . . the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, cmt. (n. 3(E)). Nevertheless, the Second Circuit and other Courts of Appeals have held that, in cases such as this, where the defendants stole money from repeat investors, the loss amount is simply the amount of principal that the victims had invested in the final transaction. *See United States* v. *Alfonso*, 479 F.3d 570, 572-73 (8th Cir. 2007) (holding "that the district court properly declined to offset victims' gains on one investment against their losses on subsequent investments"); *United States* v. *Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997) ("We have held that loss in fraud cases includes the amount of property taken, even if all or part has been returned. . . . One reason for this rule is that, as in Carrozzella's case, the return of money as interest or other income is often necessary for the

---

[8]   It is clear that the defendants never repaid Dextra after June 16, 2005 given their repeated protestations at trial that they were prevented by the Government from repaying victims following their arrests on May 26, 2005.

scheme to continue."); *United States* v. *Mucciante*, 21 F.3d 1228, 1237-38 (2d Cir. 1994)

("Although [defendant] returned some of [victim-1]'s money, and repaid [victim-2] and [victim-3], he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for [victim-1]'s benefit.").

In November 2001, the United States Sentencing Commission amended the Sentencing Guidelines to clarify that "bargained for" interest should not be included in the calculation of loss. See U.S.S.G. § 2B1.1, cmt. (n. 3(D)(i)); U.S.S.G. Amendment 617, pp. 182-83 (November 1, 2001).[9] Accordingly, in a case in which a defendant induces a victim to invest principal in return for a sizable interest payment, but the victim then fails to repay the principal and the promised interest, the loss amount includes only the principal, and not the interest. *See United States* v. *Morgan*, 376 F.3d 1002, 1014 (9th Cir. 2004). However, this rule regarding "bargained for" interest only applies to outstanding investments, and not to interest that the defendant paid on prior investments in furtherance of his scheme to defraud. *See United States* v. *Coghill*, 204 Fed. Appx. 328, 330 (4th Cir. 2006). In *Coghill*, the Fourth Circuit explained that

---

[9] Prior to the passage of Application Note 3D(i), several circuits, including the Second, had held that "bargained for interest" was properly included in the determination of loss amount. *See United States* v. *Nolan*, 136 F.3d 265, 273 (2d Cir. 1998) (loss amount included the principal that victim had invested plus the unpaid interest that the defendant had promised to pay the victim); *United States* v. *Porter*, 145 F.3d 897, 899-901 (7th Cir. 1998) (same); *United States* v. *Aptt*, 354 F.3d 1269, 1277-78 (10th Cir. 2004) (addressing conduct that occurred prior to 2003); *United States* v. *Lowder*, 5 F.3d 467, 470-71 (10th Cir. 1993) ("Defendant defrauded his victims by promising them a guaranteed interest rate of 12%. He induced their investment by essentially contracting for a specific rate of return. He also sent out account summaries, showing the interest accrued on their investment. This is analogous to a promise to pay on a bank loan or promissory note, in which case interest may be included in the loss."); *see also United States* v. *Szeja*, 127 Fed. Appx. 890, 892-93 (7th Cir. 2005) ("[W]here the defendant makes specific representations about a property's value or promises the victim a particular return on an investment, the defendant's own valuation can be used to calculate loss at sentencing.").

Application Note 3D(i) does not apply to interest that the defendant had previously paid:

> The exclusion of interest from the calculation of loss under the
> Guidelines serves to prevent victims from recovering all interest
> they could have earned had the fraud never occurred. *See United
> States* v. *Morgan*, 376 F.3d 1002, 1014 (9th Cir.2004).  It does not
> follow, as [defendant] suggests, that payments already made that
> both parties understood would be applied in part to interest due and
> the remainder to principal ought to instead be applied solely to
> principal for purposes of calculating loss. Rather, the district court
> properly calculated loss by determining the outstanding principal
> balance of the loan less the amount the victims were able to
> recover through liquidation of the collateral provided to secure the
> loan.

204 Fed. Appx. At 330; *see also United States* v. *Partow*, 283 Fed. Appx. 476, 478 (9th Cir. June

5, 2008) ("rejecting defendant's argument that the district court should have deducted principal

payments because "the evidence did not support a determination that principal payments had

been made on the Rezanof loan."); *United States* v. *Hartstein*, 500 F.3d 790, 791-95 (8th Cir.

2007) (Where defendant solicited loans from numerous victims, promising to repay their

principal within a short time period and to give them free travel benefits including cruises and

first-class airline tickets, the Court concluded that "the travel benefits were akin to interest that

[the defendant] promised to her lenders" and found that "the payment of travel benefits, which

were valued at approximately $300,000, "did not in any manner restore to the victims the sums

they had loaned to Hartstein."). Consequently, in cases where the defendant makes interest

payments to victims, even if payments are made prior to the time at which the fraud is detected,

such interest payments do *not* serve to reduce the loss of outstanding principal under the

Guidelines.

3.      **Discussion**

As an initial matter, the defendants do not dispute that they owe more than $40 million to the respective victims identified above. (*See e.g.*, Vilar Summation, Tr. 5346 ("Did anyone ever say to you they didn't owe you the money, they weren't going to pay you the money? No. They're committed to the obligations and want to pay them."); Tanaka Summation, Tr. 5363 ("this is a civil dispute about debts [Tanaka] has never denied").[10]  At least one Court has held that in such circumstances, "where the defendant makes specific representations about a property's value or promises the victim a particular return on an investment, the defendant's own valuation can be used to calculate loss at sentencing." *United States* v. *Szeja*, 127 Fed. Appx. at 892-93.  Nevertheless, the defendants persist in challenging the findings of the Probation Office and claim that the loss amount is actually zero. (*See e.g.*, Vilar Mem. at 2-5; Tanaka Mem. at 23-26).  The defendants articulate a series of misguided arguments in support of this claim, none of which survives scrutiny.

a.      **Payments To Investors On Earlier Investments Do Not Reduce Losses Sustained by Those Investors On Subsequent Investments**

Tanaka claims that, because the Mayers, Lecube-Chavez and Cox received payments that exceeded their principal investments, these victims did not sustain any losses under the Guidelines. (Tanaka Mem. at 24).  In support of this baseless claim, Tanaka posits the specious proposition that Application Note 3(E) compels the Court to compute loss by crediting all payments to victims against their principal investments. (Tanaka Mem. at 26).  In taking this

---

[10]      The defendants may dispute the remaining unpaid balance owing to Dextra, evidence of which was not offered at trial; however, such a position would be in stark contrast to the defendants' acknowledgment that, as to every other victim identified by the Government, the defendants do, in fact, owe the unpaid balances identified by the Government.

tack, Tanaka ignores entirely the distinction between investors who made a one-time investment and investors, like the Mayers and Lily Cates, who reinvested much of the profits and interest they received from earlier investments. There is nothing in the language of Application Note 3(E) that remotely suggests that the profits or interest paid to an investor on earlier investments should reduce the loss sustained by that investor on subsequent investments. To the contrary, in *Alfonso* the Eighth Circuit squarely rejected the notion that profits on earlier investments serve to offset losses sustained on later investments.

 The defendant in *Alfonso* operated a Ponzi scheme in which he had repeat investors; i.e., the victims received a profit on prior deals but sustained heavy losses on the final investment. The defendant contended that the loss amount for any particular investor should offset that investor's final loss by the earlier profits that the investor received from the defendant. *Alfonso*, 479 F.3d at 571-72. The Court of Appeals disagreed, holding that "that the district court properly declined to offset victims' gains on one investment against their losses on subsequent investments." *Id.* at 573. The Court explained that:

>  Ponzi scheme operators do not provide investors with gains
> out of the goodness of their hearts or to lessen damage to investors,
> but to keep their fraudulent scheme running. . . . Accordingly, they
> should not reap sentencing benefits for making payments to
> investors that are designed to perpetuate their scheme.
>
>  The considerations that underlie [U.S.S.G. § 2B1.1, cmt. n.
> 3(F)(iv)]'s prohibition against offsetting one investor's losses by
> another investor's gains also counsel against allowing a defendant
> to use a victim's gains on an earlier investment to offset losses on
> that same victim's later investment. Just as gains realized by an
> individual investor lure other investors into the scheme, those gains
> may also entice that same investor to make further contributions to
> the fraudulent enterprise. A repeat investor is essentially in the
> same position as a new investor for these purposes. To hold

27

> otherwise would be to reward defendants for conduct that
> perpetuates, and constitutes a component of, the Ponzi scheme.

Id. at 572-73.

Moreover, during trial, Tanaka himself took the view that funds reinvested in the GFRDA program constituted new investments of principal, which Amerindo was obligated to repay just as it had repaid the principal on prior investments. (*See* Tr. 4240). Accordingly, the loss relating to the Mayers is the $11,066,713.44 they invested in Amerindo's GFRDA program in January 2001. The loss relating to Cates consists of: (i) the $425,000 the defendants stole from her Bear Stearns account, (ii) the $5,000,000 the defendants stole from Cates in connection with the SBIC fraud, (iii) the $225,000 in interest that was paid into Cates' Amerindo account, (iv) the reinvested $1 million of profits from Cates' original Rhodes Capital account, and (v) the $3,120,133.85 of "accumulated dividends + interest account" that consisted of profits and interest that Cates reinvested with Amerindo. The total loss relating to Cates is $9,770,133.85.[11]

---

[11] Although the Probation Office does not seek to hold the defendants liable for any losses attributable to investors Binna, Just Capital, Lynx, Nemo, Paragon, Worldwide, and the Kaye family, Tanaka nevertheless feels the need to mention that these investors were "all repaid in full, principal and interest." (Tanaka Mem. at 26). The Court should take note that many of these investors recouped their investments only after attorney Stephen Gray interceded on their behalf. (*See e.g.*, Tr. 4145 (Gray discussing litigation commenced by investor Beulah Birrd (Lynx) against Amerindo)). Thus, it appears that Amerindo returned funds to certain investors out of fear that the investors might detect their fraud through further investigation and/or litigation or otherwise. In light of the directive contained in U.S.S.G. § 2B1.1, Application Note 3(E), that the loss to investors should *not* be reduced by money returned to investors after "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim," it is arguable that the defendants should not be credited for funds reimbursed to certain of these victims. At a minimum the losses attributable to these investors consist of the costs they expended, both financial costs and the value of the time they spent, in an effort to recoup their Amerindo investments.

28

**b.     Interest Payments Made To The Victims Do Not Offset The Loss Of
Principal**

The defendants also rely upon U.S.S.G. § 2B1.1, Application Note 3(D)(i) in

support of their argument that the loss amount in the PSR is overstated because it includes

interest that was promised to the defendants.  (Tanaka Mem. at 27; Vilar Mem. at 4).  This claim

is baseless.

Insofar as the defendants contend that the interest payments they made to victims

should serve to reduce the loss of the victims' principal investments, this claim is flatly

contradicted by both the relevant case authority and common sense.  First, it does not follow

from the fact that loss omits "bargained for" interest, *see* U.S.S.G. § 2B1.1, Application Note

3(D)(i), that interest payments that have been previously made to victims somehow operate to

reduce losses attributable to the invested principal.  Inosfar as the Guidelines apply a "net loss"

approach, this requires that repayments of principal to investors must reduce the amount of lost

principal.  Accordingly, the Government does not seek to hold the defendants liable for Cates'

original $1.3 million investment in Amerindo because it appears that the principal relating to this

investment was returned to Cates (along with subtantial profits).  However, application of a "net

loss" approach does not require, or even permit, the reduction of lost principal by interest

payments made to victims.

As discussed above, the Fourth, Eighth and Ninth Circuits have all held that

interest payments made to victims specifically do *not* operate to reduce the loss amount under the

Guidelines when the loss consists of unpaid principal.  *See United States* v. *Coghill*, 204 Fed.

Appx. at 330 ("It does not follow, as [defendant] suggests, that payments already made that both

parties understood would be applied in part to interest due and the remainder to principal ought to instead be applied solely to principal for purposes of calculating loss."); *United States* v. *Hartstein*, 500 F.3d at 791-95 (payments "akin to interest that [the defendant] promised to her lenders . . . did not in any manner restore to the victims the sums they had loaned to Hartstein" and therefore did not reduce the loss calculation under the Guidelines); *United States* v. *Partow*, 283 Fed. Appx. at 478 ("rejecting defendant's argument that the district court should have deducted principal payments because "the evidence did not support a determination that principal payments had been made on the Rezanof loan.").

Like the Fourth, Eighth and Ninth circuits, this Court too should rule that interest payments made to victims do not serve to reduce the loss of the victims' unpaid principal investments. Indeed, a contrary ruling would have the anomalous consequence of allowing all borrowers who are prepared to commit fraud to borrow funds at a zero rate of interest. So long as such criminal borrowers make payments to the lenders that ultimately equate to the principal that was borrowed they will not be penalized for causing any loss to the lenders, even if such payments occur over a period of decades during which the lenders are wholly deprived of the use of the loaned principal. Such a result would be not only contrary to the relevant case authority, but antithetical to the principles of deterrence and just punishment that underpin the Guidelines.[12]

_____

[12] In fact, the rule precluding the inclusion of "bargained for" interest in loss calculations is animated, in part, by the desire to "avoid[] unnecessary litigation regarding the amount of interest to be included" and "is consistent with the general purpose of the loss determination to serve as a rough measurement of the seriousness of the offense and culpability of the offender." U.S.S.G. Amendment 617, p. 182 (November 1, 2001). Including interest that has already been paid to victims in the loss calculation would not involve litigation concerning "the amount of interest to be included." Moreover, reducing the outstanding unpaid principal balances owed to victims by interest paid to those victims would undermine the ability of the Guidelines to "serve as a rough measurement of the seriousness of the offense and culpability of the offender."

Insofar as the defendants claim that the Government seeks to hold them accountable under the Guidelines for losses attributable to unpaid interest payments owed to victims this is simply not the case. The Government seeks to hold the defendants accountable only for interest payments that were paid into the victims' Amerindo accounts *and reinvested* by the victims. Accordingly, the Government does not include in its Guidelines loss calculation promised interest that the defendants failed to pay to Lecube-Chavez, Cox, and the Mayers in 2004.

Finally, with respect to Tara Colburn, Tanaka argues that the loss amount at most equates to $450,000, consisting of Ms. Colburn's initial $1 million principal investment, less principal repayments of $550,000. (Tanaka Mem. at 27). Tanaka argues that the $550,000 that was returned to Colburn constituted a repayment of principal. It appears, however, that the portion of the trial record on which Tanaka relies does not make clear whether the repaid amounts constituted repayments of interest, principal, or both. In any event, even if the loss amount attributable to Ms. Colburn were found to be $450,000 rather than the nearly $1,000,000 set forth in the PSR, this would not affect the specific offense enhancement that would apply for loss under the Guidelines.[13]

---

[13] Tanaka's additional claim that he would have repaid Colburn in full had the Government not arrested him (Tanaka Mem. at 28) is undermined by the fact that he did not repay that money before the fraud was detected. The fact that a settlement agreement called for repayment of those funds at a date subsequent to detection of the fraud does not somehow obviate the fact that the losses suffered by Colburn were caused by the defendants' fraud, nor does it change the fact that these funds were not returned to the victim prior to detection of the fraud. Tanaka's attempt to analogize this case to *United States* v. *Rutkoske*, 506 F.3d 170 (2d Cir. 2007) and *United States* v. *Ebbers*, 458 F.3d 110 (2d Cir. 2006) under the theory that the Court must account for other factors that contributed to the defendant's loss (Tanaka Mem. at 28) is similarly unavailing. In fact, in circumstances in which a defendant induces the loss at issue by commission of the fraud, the defendant is liable for the full amount of loss notwithstanding the

31

**c.     The Court Should Reject Defendants' Argument That The Value of
The Four Bear Stearns Accounts Should be Credited Against Any
Loss Calculation**

Tanaka and Vilar both argue that the value of the funds in the four Bears Stearns

accounts – *i.e.,* accounts held in the names of ATGF, ATGF II, M26, and Techno Raquia –

should be credited against any loss calculation under U.S.S.G. § 2B1.1.  Tanaka suggests that

these credits against loss are warranted because the Government "argued that the funds in the

four Bear Stearns accounts was GFRDA money." (Tanaka Mem. at 31).  Vilar appears to

contend that such a crediting is also appropriate because the funds in the four Bear Stearns

accounts constitute pledged collateral, under U.S.S.G. § 2B1.1, note 3(E).  (Vilar Mem. at 2).

Defendants' arguments are baseless.

**i.     Contrary to Tanaka's Claims, The Four Bears Stears Accounts
Do Not Contain Solely GFRDA Money**

Tanaka argues that the Government should be judicially estopped from contesting

that the four Bear Stearns accounts contained GFRDA funds.  (Tanaka Mem. at 30).  Tanaka

further claims that the Government argued at trial "that the funds in the four Bear Stearns

accounts was GFRDA money" and should not be permitted to now claim that the Bear Stearns

accounts "did not contain the GFRDA money." (Tanaka Mem. at 31).  Accordingly, Tanaka

---

possibility that other factors may have contributed to the loss.  *See e.g., United States* v. *Leonard*,
529 F.3d 83, 93 (2d Cir. 2008) (noting that in circumstances involving a fraudulent inducement
district courts may appropriately calculate loss in a manner similar to rescission); *United States* v.
*Kelley*, 305 Fed.Appx. 705, 709 (2d Cir. Jan. 5, 2009) (Summary Order) (where clients
purchased securities without having been informed of the defendant's interests in the company,
"*although the securities at issue may have been subject to market forces,* the purchase of the
securities and the resulting losses are a direct result of [the defendant's] actions, and all of the
losses suffered by the victims are therefore attributable to him" (emphasis added)).

claims the funds remaining in the Bear Stearns accounts should be credited towards reducing any loss related to the GFRDA offenses. (Tanaka Mem. at 31). This argument should be rejected.

The Government's position has been, and remains, that the Bear Stearns accounts contained millions of dollars of investor funds that investors believed had been invested in Amerindo's GFRDA program. The Government never argued at trial that the Bear Stearns accounts contained *only* GFRDA funds, nor does it take that position now. As the Court will recall, the parties engaged in extended argument before the Court regarding the appropriate moniker to describe the four Bear Stearns Accounts on the Government's summary charts. Initially, the Government suggested labeling these accounts as "the GFRDA Accounts" (*see* Tr. 3778-82); but, ultimately, after extended discussion on the issue, the Government used the phrase "Funds Deposited by Certain GFRDA Investors Into Bear Stearns Accounts, 1995-2000" (*See,* *e.g.,* Tr. 4584 ("Those are the funds deposited by certain GFRDA investors into the Bear Stearns account in the time frame 1995 to 2000."); GX 8202). The Government never suggested or represented that all the funds in these four Bear Stearns accounts was "GFRDA money." To the contrary, the Government was always clear that it was unable to determine the origin of all the funds within the four Bear Stearns accounts, and consistently asserted that these four accounts represented accounts into which it was able to determine that a large number of GFRDA investors deposited their GFRDA funds:

> [The] Government intends to argue that four Bear Stearns accounts, about which we heard testimony about today, are the GFRDA accounts. The evidence of that is principally the fact that virtually all the money that we can identify as money that was invested by investors into the GFRDA program went from investors into one of these accounts.
> . . . .

33

> So, you know, we don't have perfect information, and we
> can't account for every dollar that was invested, and we can't
> account for what Amerindo did with all of the money that they had,
> because they had *commingled accounts*, and we just haven't been
> able to completely parse it out.  But we are introducing evidence of
> where money that investors invested in Amerindo's guaranteed
> fixed rate deposit account, guaranteed fixed rate deposit program
> went, and we believe that that constitutes a basis for us to argue
> that these are the accounts that contained the GFRDA funds.

(Tr. 3775-77 (emphasis supplied); *see also* Tr. 3773 ("[T]his [analysis] reflects . . . money

coming from the investors directly into the GFRDA investment."); Tr. 3785 ("Now, we don't

have a witness that can say which accounts constituted the GFRDA accounts.")).  Accordingly,

the record is clear that the Government never claimed that the four Bear Stears accounts

contained solely GFRDA money.  Rather, the Government consistently argued that these

accounts represented a known universe into which an identifiable subset of GFRDA money was

deposited by GFRDA investors.

### ii.     The Funds In The GFRDA Accounts Should Not Be Credited Against Loss

The Court should reject Vilar's and Tanaka's suggestion that the value of the

funds within the four Bears Stearns accounts should be credited against loss.  As stated above,

the Government has consistently argued that the four Bear Stearns accounts contained

commingled assets that included funds besides GFRDA deposits.  Indeed, the names of those

accounts – such as ATGF (Amerindo Technology Growth Fund) and ATGF II (Amerindo

Technology Growth Fund II) – demonstrate the commingled nature of the funds contained within

those Bear Stearns accounts.  It happens to be the case that a much larger portion of the Bear

Stearns accounts contained assets invested by ATGF investors.  The Government did not

34

introduce much evidence of this fact at trial for two reasons.  First, as the Court may recall, the

defense moved to preclude the admission of evidence relating to ATGF investments.  Second, the

Government agreed that, with certain exceptions, evidence relating to the ATGF investments was

largely irrelevant to the trial proceedings.  However, the fact that such evidence was not the focus

of the trial proceedings does not change the fact that the Bear Stearns accounts contained

substantial ATGF funds as well as funds derived from other sources, in addition to the GFRDA

funds.  In any event, in the Government's view the Court need not undertake the task of assessing

what portion of these accounts contained GFRDA funds because these funds were not returned to

investors before detection of the fraud and, therefore, as discussed above, cannot be used to

offset loss.  See U.S.S.G. § 2B1.1, Application Note 3(E).

Vilar also contends that the funds in the four Bear Stearns accounts consisted of

"pledged collateral."  (Vilar Mem. at 2).  This claim is patently false.  Vilar provides no citation

to the trial record or any other evidence to support this vacuous claim which should be summarily

rejected.

### d.    Tanaka's Guidelines Calculations Should  Reflect Offense Conduct Related To The Fraud Perpetrated On Lily Cates

Tanaka contends that he should not be held responsible for the losses suffered by

Cates because he was "acquitted" of the conduct that led to those losses, because it would be

improper for this Court to consider such "acquitted" conduct in determining his sentence, and

because even were it appropriate to consider the conduct, the Government could not prove the

conduct by a preponderance of the evidence.  (*See* Tanaka Mem. at 23-24, 31-34).  Tanaka is

wrong on all counts.

i.    **Tanaka Was Convicted Of Two Counts Alleging Fraud
Perpetrated Against Lily Cates**

Tanaka was convicted of investment adviser fraud (Count Four), a Count that

everyone understood to relate to conduct related to alleged fraud perpetrated against Cates.

While the evidence concerning GFRDA fraud spanned the period from 1986 through May 26,

2005, the SBIC fraud (of which Cates was the only victim) essentially began with the June 20,

2002 meeting in which Vilar persuaded Cates to transfer $5 million to Amerindo for the purpose

of investing in an SBIC and the misappropriation from Cates of $250,000 occurred in September

2003.  Count Four alleged that:

> From in or about June 2002 through on or about May 26, 2005,
> ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY
> ALAN TANAKA, the defendants, acting as investment advisers
> with respect to investors and potential investors in Amerindo
> Investment Advisors Inc. and its affiliated entities, unlawfully,
> willfully, and knowingly, by the use of the mails and means and
> instrumentalities of interstate commerce, directly and indirectly,
> did: (a) employ devices, schemes, and artifices to defraud clients
> and prospective clients;  (b) engage in transactions, practices, and
> courses of business which operated as a fraud and deceit upon
> clients and prospective clients;  and (c) engage in acts, practices,
> and courses of business that were fraudulent, deceptive, and
> manipulative.

(Indictment ¶ 48).  Tanaka never filed a motion with respect to any infirmity in Count Four, and

first raised a question about the conduct that it covered on November 7, 2008 in making a motion

pursuant to Fed. R. Crim. P. 29:

> With respect to Count 4, which is, I believe, the investment adviser
> count, the investment adviser count makes no specific allegation of
> any particular act whatsoever.  I assume, based on the years that are
> alleged, 2002 to 2005, that it relates solely to the SBIC allegations.
> But to the extent, your Honor, that the government is alleging that
> any actions with respect to the GFRDA are part of Count 4, I

> would argue that that must fail because, one, the count relates to
> being an investment adviser in the U.S. and, two, because it
> requires advice to clients, investment advice, and I don't believe
> there has been any testimony that the GFRDA accounts or clients
> were given investment advice.

(Tr. 4803). Tanaka's assumption that Count Four related to allegations related to Cates (the

SBIC fraud) and not the GFRDA fraud, was shared by the Court (*see* Tr. 4849) and confirmed by

the Government (*see* Tr. 4849, 4851). In ruling on defendants' Rule 29 motion, the Court found

with respect to Count Four that:

> Count four is also the investment advis[e]r count, and we clarified
> that it related to the SBIC conduct, the Lily Cates conduct and not
> the GFRDA. I think as long as that is clear, then I think that this
> count, clearly there's been sufficient evidence that would support a
> finding. I'm not saying the jury will find, but I think that there is
> enough for the government to argue and it would not be irrational
> for the jury to find that the government has met its burden with
> respect to count four.

(Tr. 4871-72). Following the Court's ruling on the Rule 29 motion, the Government reiterated

that Count Four did not relate to GFRDA conduct, and clarified that it covered not only the SBIC

fraud perpetrated on Cates but also the $250,000 misappropriation from Cates. (Tr. 4881-82).

Although Tanaka never sought a jury instruction to limit Count Four to the conduct that related

to the frauds perpetrated on Cates, both the Government and defense made clear to the jury in

summations that Count Four related to that conduct. In its summation, after a lengthy discussion

of the evidence of the SBIC fraud, and the misappropriation of $250,000 from Cates, the

Government stated:

> The evidence of the frauds perpetrated against Lily Cates is even
> more proof of the defendants' guilt with respect to count one of the
> indictment, the conspiracy to defraud clients by soliciting their
> funds with fraudulent promises to invest in products that didn't

37

exist and misappropriating the funds.

It's also proof of their guilt with respect to count two, which is
securities fraud, in connection with the sale of the SBIC product,
and Count Four, which charges the defendants with investment
advis[e]r fraud.

(Tr. 5327).

In his summation, Tanaka told the jury that ten of the twelve counts in the

Indictment, including Count Four, related to Cates:

Yesterday when we left off at the end of court, we were speaking
about the Guaranteed Fixed Rate Deposit Account program.  Now,
that program only relates to counts one and three of the indictment.
. . . .
Now turning, ladies and gentlemen, to the other counts of the
Indictment.  Ten of those counts relate to Lily Cates, ten of them.

(Tr. 5426-27).  Thus, counsel for Tanaka differentiated clearly between the GFRDA fraud, which

was alleged in both Counts One (conspiracy) and Three (securities fraud in connection with the

purchase and sale of notes in the form of Amerindo Guaranteed Fixed Rate Deposit Accounts),

and conduct related to the frauds perpetrated on Cates, which were related to the allegations in

the other ten counts of the Indictment, including Count Four.  Later, counsel for Tanaka

reiterated that point: "So let's take a look at some of the details of these charges, ten of them, that

relate to Lily Cates."  (Tr. 5445).

Given this history, and the guilty verdict rendered by the jury against Tanaka with

respect to Count Four, there can be no serious argument that Tanaka was acquitted of all offenses

that alleged wrongdoing related to Cates' investments.  To the contrary, Tanaka was convicted of

Count Four -- an offense that *only* related to fraud perpetrated by the defendants on Cates.

Furthermore, Tanaka was also convicted of conspiracy to commit securities fraud,

investment adviser fraud, mail fraud, wire fraud, and money laundering (Count One).  The

conspiracy charge described the scheme to defraud as follows:

> From at least as early as in or about July 1986 to on or about May
> 26, 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and
> GARY ALAN TANAKA, the defendants, perpetrated a scheme to
> defraud investors by soliciting millions of dollars of funds under
> false pretenses, failing to invest investors' funds as promised, and
> misappropriating and converting investors' funds to their own
> benefit and the benefit of others without the knowledge or
> authorization of the investors.  To execute the scheme, VILAR and
> TANAKA solicited and caused others to solicit victims to invest in
> fraudulent investment products, including the Amerindo SBIC
> Venture Fund LP and the Guaranteed Fixed Rate Deposit Account
> Program ("GFRDAs").  VILAR and TANAKA induced victims to
> invest in these products by, among other things, promising high
> rates of return, with little or no risk, within short periods of time.
> In truth and in fact, as VILAR and TANAKA well knew, these
> investment opportunities were fraudulent.  VILAR and TANAKA
> failed to fulfill their promises to the investors by, among other
> things, failing to invest the funds as promised, unilaterally
> changing the terms of the investments, and failing to redeem the
> investments upon the investors' requests.

(Indictment ¶ 6).  In describing the conspiracy charge, the Indictment alleged misconduct with

respect to Cates (Indictment ¶¶ 7-30), including the SBIC fraud (Indictment ¶¶ 10-26) and the

defendants' theft of $250,000 from Cates' managed account by forging her signature (Indictment

¶¶ 27-30).  The conspiracy charge also contained a description of the GFRDA fraud (Indictment

¶¶ 31-34).  Among the overt acts listed in Count One were eleven acts that related to the frauds

perpetrated on Cates (Indictment ¶¶ 42(n)-(t), (v)-(x), and (z)).  Tanaka expressly declined to

request a jury verdict form that specified the overt acts upon which the jury unanimously agreed.

(Tr. 4992-93, 5407).  In light of the jury's verdict on Count Four, described above, and Count

Three, it is reasonable to infer that Tanaka's conviction on Count One reflected the jury's finding

that Tanaka defrauded both Cates and the GFRDA investors.  Accordingly, the offense conduct

related to Cates should be included in the calculation of Tanaka's offense level.

> ### ii.    Even Were Tanaka Acquitted Of All Conduct Related To Cates, The Law Permits The Court To Consider That Conduct In Sentencing Tanaka

The Sentencing Guidelines "provide that in calculating a defendant's specific

offense characteristics, the district court is to, among other things, take into account 'relevant

conduct.'" *United States* v. *Maaraki*, 328 F.3d 73, 75 (2d Cir. 2003); *see also United States* v.

*Shumard*, 120 F.3d 339, 340 (2d Cir. 1997) ("The Sentencing Guidelines recognize that a

defendant should be held accountable for both the conduct underlying the specific count of which

he is convicted, and also any other 'relevant conduct.'"). Section 1B1.3(a) of the United States

Sentencing Guidelines defines "relevant conduct" as:

> (1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; [and]
>
> (2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts [*i.e.*, when the offense level is determined largely on the basis of the total amount of harm or loss], all acts and omissions

> described in subdivisions (1)(A) and (1)(B) above that were
> part of the same course of conduct or common scheme or
> plan as the offense of conviction[.]

U.S.S.G. § 1B1.3(a).

In determining loss amount under the Guidelines, a district court may consider conduct related to acquitted counts as "relevant conduct." As the Guidelines state, "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3(a), app. 1. Furthermore, "the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." *Id.* "Relevant conduct" may include loses resulting from conduct for which a defendant was not even charged, or convicted. *See United States* v. *Bove*, 155 F.3d 44, 48 (2d Cir. 1998) (holding that a district court properly include tax losses resulting from uncharged conduct in its Guidelines calculation as a "defendant need not have been charged or convicted of those related acts or omissions for them to qualify as relevant conduct.").

The Second Circuit has ruled conclusively — and, following the Supreme Court's decision in *United States* v. *Booker*, 543 U.S. 220 (2005), has continued to hold — that acquitted conduct may be considered for sentencing purposes under the Guidelines. *United States* v. *Jones*, 531 F.3d 163, 176 (2d Cir. 2008) (holding that post-*Booker*, a district court may take acquitted conduct into account when sentencing a defendant); United *States* v. *Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005), *cert. denied*, 547 U.S. 1060 (2006) (same); *see also United States* v. *Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) ("A sentencing court is not limited to considering only evidence of

the convicted offense; it may take into account other relevant conduct, and even acquitted

conduct[.]") (citations to U.S.S.G. § 1B1.3, *Vaughn*, and other authority omitted); *United States*

v. *Singh*, 390 F.3d 168, 191 (2d Cir. 2004) ("It is well-settled that acquitted conduct can be taken

into account in sentencing and that a preponderance of the evidence is all that is required to prove

the amount of loss.").  As the Second Circuit held (post-*Booker*) in *Vaughn*:

> district courts may find facts relevant to sentencing by a
> preponderance of the evidence, *even where the jury acquitted the
> defendant of that conduct*, as long as the judge does not impose (1)
> a sentence in the belief that the Guidelines are mandatory, (2) a
> sentence that exceeds the statutory maximum authorized by the
> jury verdict, or (3) a mandatory minimum sentence under § 841(b)
> not authorized by the verdict.

430 F.3d at 527 (emphasis supplied).  To be sure, the Second Circuit also explained in *Vaughn*

that, while district courts may still "take into account acquitted conduct in calculating a

defendant's Guidelines range," they "are not required to do so.  Rather, district courts should

consider the jury's acquittal when assessing the weight and quality of the evidence presented by

the prosecution and determining a reasonable sentence." *Vaughn*, 430 F.3d at 527 (citing *United*

*States* v. *Cordoba-Murgas,* 233 F.3d 704, 708 (2d Cir. 2000)); *accord Jones*, 531 F.3d at 176.

Tanaka urges this Court to ignore Second Circuit precedent because consideration

of acquitted conduct would violate his Sixth Amendment right to a jury trial.  (*See* Tanaka Mem.

at 31-33).  Yet Tanaka concedes, as he must, that the law of the Second Circuit does not support

his contention.  (Tanaka at 32 and n.10).  Indeed, this Circuit has definitively held that the

"acquitted conduct" holding in *United States* v. *Watts*, 519 U.S. 148 (1997), survives *United*

*States* v. *Booker*, 543 U.S. 220 (2005).  *Vaughn*, 430 F.3d at 526 (holding that *Booker* does not

"undermine the continued validity of the ruling in *Watts*.").  Furthermore, as this court stated in

*Vaughn*, "Courts of Appeal should continue to follow directly controlling precedent even where that decision appears to rest on reasons rejected in another line of decisions." *Id.* (citing *Agostini v. Felton*, 521 U.S. 203, 237-38 (1997)); *accord Jones*, 531 F.3d at 176.  Moreover, Tanaka fails to consider his convictions of three felonies, including a conspiracy count (Count One) that encompasses – under either a reasonable doubt standard or a preponderance standard – all his conduct.

Under these well-established principles, this Court can – and should – take into account Tanaka's acquitted conduct as relevant conduct when calculation his Guidelines sentencing range including, among other things, the loss amount attributable to Tanaka.

> **iii.    Even Were The Court To Find That Tanaka Was Acquitted Of Conduct Related To The Fraud Perpetrated On Cates, There Was  Ample Evidence At Trial From Which The Court Should Conclude That Tanaka Did Participate In That Offense Conduct**

The Government submits that the proof at trial of Tanaka's participation in the fraud perpetrated against Cates was overwhelming.  At a minimum, there was more than enough evidence for the Court to find, beyond a preponderance of the evidence, that Tanaka defrauded Cates as part of the relevant conduct for which he is responsible.

As discussed above, Tanaka played an integral role in stealing $250,000 from Cates' Bear Stearns account on September 25, 2003 by sending a letter of authorization to Bear, Stearns that bore the forged signature of Cates and directed the transfer of $250,000 from Cates' account to an Amerindo account.  (GX 1-T at 30-31; GX 3350-17; GX 4955).  Maxine Rye provided compelling, highly credible, detailed testimony about how Tanaka ordered her to cut-and-tape the signature of Cates from one document onto another document in order to make

it appear as if Cates had authorized the transfer of $250,000 from her account into an account controlled by the defendants. (GX 1-T at 30-31; GX 3350-17, 4955). The very next day Tanaka moved that $250,000 into one of Vilar's personal bank accounts. (Tr. 2428-34, 3496). This alone constitutes overwhelming evidence of Tanaka's participation in the fraud perpetrated against Cates.

Moreover, in August 2004, Vilar and Tanaka executed another unauthorized wire transfer of monies out of Cates' Bear, Stearns account. In that instance, they stole an additional $175,000 from Cates, the proceeds of which were used to pay down a margin call on a trade that occurred in another Amerindo account that Tanaka controlled. (GX 5851 at 2). Again, they used a document to effect the transfer that purported to have been signed by Cates. In fact, Cates neither signed the document nor authorized the transfer. (Tr. 2179-82). Cates testified that, after learning about this document from her Bear Stearns broker, she confronted Tanaka about the document and that Tanaka answered as follows with respect to Cates' inquiry about how her signature appeared on the document: "yours is -- wood block is the word. He says, I believe it's a stamp, and it could be a wood block or something . . . we're not going to call you or any of our clients whenever we need to do business. We just do it on their behalf." (Tr. 2185). Cates' testimony was further corroborated by Eugene Ross, who was present at the meeting in which Cates confronted Tanaka and Vilar about the $175,000 transfer. (Tr. 2484-85). According to Ross, after being confronted by Cates about the fraudulent transfer, Tanaka asked Vilar whether this would "kill our merger with Bear Stearns. (Tr. 2485).

Rye's testimony about Tanaka's involvement in the fraudulent $250,000 transfer, the similarity between that transfer and the fraudulent $175,000 transfer, and the testimony

elicited from Cates and Ross provide overwhelming evidence that Tanaka defrauded Cates out of $175,000 on August 9, 2004. This fraudulent scheme was inextricably intertwined with the charged scheme perpetrated against Cates and, as such, is part of the relevant conduct that should be considered in assessing the loss amount for which Tanaka is responsible.

Tanaka also participated in deceiving Cates about the $5 million SBIC investment. Although Tanaka was not present at the initial meeting that led Cates to invest $5 million in the Amerindo SBIC on or about June 20, 2002 (Tr. 2100-04; GX 701; GX 2199), her funds were deposited into an Amerindo bank account at Bear, Stearns that was controlled by Vilar and Tanaka. (Tr. 3641; GX 709). In addition, Tanaka was aware of the fact that the $5 million constituted an investment in Amerindo by Cates, as evidenced by his handwriting, and Maxine Rye's comments, that appear on the wire transfer instructions. (GX 3350-10). Furthermore, during the days and weeks following the deposit of Cates' funds into an Amerindo account, it was Tanaka who disbursed those funds to a personal bank account held by Vilar (Tr. 4609; GX 8203), to an AMI Account to pay for various Amerindo U.S. business expenses (Tr. 4609; GX 8203) and to an account in Luxembourg to repay a GFRDA investor, named Beulah Birrd, with whom Vilar and Tanaka, personally and on behalf of Amerindo, had entered into a settlement agreement involving the repayment of her $6 million investment in an Amerindo GFRDA. (Tr. 4609; GX 8203). The fact that Tanaka used Cates' money to pay back another Amerindo client, to finance Vilar's spending, and to pay certain Amerindo expenses constitutes ample evidence that Tanaka too, in addition to Vilar, defrauded Cates. When combined with the evidence that it was Tanaka who directed unauthorized transfers of $250,000 and $175,000, respectively, from Cates' accounts to pay for similar items (i.e., Vilar's personal expenses and

Amerindo's corporate expenses) the evidence of Tanaka's role in defrauding Cates is overwhelming.

Moreover, in addition to the foregoing, the evidence at trial demonstrated that Tanaka was apprized, in real time, of the lies Vilar was telling Cates about the status of her $5 million SBIC investment after Tanaka and Vilar had spent that money. (*See e.g.*, GXs 285, 4053). This, too, demonstrates Tanaka's complicity in the fraudulent scheme that was perpetrated against Cates.

**D.     The Multiple Victim Enhancement**

The Guidelines provide for a two-level sentencing enhancement if the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). Application Note 1 defines "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)" and further defines "person" to include "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." U.S.S.G. § 2B1.1, App. Note 1. The Second Circuit held in *United States* v. *Abiodun*, 536 F.3d 162 (2d Cir. 2008), that individuals who are ultimately reimbursed "can be considered 'victims' of a theft or fraud offense for purposes of U.S.S.G. § 2B1.2(b)(2) if -- as a practical matter -- they suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Abiodun*, 536 F.3d at 168-69. *Abiodun* further requires that any such loss, including the value of a victim's time expended in attempting to recover their money, must be included in the loss amount calculation of Section 2B1.1(b)(1). *Id.* at 169.

As discussed in Part I.C. of this memorandum, *supra*, the following victims suffered losses as a result of defendants' conduct: Lily Cates; Herbert Mayer, Lisa Mayer, Debra

Mayer,[14] Graciela-Lecube Chavez, Robert Cox, Tara Colburn, and Dextra.  In addition, the

defendants defrauded a number of other victims, including: Binna, Just Capital, Lynx, Nemo,

Paragon, Worldwide, and the Kaye family.  While these latter victims succeeded in recouping

their principal investments they undoubtedly expended resources in order to do so.  For example,

Beulah Birrd (Lynx) hired a lawyer and sued the defendants before she succeeded in recouping

her investment (which, unbeknownst to her, came from Lily Cates' SBIC investment).  A number

of the other victims retained Stephen Gray to assist them in recovering their investments.

However, because the Government is not in a position to quantify the costs to these victims, and

has not sought to include these costs in the loss calculation, the Government does not seek the

two-level enhancement that would otherwise apply under U.S.S.G. § 2B1.1(b)(2)(A)(i).

Nevertheless, the Government requests that the Court take into account, under 18 U.S.C. §

3553(a), that multiple victims were harmed by the defendants' fraud.

### E.    A Substantial Part Of The Fraudulent Scheme Was Committed Outside The United States

Section 2B1.1(b)(9)(B) provides for a two-level sentencing enhancement if "a

substantial part of a fraudulent scheme was committed from outside the United States."  U.S.S.G.

§ 2B1.1(b)(9)(B).   Both Vilar and Tanaka concede, as they must, that this two-level

enhancement applies to their offense conduct.  (Vilar Mem. at 6; Tanaka Mem. at 37).  The trial

record was replete with testimony and evidence concerning Tanaka's conduct in connection with

the offenses, much of which occurred from the offices of Amerindo UK in London, England, as

---

[14]      It is appropriate to count each of the Mayers as individual victims because the
investment was undertaken jointly by all of them (*see* GX 2112 (in which they all agreed to the
terms of the December 2000 investment of $11,066,713.44)), and they each suffered financially
as reflected in their victim impact statements (*see* Exs. D and E).

well as the involvement of individuals in Panama in connection with the sham Amerindo Panama

corporation and Morton Financial.  Accordingly, the Court should add this two-level

enhancement in calculating the defendants' offense levels.

**F.    The Investment Adviser Enhancement Should Be Added To The Offense Level Of Both Defendants**

Both Vilar and Tanaka contend that the four-level enhancement provided by

U.S.S.G. § 2B1.1(b)(16)(A)(iii) for offense conduct that involves violations of securities law by

individuals who, at the time of the offense, were investment advisers or were associated with an

investment adviser (the "IA Enhancement"), is inapplicable to their conduct.  Without citation to

any pertinent authority, both defendants argue that application of the IA Enhancement would

result in "double counting" because being an investment adviser is an element of one of the

offenses of which they were convicted (Count Four) and that, therefore, the applicable base

offense level applicable to that conviction implicitly takes into account the fact that they were

investment advisers.   (*See* Vilar Mem. at 5-6; Tanaka Mem. at 37).  Defendants' argument is

unsupported by law or logic.

**1.    By Its Terms The IA Enhancement Applies To Investment Adviser Fraud**

The Sentencing Commission explicitly intended that the investment adviser

enhancement apply to individuals whose conduct involved violations of the prohibition against

investment adviser fraud.

There are two pertinent prerequisites to the application of the IA Enhancement:

first, that offense involve "a violation of securities law," and second that, at the time of the

offense, "the defendant was . . . an investment adviser, or a person associated with an investment

adviser." U.S.S.G. § 2B1.1(b)(16).  The Application Notes to this provision make clear that the "securities law" referred to in the language of the enhancement includes the prohibition against investment adviser fraud of which both defendants were convicted. *See* U.S.S.G. § 2B1.1(b)(16), App. N. 14(A).  That Application Note defines "securities law" to include, among other things, "the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)," which in turn defines "securities laws" to include, among others, both the Securities Exchange Act of 1934 (which includes the general prohibition against securities fraud of which Vilar was convicted in Counts Two and Three, and of which Tanaka was convicted in Count Three) and the Investment Advisers Act of 1940 (which includes the prohibition against investment adviser fraud of which both defendants were convicted in Count Four). *See* 15 U.S.C. § 78c(a)(47).

Accordingly, not only do the Guidelines make clear that the IA Enhancement should be applied to investment adviser fraud, notwithstanding the fact that being an investment adviser is an element of that offense, but the Guidelines also apply to the convictions of Counts One, Two and Three.[15]

---

[15]     Defendants ignore the fact that, even were the Court to accept defendants' unsupported contention that the IA Enhancement should not apply to securities fraud convictions for which being an investment adviser is an element of the offense, they also were convicted of other offenses for which being an investment adviser was not an element of the offense and as to which the IA Enhancement applies.  Specifically, Vilar was convicted of two counts of securities fraud (Counts Two and Three), and Tanaka was convicted of Count Three.  Both defendants also were convicted of conspiracy to commit securities fraud (Count One), as to which the IA Enhancement also applies.  *See* U.S.S.G. § 2X1.1(a) (requiring the application of "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.").  Accordingly, even if the IA Enhancement does not apply to Count Four – a proposition that the Government does not accept – it clearly applies to Vilar's convictions of Counts One, Two and Three, and Tanaka's convictions of Counts One and Three, and their offense levels should