2.      **Defendants' Argument Is Illogical And Is Not Supported By The Guidelines**

Section 2B1.1(a) not only provides the base offense level for most fraud and other economic crimes, including mail fraud, wire fraud, investment adviser fraud, and securities fraud, but also provides the base offense level for a wide variety of other offenses, ranging from force, violence, and threats involving animal enterprises (18 U.S.C. § 43), to false claims for postal losses (18 U.S.C. § 288), to uttering counterfeit foreign bank notes (18 U.S.C. § 483), to false statements (18 U.S.C. § 1001), to theft from gaming establishments on Indian lands (18 U.S.C. § 1167), to coal depradations (18 U.S.C. § 1851), to false crop reports (18 U.S.C. § 2072). (*See* U.S.S.G. App. A). In light of the breadth of offenses that Section 2B1.1(a) covers, defendants' argument that the base offense level must take into account the special breach of trust involved when an investment adviser commits one of the crimes to which the Guideline applies (investment adviser fraud) is illogical on its face.

The illogic of defendants' argument is borne out by the history of the enhancement. The investment adviser enhancement was enacted as part of a package of amendments to the Guidelines in response to directives in the Sarbanes-Oxley Act of 2002. As the Sentencing Commission explained,

> The amendment expands the scope of this enhancement to cover . . . investment advisers, and associated persons of an investment adviser. . . . The Commission concluded that a four level enhancement appropriately reflects the culpability of offenders who occupy such positions and who are subject to heightened fiduciary duties imposed by securities law . . . similar to duties imposed on officers and directors of publicly traded corporations. Accordingly, the court is not required to determine specifically whether the defendant abused a position of trust in order for the

consequently be increased by four levels.

enhancement to apply, and a corresponding application note
provides that, in cases in which the new, four level enhancement
applies, the existing two level enhancement for abuse of position of
trust at § 3B1.3 . . . shall not apply.

U.S.S.G. App. C, amend. 653. Thus, it is clear that the Sentencing Commission determined that

it was appropriate to provide for greater penalties for crimes involving an abuse of the special

trust placed in investment advisers, and that the base offense level – which is applicable to a wide

variety of crimes regardless of whether those crimes are committed by an investment adviser –

and other potentially applicable enhancements were insufficient to take into account the gravity

of a violation of securities law committed by an individual associated with an investment adviser.

Moreover, the Commission explicitly found that Section 3B1.1's two-level enhancement for

abuse of a position of trust that had been applicable to individuals convicted of investment

adviser fraud prior to the adoption of Amendment 653 was insufficiently large, and that a four-

level enhancement was appropriate.[16]

The fact that the Sentencing Commission intended to provide for an enhanced

offense level for investment advisers that commit securities fraud above and beyond the base

offense level in U.S.S.G. § 2B1.1 is further established by the contrast between Section 2B1.1

and the regime established by the Commission in the Guidelines applicable to Offering, Giving,

Soliciting, or Receiving a Bribe (U.S.S.G. § 2C1.1) and Offering, Giving, Soliciting, or

---

[16]     Defendants completely ignore the standard two-level abuse of a position of trust
enhancement provided by U.S.S.G. § 3B1.3. Even if defendants' argument had any merit, that
two-level enhancement would clearly apply given the position of private trust that the defendants
occupied vis-à-vis their client-victims. *See, e.g.*, *United States* v. *Hirsch*, 239 F.3d 221, 227-28
(2d Cir. 2001) (finding defendant held a position of trust because he "was a broker and
investment advisor entrusted with investment discretion by his investors and because he had a
fiduciary and personal relationship (rather than an arms-length relationship) with his investors").

Receiving a Gratuity (U.S.S.G. § 2C1.2). The Guidelines applicable to cases involving bribes and illegal gratuities set forth two alternative base offense levels that *explicitly* take account of the abuse of public trust implicit in the crimes if carried out by a public official. Both U.S.S.G. § 2C1.1 and U.S.S.G. § 2C1.2 contain both a standard base offense level and an alternative, higher, base offense level to be applied if the defendant was a public official. Both of those Guidelines further instruct courts in their Application Notes not to apply the § 3B1.3 adjustment for abuse of position of trust. The Sentencing Commission adopted this alternative base offense level scheme in Amendment 666, which became effective on November 1, 2004.[17] Had the Commission intended to have the base offense level applicable to investment adviser fraud reflect the breach of the heightened duty of fiduciary responsibility held by investment advisers, it could have done so in the past five years. It's failure to do so is further evidence that the base offense level of Section 2B1.1 was not intended by the Commission to encapsulate additional punishment for breach of trust.

---

[17]    The Commission explained the amendment as follows:

> Sections 2C1.1 and 2C1.2 each are amended to include alternative base offense levels for public official defendants who violate their offices or responsibilities by accepting bribes, gratuities, or anything else of value. The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes.

U.S.S.G. Amend. 666 (Nov. 1, 2008 ed.).

3.    **The Court Should Reject Tanaka's Argument That The IA Enhancement Does Not Apply To His Securities Fraud Conviction**

Finally, the Court should reject Tanaka's argument that the IA Enhancement is inapplicable notwithstanding his conviction of Count Three because that conduct "did not relate to his alleged role as a United States registered investment adviser." Tanaka Mem. at 37. Section 2B1.1(b)(16)(A)(iii) does not require that the convicted defendant be associated with an SEC- registered investment adviser; rather, it ascribes to the term "investment adviser" the same definition as that provided for in Section 202 of the Investment Advisers Act of 1940. *See* U.S.S.G. App. Note § 2B1.1(14)(A). Section 202 defines "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b-2(a)(11). The evidence at trial was clear that Tanaka acted as an investment adviser, and the jury so found in convicting Tanaka of Count Four. Moreover, the evidence at trial made clear the defendants' efforts to hide behind commas and Panamanian shell companies, while presenting themselves to Cates and the GFRDA clients as "Amerindo" -- the U.S. regulated investment adviser with major institutional clients. The jury soundly rejected that legerdemain at trial, and this Court should reject Tanaka's final desperate effort to hide behind his Panamanian shell company to avoid the application of a Guidelines enhancement at sentencing.

G.    **Vilar And Tanaka's Conduct Warrants An Aggravating Role Enhancement**

Both Vilar and Tanaka agree with the Probation Office that their roles as organizers, leaders, managers or supervisors in the criminal activities for which they were convicted warrant a two-level increase in offense level pursuant to U.S.S.G. § 3B1.1(c).

**H.     Vilar's Offense Level Should Be Increased Because He is Subject To An Enhancement Under U.S.S.G. § 3C1.1 For Obstruction Of Justice**

Vilar disputes Probation's two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  (Vilar Mem. at 5).  Vilar contends that no enhancement is warranted because, by moving to suppress his post-arrest statements, he was only "putting the government to its proof."  (*Id.*).  For the reasons that follow, the two-point obstruction enhancement is warranted.

**1.     Applicable Law**

Section 3C1.1 of the United States Sentencing Guidelines requires a two-level upward adjustment "if . . . the defendant . . . attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to the defendant's offense of conviction and any relevant conduct."  U.S.S.G. § 3C1.1.  The enhancement applies where a defendant, "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory."  *United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993).  The enhancement also applies when a defendant "(a) threaten[s], intimidat[es], or otherwise unlawfully influenc[es] a co-defendant, witness, or juror, directly or indirectly, or attempt[s] to do so; [or] (b) commit[s], suborn[s], or attempt[s] to suborn perjury."  U.S.S.G. §3C1.1, App. Note 4.

Before applying an obstruction enhancement based on perjury, the sentencing court must find:  "that the defendant (1) willfully (2) and materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States* v. *Zagari*, 111 F.3d 307, 329 (2d Cir. 1997).  Testimony is "material" if it would tend to affect or

influence the issue under determination," if believed.  U.S.S.G. § 3C1.1, comment. (n.6); *see also United States* v. *Fayer*, 573 F.2d 741, 745 (2d Cir. 1978) ("The test of materiality is whether the false testimony was capable of influencing the fact finder in deciding the issue before him").

When the sentencing judge finds that the defendant "has clearly lied" in a statement made under oath, he "need do nothing more to satisfy *Dunnigan* than to point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." *United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996). For sentencing purposes, perjury need only be proved by a preponderance of the evidence. *See United States* v. *Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001). Once its factual predicates have been established, the obstruction adjustment is mandatory. *See United States* v. *Ruggiero*, 100 F.3d 284, 293-94 (2d Cir. 1996). "An obstruction enhancement under §3C1.1 may be imposed on the basis of a defendant's knowingly false affidavit submitted in support of a motion to suppress if the affidavit could have influenced disposition of the suppression motion." *United States* v. *Lincecum*, 220 F.3d 77, 80-81 (2d Cir. 2000).

## 2.   Discussion

This Court should impose a two-level upward adjustment for obstruction of justice because Vilar submitted a knowingly false affidavit to the Court that was material to the determination of his motion to suppress post-arrest statements.  In *Lincecum*, the defendant submitted an affidavit in which he falsely claimed that he had asked for an attorney during a post-arrest interview. *Id.* at 79.  Based on the allegations set forth in the affidavit, the district court held an evidentiary hearing in which law enforcement officers contradicted the defendant's allegations. *Id.*  Before the district court could decide the defendant's motion to suppress his

post-arrest statements, the defendant withdrew his motion. *Id.* at 80. After trial, the district court

held that the defendant was subject to a two-level upward adjustment for obstruction because of

the false representations in his affidavit. *Id.* The Second Circuit affirmed this adjustment,

finding that the defendant had knowingly submitted sworn misrepresentations that, if credited by

the district court, would have resulted in the granting of his motion to suppress. *Id.*

       In this case, Vilar submitted a sworn declaration in which he specifically claimed

that he had never been apprized of his *Miranda* rights. (Affidavit of Alberto Vilar dated

September 12, 2005 ¶ 4 ("On or about May 25, 2005, I was arrested at Newark Airport. To the

best of my recollection, and I believe my recollection is accurate, at no time before my arrest or

while I was being transported for processing or thereafter was I ever told or read a list of

rights.")). Judge Karas (to whom the case was then assigned) concluded otherwise, and found

Vilar to have been informed of his *Miranda* rights and affirmed that he (Vilar) understood them.

(*See* Order dated January 19, 2005, at 3-4.) By crediting the testimony of the agents, Judge Karas

necessarily concluded that Vilar's sworn statements to the contrary were false. Further, Vilar's

statements clearly were material in that, if true, they would have demonstrated a violation of

Vilar's constitutional rights that would have required the granting of his motion to suppress his

post-arrest statements. Under these circumstances, this Court, following *Lincecum*, should add a

two-level adjustment for obstruction of justice to Vilar's offense level.

## I.    Both Vilar And Tanaka Should Be Placed In Criminal History Category I

       Neither Vilar nor Tanaka have any criminal history points and, accordingly,

should be placed in Criminal History Category I. (*See* Vilar PSR ¶¶ 99, 139; Tanaka PSR ¶¶ 99,

133).

*       *       *

In sum, based on the arguments set forth above, the Court should endorse the Probation Office's Guidelines calculations, with the exception of the two-level enhancement that the Probation Office attributed for defrauding ten or more victims.  Consequently, the advisory Guidelines ranges for the defendants are 262 to 327 months for Vilar, and 210 to 262 months for Tanaka.  (See Vilar PSR ¶ 139; Tanaka PSR ¶ 133).

## II.

## APPLICATION OF THE SECTION 3553(a) FACTORS

As discussed below, the Government respectfully submits that application of the sentencing factors to Vilar's and Tanaka's conduct calls for the imposition of sentences within the advisory ranges established by application of the Sentencing Guidelines.

**A.    The Nature And Circumstances Of The Offenses And The History And Characteristics Of The Defendants**

**1.    Nature And Circumstances Of The Offenses**

Vilar and Tanaka were wealthy, powerful, respected financial professionals.  They did not commit these offenses against their peers or against their pension fund clients.  They didn't steal from those clients because, as was amply demonstrated at trial, they simply could not do so.  They deceived and stole from certain of their private clients – long-time friends, and investors – while paying off others for a simple reason: they thought that their victims were weak and that they could get away with it.  That's why they stole from Lily Cates to pay back Beulah Birrd, who had the resources to institute a legal action against them.  They stole from clients that they thought they could string along with lies and deception.  Vilar and Tanaka  committed these

57

offenses because they thought they could do so with impunity, and because they preferred to mislead and steal from clients rather than to sacrifice something personal like a race horse, personal property, or their ego to make good on their promises to their clients, or to support their failing business.

The losses that they caused ranged from the relatively small ($48,434.12 to Graciela Lecube Chavez) to the large (more than $11 million lost by the Mayers), but to each investor, no matter what the size of the loss, the loss was significant to them. The tactics used by the defendants ranged from the sophisticated (using a Panamanian shell company and crafting phony corporate documents in an effort to distance themselves from that company when necessary) to the crude (cutting and taping a client's signature on a wire transfer request to steal their money). And their motive was commonplace: greed.

Nothing about the nature and circumstances of the offenses committed by Vilar and Tanaka counsels for imposition of a sentence less than that recommended by the Guidelines.

### 2.   History And Characteristics Of The Defendants

As the evidence at trial demonstrated, Vilar and Tanaka were complementary partners in crime. Vilar was the public face, willing to lie to the world without hesitation whenever it suited his interest; Tanaka tried to stay behind the scenes, managing the operational details, while being careful to put as little as possible in writing, to say as little as possible to investors, and to hide behind the blizzard of lies told by Vilar. As shown below, however, their similarities far outweigh their differences. Both Vilar and Tanaka have shown a willingness to lie and deceive. Neither defendant is able to offer any compelling explanation for their supposedly aberrant behavior. Indeed, neither defendant has taken responsibility for his crimes.

Both defendants claim that there are no losses, no victims, and that the prosecution was based on technicalities at best.

There is nothing about the history and characteristics of either defendant to suggest that leniency would be appropriate.

### a.   Alberto Vilar

#### i.   Vilar's Character

Vilar grandiosely compares his circumstances to those of a Shakespearean tragic figure whose downfall was brought by his "pride and carelessness with the truth." (Vilar Mem. at 1). He has shown no remorse for his crimes and has offered no sympathetic explanation for his actions. Immediately prior to trial, Vilar was quoted in the New York Times as saying, with respect to his defrauding Lily Cates, "There's no way they can prove that. She made millions with the firm, and I had complete authorization to invest her money." (Ex. F at 4). He referred to the GFRDA allegations as "a 100 percent lie." (*Id.*). Immediately after trial, having had three and one-half years to reflect on his actions, and nine weeks to see the mountain of evidence that proved his guilt, when asked what went wrong, he could only say, "I don't know." (Ex. G at 1). Now, nearly a year after his conviction, he maintains that he "had no intention of stealing his clients' money." (Vilar Mem. at 1). In perhaps the most shocking assertion in his sentencing memorandum blames his victims for whatever losses they suffered: "[The Mayers] kept their money in the GFRDA program even though interest rates plummeted from 21% to 1%, [and] it would have been obvious to any reasonable person that the GFRDA money could not have been invested in accordance with the mix described in the Offering Circulars and produce interest of between 15% and 7%." (Vilar Mem. at 5).

This Court has already found Vilar to be an individual who simply can not be trusted. As the Court stated in detaining Vilar following his convictions, "[t]he record is replete, I think, with letters that reflect Mr. Vilar's willingness, at almost no provocation, to concoct and fabricate stories that are demonstrably false" and "there is ample proof in this case of Mr. Vilar disregarding the truth and making false statements to clients, to government agencies, even courts . . . ." (12/18/08 Tr. 5, 7). As the Court no doubt recalls from trial and the deception catalogued in the Government's post-trial bail submission, Vilar's pattern of lies and deceit includes: breaching his fiduciary duties to investors and friends for decades; lying to the IRS, lying to the SEC; submitting a false declaration to this Court in connection with his motion to suppress his post-arrest statements; twice falsely certifying to the County Clerk and Clerk of the New York County Supreme Court that he was a resident of the United Kingdom, when in fact he was not; and lying to the world at large by inventing a mythological childhood in Cuba.

Vilar seems unable to control his mendacity, and this fact weighs against leniency.

### ii.   Vilar's "Philanthropy" Is Far Outweighed By The Damage He Caused To Victims And Others

In an effort to counterbalance his history of fraud, deception and lies, Vilar's sentencing submission catalogues his public and private philanthropy. As Vilar candidly acknowledges, sentencing is a time to weigh the good against the bad (*see* Vilar Mem. at 8, 13), and given Vilar's emphasis on his charity, it is worth pointing out that Vilar: (1) made at least some of his charitable contributions with other people's money; and (2) made large promises that he could not keep – promises on which charitable institutions relied to their detriment.

In 1999, Vilar pledged $15 million to Washington & Jefferson College ("W&J")
to construct and equip a new building to be named The Vilar Technology Center and to support
other mutually agreeable projects. (*See* GX 5105-N/A, attached as Ex. O; Tr. 2971). In his
pledge letter, Vilar stated, "I understand that the College will be relying on this pledge for its
future activities." (GX 5105-N/A). With respect to the Vilar Technology Center, Vilar promised
to pay more than 60 percent of the costs associated with its construction, which was estimated to
total $22 million and $26 million in 2000 and 2001, respectively. (Tr. 2972, 2974). In addition,
Vilar promised to contribute to W&J's annual fund and to repay expenses advanced by W&J for
the Vilar Distinguished Artist Series, which brought artists and ensembles to W&J to perform.
(Tr. 2974-76). Vilar provided a total of $2.3 million to W&J, including $540,000 that he and
Tanaka stole from Cates. (Tr. 2997-3000; GX 8203; GX 76-E-1). W&J acted in reliance of
Vilar's pledges, and "exhausted [its] borrowing capacity" in so doing. (GX 5119-N/A, attached
as Ex. Q).

Vilar followed a similar pattern with his pledges to the American Academy in
Berlin ("AAB"). In 2001, Vilar pledged $4.5 million to fund a fellowship at AAB. (Tr. 3246).
Vilar also pledged an additional $400,000 to AAB to fund the hiring of a development director
that the organization would not have hired without Vilar's pledge. (Tr. 3247-48). Of the nearly
$5 million that Vilar pledged to AAB, he actually provided a total of $252,000 to AAB,
$177,000 of which he and Tanaka stole from Ms. Cates. (Tr. 3248, 3264; GX 8203; GX 76-E-2).

Vilar reportedly pledged millions to the Met, and fulfilled only a fraction of his
promises. (*See* James B. Stewart, "The Opera Lover," New Yorker, Feb. 13, 2006, pp. 5-6, 9, 12,
attached as Ex. H). Of the money that Vilar did give to the Met, $1.575 million is traceable to

funds that Vilar stole.  On or about December 21, 2000, Beulah Birrd sent approximately

$5,999,980 million to the Techno Raquia account at Bear Stearns, in connection with her

investment in GFRDA.  (GX 2096-D; GX 716-12).   On or about January 18, 2001,

approximately $5 million was sent from Techno Raquia to the PTC account in the Bahamas.

(GX 717-A-N/A, attached as Ex. P).   On January 29, 2001, $3.5 million was sent from the PTC

Account to Vilar's personal checking account at JP Morgan Chase.  (GX 76-A).  On February 1,

2001, Vilar wrote a check in the amount of $1.575 million to the Metropolitan Opera.[18]  (GX 76-

A; GX 76-D-1).  At trial, the evidence established that, when it came time to repay Ms. Birrd

pursuant to a settlement agreement, Vilar and Tanaka used approximately $2.85 million the $5

million SBIC investment they stole from Lily Cates to do so.  (GX 8203).  Regardless of whether

the money sent to the Met is viewed as money stolen from Ms. Birrd or money stolen from Ms.

Cates, Vilar again used stolen money for his philanthropic endeavors.

     Whatever positive benefits Vilar's very public efforts at philanthropy might have

had in terms of money contributed and inspiration to others to make charitable donations, those

efforts were at least matched by the negative consequences of stealing investor money to make

good on some of those commitments, and causing institutions to act in reliance on his unfulfilled

promises to their detriment.  Moreover, it is clear that his outsized pledges were in no small

measure an effort at self-aggrandizement.  Vilar wanted his name on buildings and in the news.

There can be little doubt that his charitable pledges were also good for business.  They allowed

---

[18]     On the same day, Vilar wrote another check in the amount of $500,000 to Fondazione
Teatro Alla Scala, another beneficiary of his philanthropy.  (*See* Vilar Mem. at 10).

him to mingle with the wealthy and powerful and to wrap himself and his firm in the mantle of legitimacy provided by the institutions to which he chose to contribute.

Even in pursuing his private causes, including making contributions to family, Vilar managed to cause harm.  Among the letters attached to Vilar's sentencing memorandum is a letter from his second cousin, John Walsh.  (Vilar Mem., Ex. E).  John Walsh wrote of his love for this "very troubled, complex, and charitable man," and spoke of the significance to his family of Vilar having offered to pay for his college tuition and those of his four siblings:

> Most significantly, he paid for my college education.  Only weeks before I started my freshman year, Alberto sent a letter to my parents offering to pay their five children's tuitions in full.  The gesture was unsolicited and unexpected; we considered it a near-miraculous burst of generosity.  The relief of 20 years' worth of tuitions overwhelmed my parents, even after they had saved college money our whole lives.  In a stroke, Alberto gave them comfort and peace of mind that they richly deserved.

(Vilar Mem., Ex. E).  Don Walsh, John Walsh's father, puts his son's letter in context:

1. I invested approximately $220K, which represented my share of the proceeds of my mother's estate, in the "offshore" Amerindo Technology Growth Fund and Rhodes Capital, on Alberto's recommendation.

2. Shortly before his arrest, Alberto's London Amerindo office sent me an account statement stating that the value of that account was over $200K.

3. Despite numerous documented attempts, by phone, mail and email, to reach officials in the London office, Amerindo's New York office, Alberto himself and his lawyers, I have never received any response as to the status or whereabouts of my money, or even an acknowledgment of my inquiry.

4. I have 5 children.  3 have graduated from college within the past 5 years and 2 are enrolled now.  I needed that money.  In fact, not uncharacteristically, Alberto had offered in 2000 to put them through college, and he did, in fact, pay much of the cost of tuition for my oldest child.

5.      I would like to know from Alberto or his attorney where that money is and whether I will ever see it again.

6.      I continue to believe it was not stolen by him.

7.      My financial wherewithal has been greatly diminished by the unavailability of that money.

(Ex. I attached hereto).  Vilar's charitable impulse was again greater than his wallet.  He left his cousin not only without the promised gift, but also without the money his cousin had invested with Amerindo.

The benefits of Vilar's public and private philanthropy must also be weighed against the damage he did to victims like the Mayers, Cates, Graciela Lecube-Chaves, and others, whose physical, emotional, and financial health have all suffered as a consequence of the frauds perpetrated on them by Vilar and Tanaka.  (*See* Point II.B.1, *infra*).

**b.      Gary Tanaka**

Like Vilar, Tanaka has shown no remorse for his acts; indeed, Tanaka maintains to this day that he did nothing wrong.  In an article posted on September 12, 2009 on the website www.bloodhorse.com, Tanaka is quoted as saying, "Basically, they nailed us on technicalities. There are no victims.  Nobody lost money.  Now you have super-frauds like (Bernard) Madoff who wiped people out.  Nobody lost money with us, and the feds are trying to put us away for long-term sentences when there are no victims.  They wasted $14 million and four years on us.  It doesn't make sense."  (Ex. J, attached hereto).

As the Court well knows, Tanaka was not convicted based on "technicalities." Tanaka was convicted of crimes that involved decades of lying to investors about how he, their fiduciary, the man responsible for Amerindo trading, had invested their funds.  Tanaka was

64

convicted because he helped to divert investor funds to benefit his failing firm, to repay other investors, and to fund the extravagant lifestyle of his business partner.  It was not a "technicality" when Tanaka ordered Maxine Rye to cut and tape Lily Cates's signature on a wire transfer instruction to steal $250,000 for the benefit of Mr. Vilar.  That straight-out theft, and the later theft of another $175,000 using the same crude method, was as brazen and non-technical a crime as could be.

Tanaka's failure to take any responsibility for his crimes counsels in favor of a Guidelines sentence.

### i.   Tanaka's Purportedly Upstanding Conduct In His Horse Racing Affairs Is Further Evidence Of His Lack Of Character

The conduct for which Tanaka was convicted stands in sharp contrast to the man described in a large number of the letters attached to his sentencing memo.  Those letters describe a man who has demonstrated integrity in his business relationships with trainers, breeders and others, as a prominent race horse owner both in the United States and abroad.  (*See* Tabs 2, 7, 9, 10, 11, 13, 20, 30, 32, 38, 41, 52, and 54).  The writers of those letters report Tanaka's consistent concern for horses' welfare (*see* Tabs 2, 32), that he "paid his invoices promptly" in 2003 and 2008 (Tab 2), and that "his word is stronger than any signed contract. (Tab 10).

Those letters show that Tanaka put his horse racing activities and his relationships with his agents, trainers, breeders, and counterparties ahead of the fiduciary duties he assumed as an investment adviser.  It is clear from these letters that Tanaka knows how to behave with integrity, that he is capable of being concerned for the welfare of others (whether they have two

65

legs or four), and that he is capable of meeting his personal obligations when he wants to.[19]  The trial record demonstrated, however, with Tanaka acted with the basest of motives in the decades of lies that he helped to perpetrate on GFRDA victims like the Mayers, who thought that he had invested their money as he had promised in writing, when in fact he had not.  Likewise, the testimony of Maxine Rye showed that he hardly acted with "complete transparency" (*see* Tab 7) when he directed Ms. Rye to cut and tape Lily Cates's signature on a wire transfer instruction so that he could steal $250,000 from Ms. Cates to benefit Vilar.

          Tanaka offers no explanation for his long-standing pattern of deceptive behavior with respect to his private clients – whether compared to how he treated his institutional clients (from whom he could not steal because their funds were in custodial accounts over which Tanaka only had trading authority), or compared to those involved in his horse racing activities. Perhaps his behavior is explained by the fact that his private clients did not have the information, resources or strength to place them on an equal footing with Tanaka as did his institutional clients or fellow thoroughbred race horse owners.  Perhaps Tanaka calculated that it was more important to have a good reputation in the horse racing world than to be known as a sharp dealer. In any event, it is clear that Tanaka's conduct in defrauding investment adviser clients was calculated and driven by self-interest, including obtaining funds for his business partner, and obtaining funds for the operation of their struggling firm.  Tanaka's reported upstanding conduct in his personal, private business affairs should carry little weight in his favor at sentencing.  His

---

[19]      The Government notes that it is a mystery how Tanaka has managed to keep up his successful horse racing business since his arrest – currently owning 20 horses that compete overseas – and yet reported to the Probation Office no assets or income related to that business other than $5,000 of "Racing Memorabilia." (*See* PSR ¶¶ 124-126, 129; Ex. J).

behavior was not aberrant, and it is not explicable by any circumstance, let alone a circumstance that provides any significant counterweight to his criminal conduct as measured by the Sentencing Guidelines.

### ii.     <u>Tanaka's Birthplace Is Irrelevant To Sentencing</u>

Tanaka asserts that the fact that he was born in an internment camp during WWII had effects on him that he urges the Court to consider in determining an appropriate sentence (*see* Tanaka Mem. at 3, 19).  Tanaka also provided the Court with numerous letters that, among other things, further call the Court's attention to the fact that Tanaka was born in an internment camp (*see* Tabs 3, 5, 8, 18, 28, 35, 36, 39, 40, and 57).   Notwithstanding the conclusions drawn by others about the impact of that experience, Tanaka apparently believes that the experience did not affect him as much as others report, and there is certainly no evidence in the record that his early years provide any explanation for the crimes he committed.

According to information that Tanaka provided to the Probation Office, Tanaka spent his first 2 ½ years in an internment camp; however "he has no recollection of how life was at the camp." (PSR ¶ 102).  Tanaka further described his subsequent childhood in Seattle as "enjoyable." (PSR ¶ 103).  Tanaka graduated from Massachusetts Institute of Technology and subsequently obtained a Ph.D. from Imperial College in London.  (PSR ¶¶ 105, 106).  Finally, Tanaka reports that "he has never suffered from any mental or emotional problems that required therapeutic care." (PSR ¶ 116).  Based on this record, the Court should give no weight to the fact that Tanaka's early childhood was spent in an internment camp.

**B.**     <u>The Purposes Of Sentencing</u>

**1.**     <u>The Seriousness Of The Offenses</u>

That the offenses of conviction were serious is beyond dispute.  The statutory

maximum sentences for the offenses enacted by Congress, and the stiff advisory sentences that

follow from the application of the considered judgment of the Sentencing Commission, make

that clear.  Such a result is not surprising because the anti-fraud laws are intended to protect both

individuals and the market, generally.  When previously respected investment professionals such

as Vilar and Tanaka are convicted of serious crimes that arise from their work, there are ripple

effects that include investor distrust of  investment professionals and the financial markets,

generally.  The human toll caused by the defendants' conduct was also palpable in the trial

testimony of victims and the impact statements that have been submitted to date.

Ed Swanson, writing on behalf of Lily Cates, states that because the defendants

stole more than $9 million from her, she was forced to sell the apartment where she had intended

to spend the rest of her life.  (*See* Ex. K at 1).  Moreover, the fact that Vilar (whom she

considered to be like a "brother") and Tanaka (whom she believed to be a "trusted friend") had

stolen from her was "an emotional bombshell."  (*Id.*).  "The stress on Lily from these revelations

has been almost overwhelming at times.  She not only has had trouble sleeping but has lost

significant weight."  (*Id.*).

Lisa Mayer, writing on her behalf, as well as her father, Dr. Herbert Mayer, wrote

on February 3, 2009:

> From December 2002 through today, it has been an
> excruciatingly painful and difficult fight to recover our money.  We
> believed that Alberto Vilar and Gary Tanaka were men of the

highest standards and it has been devastating to be deceived and to learn of their moral turpitude. Entrusting our hard earned money to these two greedy con men is a horror. They took us for a ride, ruined our lives and shattered our dreams.

What has made all of our ordeal even more heinous and outrageous is knowing that Alberto and Gary knew that my father was elderly, handicapped and sick and they selected us, among other victims to prey upon, while paying back full principal and interest to other clients. They thought that we would be took weak to ever fight back.

So how has this impacted us financially, physically and emotionally?

Financially, we have lost everything. In order to survive we had to incur [] an insane and staggering amount of debt, to borrow against all non-Amerindo assets. We re-mortgaged our Puerto Rico condos and the Yonkers house, took out lines of credit and sold our insurance policies and personal possessions. At this time we are completely insolvent, facing over five and a half million dollars of debt. We can't make the payments on these loans. The bank in Puerto Rico is foreclosing on our condos. The bank in New York is threatening to foreclose on our house. We don't know where we will live. Our cars are about to be taken from us for lack of payment.

. . . .

The aggravation and anxiety, the sleepless nights, the constant worrying and stomach aches have made our lives a living hell. Our eighty-eight year old father has suffered horrendously – in and out of hospitals by ambulance at all hours. He has been left in a very precarious and delicate condition requiring 24 hour care. For a man that gave so much of himself as a truly dedicated doctor saving countless lives and never, ever turning any patient in need away because of lack of finances, he is consumed with sadness and pain at having been defrauded.

Personally, I am in such a state of acute anxiety about whether or not I will be able to pay the Con Edison bill next month, how my family will eat and how long we will have a roof over our heads. I suffer from emotional gaps of extreme hopelessness.

The toll this disaster has taken on me has not yet been comprehended. I suffer from a serious sleep disorder as I am under enormous chronic tension and occasionally feel a tightening in my chest as if the weight of all this pressure is too much to bear. And I have buried my emotions for so long with a complete lack of a personal life.

Emotionally, I am numb from so many years of this hard fought battle. . . .

The last several years I have worked nonstop at compiling twenty years of paperwork, our financial history, in order to help recover our money. This has been a massive and stressful mission. My life is in disarray, shattered and I am barely able to withstand the race against time. . . .

(Ex. D at 7-9). For her part, Debra Mayer informed the Court that Vilar and Tanaka's crimes have harmed her health. (*See* Ex. E). She wrote of a gastric ulcer caused by stress, severe breathing episodes and disrupted sleep, and having to delay medical treatment because of her financial condition. (*Id.*). Ms. Mayer also reported that she "stressfully struggle[s] with all [her] immediate daily human necessities, such as [her] lodging, . . . electricity, telephones, television, insurance, food, etc. My car is about to be taken from me. I am horrified and terrified." (*Id.*). Ms. Mayer wrote that she had also "witnessed my father experience severe episodes of anxiety and breaking down to the point of weeping uncontrollably." (*Id.*). She concluded, "This spiraling collapse has created enormous anxiety for me in trying to cope with the present. I am very frightened for my future." (*Id.*).

Ms. Lecube-Chavez testified at trial that, in attempting to get her money back, she "felt like a beggar." (Tr. 381). On cross-examination, when asked about her frustration, she testified, "at my age, how much do I have to live? I want to live another 83 [years], but most probably I will not. And I want -- I want some peace, do you understand? Peace. And I don't

get it with this case. Of course, if you are my age and you work so much and you went through so much, and then I even lost my wonderful credit because I have to present bankruptcy." (Tr. 404). In her victim impact statement, Ms. Lecube-Chavez wrote that,

> The impact of the Vilar-Tanaka news aggravated my total health translating [it] into "an acute inflammation of the whole nervous system" according to two specialists at Mt. Sinai Hospital in New York. My hands and arms got swollen, I couldn't hold a pen or the phone, and I felt constant excruciating pain. I couldn't walk or move. Even today I can't reach the top of my head or put shoes on. I'm paying a lady to help me, and I driver because I can't take public transportation. I don't audition anymore for movies and TV commercials because I lack freedom of movement. I need a stroller to walk, and I can't climb stairs.

> My basic expenses are covered with my Social Security check and two small pensions from SG and AFTRA, the actors unions I belong to. My credit rating was excellent. But due to the circumstances detailed above, I faced bankruptcy. My son and his wife helped me pay for lawyers and incidentals that amounted to $2,500 and I endured constant harassment for an entire year, including weekends and late night phone calls by the banks, causing me more stress, inflammation of arms and legs, and pain that [] was hard to handle. I had to stop using contact lenses because I wasn't able to remove them!

> Since then, I jump every time the phone rings or there is a knock at my apartment door. I often have nightmares about all these events . . . .

> I want Mr. Alberto Vilar to grow older in jail, and somehow to get some of my money back, so I could have some peace.

(Ex. L, attached hereto).

The more than $85,000 of losses suffered by Robert Cox, have left his nephew, Gary Cox, with the prospect of running out of the funds necessary to provide medical care to his uncle who suffers from Alzheimer's disease. (*See* Ex. M).[20]

In light of the seriousness of the offenses committed by the defendants, and the harsh effects of the crimes on their victims, imposition of sentences in the ranges provided for by the Sentencing Guidelines is appropriate.

## 2.    Promotion Of Respect For The Law, Deterrence, And Just Punishment

It is important for both specific and general deterrence, and to promote respect for the law, that both Vilar and Tanaka receive sentences that include lengthy terms of incarceration. Lenient sentences would, in essence, vindicate their claims that they were convicted on technicalities, that there were no real crimes, real victims or real losses.  Lenient sentences would also reinforce the widely held belief that someone who jumps a subway turnstile or steals a loaf of bread would go to jail, while white collar felons who steal millions can continue to engage in expensive "hobbies" and avoid proportionate punishment.

Tanaka claims that he has "lost everything" and "already has been severely punished." (Tanaka Mem. at 44).  He continues to blame the Government for the destruction of his "indisputably legitimate and successful" business, and contends that no additional punishment is required to protect the public from Tanaka or to deter others from committing the crimes he committed.  (*Id.* at 44-45).  Finally, Tanaka asserts that he can receive better medical

---

[20]       The Government also attaches as Ex. N, a statement of Eugene Ross, who testified at trial.

treatment at Memorial Sloan Kettering Cancer Center than he would receive in prison. (*Id.* at 45). Tanaka's arguments do not provide a sound basis for a lenient sentence.

Tanaka has not "lost everything." The Mayers have lost everything, or nearly everything. Graciela Lecube Chavez was driven close to bankruptcy. Gary Cox doesn't have funds to care for his Alzheimer's afflicted uncle. Meanwhile, Gary Tanaka continues to run twenty thoroughbred racehorses around the world. He does not have a penny of debt. His "successful" business saw its assets under management plunge from about $10 billion to approximately $1 billion in the 2000-2003 time period, and because the fees that business generated (which were based on a percentage of assets under management) could not cover the costs of the business, he and Vilar fired employees, downsized offices, and stole $650,000 from Lily Cates to fund Amerindo's corporate checking account – an account that had a balance of only approximately $385,000 immediately prior to the arrests of the defendants. (*See* Tr. 259-60, 487-89, 1662-63; GX 78). With respect to his medical care, Tanaka has not provided the Court with any information that should give pause concerning the ability of the Bureau of Prisons to provide the care that he requires.

**C.   Tanaka's Arguments In Support Of A Probationary Sentence Are Unavailing**

Vilar concedes that an incarceratory sentence is appropriate in his case. (Vilar Mem. at 1, 13). Tanaka points out that a sentence of probation is available for each of his convictions, and he contends that a lengthy term of probation should be imposed with a requirement that he work for the benefit of investors. (Tanaka Mem. at 1-2, 45-46, 48). The Court should reject Tanaka's suggestion, and should instead sentence both defendants to lengthy terms of incarceration.

1.      **Tanaka's Offer To Help Amerindo Investors Other Than Cates And The
        GFRDA Investors If Sentenced To Probation Should Be Given Little Weight**

In support of his request for a sentence of probation, Tanaka brought to the

Court's attention the letter of Paul Marcus, an ATGF investor who asserts that,

> [m]y fellow investors (Cates, Heitkonig, Salvitti, and others) feel
> certain that if assigned the task, Tanaka could locate the existing
> assets and help them increase in value for our benefit. My fellow
> investors and I are among the largest investors/creditors in the
> events described in the SEC complaint. We are urging the court to
> be lenient, allowing and directing Gary Tanaka to locate the assets
> that would restore some of the remaining investors' losses. Tanaka
> can not help us while sitting in a jail cell.
>
> *We ask an urge the Court to direct that* Mr. Tanaka's sentence
> require that he devote all of his working time to locating and
> recovering the assets held by Amerindo/ATGF for the benefit of all
> Amerindo/ATGF investors.

(Tanaka Mem. Tab 29 (emphasis added); Tanaka Mem. at 1-2, 47-48). Neither Mr. Marcus, nor

Tanaka, explain why Tanaka could not, or would not, provide assistance in locating assets if

incarcerated. Nor does Mr. Tanaka explain why he has done nothing in the past four and one-

half years to assist victims to whom he concedes he owes money.

Even more importantly, Mr. Marcus was not a victim of the crimes for which

defendants were prosecuted and convicted, and he does not speak for those victims. Although

Mr. Marcus purports to speak for Ms. Cates, he has no authority to do so. According to the

September 30, 2009 letter from Edward T. Swanson, Esq. to the Court, written on behalf of Ms.

Cates,

> [Lily] is adamant that Mr. Marcus does not speak for her and was
> never authorized to do so. In fact Lily strongly disagrees with the
> urging by Mr. Marcus that Gary Tanaka be given probation. Mr.

74

> Tanaka knows where assets are hidden, and should be obligated to
> help in their recovery as part of his sentence.  Indeed, Mr. Tanaka
> apparently owns over 20 thoroughbred racehorses that have been
> racing around the world.  If Mr. Tanaka cares so much about his
> defrauded investors, why weren't the horses sold years ago and the
> proceeds placed in trust for the investors?  Unless Mr. Tanaka's
> sentence includes meaningful jail time, Mr. Tanaka will have made
> a mockery of the justice system.

(Ex. K).  Moreover, Tanaka's view that Ms. Cates did not suffer any losses, (see Tanaka Mem. at

17, 24, 31), cannot be reconciled with Mr. Marcus's assertion that Ms. Cates could benefit from

Tanaka's assistance.

Aside from the fact that the defendants comingled ATGF funds with GFRDA and

other funds, the losses suffered by Mr. Marcus as an ATGF investor have nothing to do with the

losses Cates and the GFRDA investors suffered at the hands of Vilar and Tanaka.  Indeed,

although ATGF investors did not assume the risk of being victims of fraud – something that the

Government did not attempt to prove in this case, but which is a subject of a pending civil action

brought by the SEC – ATGF investors did assume the risk that 100% of their investment would

be lost due to fluctuations in the public and private equity markets.  GFRDA investments

purported to involve no risk because they included the personal guarantees of Vilar and Tanaka

as well as the guarantees of their companies.  The SBIC investment was a complete sham

(something that Tanaka acknowledges is a possibility, see Tanaka Mem. at 42); the defendants

simply stole Ms. Cates's $5 million.

In sum, Mr. Marcus does not speak for the victims of the offenses for which Vilar

and Tanaka were convicted, and his sentencing recommendation, which Tanaka adopts, should

not carry any weight with the Court.

2.     **Tanaka's Effort To Use His Pretrial Litigation Strategy As Both A Shield And A Sword Should Be Rejected**

In his sentencing memorandum, Tanaka continues his longstanding pattern of making irrelevant and misleading assertions about why he was forced to wait "3 years, 4 months, and 4 days" from arrest to trial. Tanaka should not be permitted further to cloud the clear record. Having used his pretrial litigation strategy as a shield in an effort to preclude the use of evidence and to obtain early disclosures from the Government, Tanaka now seeks to use it as a sword: arguing that he has been "punished enough" because of the pretrial delays from which he benefitted. (*See* Tanaka Mem. 15-16, 38, 44). He should not be permitted to succeed.

Immediately following his arrest, Tanaka waived for two 30-day periods his right to be indicted. The Government subsequently requested two four-month exclusions of time to permit the Government to obtain evidence from foreign jurisdictions. What Tanaka fails to note, however, is that *every single day* for nearly three years, from September 12, 2005 to September 4, 2008, Tanaka had a motion pending in this Court – motions that would have stopped the Speedy Trial Clock in any event. *See* 18 U.S.C. § 3161(h)(1)(D). Those motions included motions: (1) to suppress all evidence obtained in the US search; (2) to suppress all computer evidence; (3) to quash a grand jury subpoena; (4) to suppress all evidence obtained from the United Kingdom in November 2005; (5) for a *Franks* hearing (twice); (6) for a bill of particulars; (7) for early pretrial disclosures; (8) to effectuate the suppression order; (9) to preclude evidence on grounds of taint (twice); (10) to preclude introduction of 404(b) evidence; and (11) to modify bail conditions (numerous). Thus, the "delay after delay" that Tanaka claims was granted to the

Government, *see* Tanaka Mem. at 16, in reality amounted to about six weeks (from July 28, 2005 to September 12, 2005).

Tanaka never moved to sever his case from that of his co-defendant. Perhaps it was part of his strategy to have Vilar next to him at trial so that the jury would be able to ascribe guilt to someone else for the charged crimes. Perhaps he calculated that the benefits he was receiving from Vilar's motion practice exceeded the personal cost. Perhaps he realized that any such motion was highly likely to fail and therefore was not worth the effort. Regardless of his reason, the fact remains that he never sought a severance. Moreover, it is undisputed that every exclusion of time under the Speedy Trial Act was lawful and properly supported by the record; indeed, Tanaka did not move to dismiss the Indictment prior to trial on the ground that the Speedy Trial Act had been violated, thereby waiving that right. *See* 18 U.S.C. § 3162((a)(2).

Despite his repeated references to his lengthy period of isolation from his wife and son, pretrial, during trial, and now, post-trial, Tanaka has never explained the reasons why his UK family has not visited him in the United States. The Court found Renata Tanaka to be a co-conspirator of Tanaka and Vilar (11/11/08 Tr. 77 ( "I find that Ranata Tanaka is a coconspirator, that the government has demonstrated that in spades.")). That Mrs. Tanaka may not have wished to expose herself to the risk of arrest were she to enter the United States is understandable, but it is hardly a reason that should generate much sympathy. The Government is sympathetic to Tanaka's son's situation; however, there has never been any explanation as to why Tanaka's son could not have flown to the United States either alone or with another friend or relative to visit his father. Given that Tanaka apparently has the resources to race thoroughbred horses around the world, he surely had the resources to buy a plane ticket so that

his son could visit him.  Moreover, on March 25, 2008, the Court authorized Tanaka to travel to London to review materials in preparation for trial, and to visit his family.  There is no evidence that Tanaka ever made any effort to do so.[21]

In short, Tanaka's lengthy separation from his family – much of which was caused by Renata's participation in a conspiracy and Tanaka's pretrial litigation strategy, which did nothing to shorten the time between indictment and trial – simply should not be a significant factor at sentencing.

**D.     The Sentencing Guidelines And The Need To Avoid Unwarranted Sentence Disparities**

The Sentencing Guidelines relating to white-collar crime have been the subject of much debate and consideration by the Sentencing Commission and others.  Since the 1990s, these Guidelines have been amended on numerous occasions to reflect the belief that, in some cases, white collar crime was not being sufficiently punished and adequate general and specific deterrence was not being provided, especially in light of the corporate scandals of the early 2000s that rocked the markets.  The applicable Sentencing Guidelines in this case – including the changes to the § 2B1.1 loss table following Sarbanes-Oxley, and the inclusion of the four-level IA Enhancement for investment advisers – reflect these concerns and thus reflect a step in the progression to greater deterrence of white-collar crime, and decisions by Congress and the Sentencing Commission that such increased deterrence is both fair and necessary.

---

[21]     Although the Government learned (to Tanaka's surprise) in connection with making logistical arrangements for the Rule 15 depositions in the summer of 2008, that the United Kingdom would not have permitted Tanaka to enter the country had he attempted to do so, what is significant is that Mr. Tanaka has repeatedly complained about his separation from his family but did not even make an effort to attempt to do so when given the opportunity.

Although no longer binding upon the Court, the Guidelines represent the considered judgment of the U.S. Sentencing Commission, a body of experts, drawn from all areas of the legal profession, specifically created to determine the appropriate sentence in particular types of cases.

As the Honorable Gerard E. Lynch has recognized, it is important for "rational judges [to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004). Judge Lynch further noted the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record." *Emmenegger*, 329 F. Supp. 2d at 426.  And both the *Booker* and *Crosby* courts stressed the continuing significance of the Guidelines under the new sentencing framework.

The Guidelines Sentences in this case reflect the seriousness of the offenses of conviction and the particular aggravating factors relating to defendants' conduct.  Imposition of Guidelines sentences would help to ensure that similarly situated defendants are treated similarly, and to avoid unwarranted sentencing disparities.

**E.**     **The Need To Provide Restitution To Victims**

Victims in this case deserve, and should be awarded restitution in this case. Neither defendant makes a persuasive case how leniency at sentencing will help to provide restitution to victims.  Indeed, if this case showed anything, it is that the defendants should not be

trusted to manage other people's money. Accordingly, this factor should not play a large part in determining defendants' sentences.

The Court should order restitution in the amount of at least $21,927,478.74, which accounts for the unpaid principal that the defendants owe to the victims identified below.[22]

| Victim | Principal |
|---|---|
| Lily Cates | $ 9,770,133.85 |
| Mayers | $11,066,713.44 |
| Tara Colburn | $    936,371.78 |
| Graciela Lecube-Chavez | $     48,434.12 |
| Robert Cox | $    105,825.55 |

Moreover, the Court should order the defendants to pay to the victims prejudgment interest on the unpaid principal.

"Title 18, United States Code, Section 3663A requires a sentencing court to order payment of restitution when sentencing a defendant convicted of . . . an offense against property under Title 18 . . . ." *United States* v. *Cummings*, 189 F.Supp. 2d 67, 76 (S.D.N.Y. 2002) (Cote, J.). Both defendants were convicted of Title 18 offenses. Moreover, both defendants were convicted of an "offense against property." Indeed, the Second Circuit has repeatedly found that restitution is mandatory for Title 18 offenses involving the theft of money. *See e.g.*, *United States* v. *Boyd*, 222 F.3d 47, 49 (2d Cir.2000) (defendants convicted of mail and wire fraud for making false statements and representations to induce customers to invest in gemstones at

---

[22]     The Government has not included the loss to Dextra in its restitution calculation because the Government has been informed that the entity that sustained the loss no longer exists and the successor in interest does not seek any restitution.

inflated prices); *United States* v. *Ismail,* 219 F.3d 76, 77 (2d Cir.2000) (defendant pleaded guilty

to embezzling funds from customer accounts); and *United States* v. *Maurer*, 226 F.3d 150 (2d

Cir.2000) (*per curiam*), *aff'g* 76 F. Supp. 2d 353, 355 (S.D.N.Y.1999) (defendant convicted of

issuing fictitious invoices to outside payee, and pleaded guilty to cashing deceased grandfather's

social security check and to passing forged checks to banks).

      The amount of restitution here includes, at a minimum, the victims' unpaid

principal investments. The fact that the defendants made interest payments to the victims does

not somehow reduce the lost principal they must return through restitution. *See e.g. United States*

v. *Davoudi*, 172 F.3d 1130, 1136 (9th Cir. 1999) (holding that, where defendant defrauded a

bank, the "interest paid is irrelevant except that it reduces the total outstanding interest"). In fact,

because "banks extend loans for the sole purpose of earning interest income, allowing [the

defendant] to subtract interest payments from the principal the bank lost would treat the

mortgage as an interest-free loan." *Id.* Accordingly, the Court should not reduce restitution by

the interest payments made the defendants previously made to the victims.[23]

      Finally, as indicated above, restitution should include prejudgment interest. The

Second Circuit has held that when a victim's funds are stolen from an interest bearing account,

the "actual value of the stolen property . . . at the time of sentencing was the nominal value of

the stolen funds plus the subsequent investment gains lost as a result of the theft." *United States*

v. *Scott*, 321 Fed. Appx. 71, 2009 WL 983032, 1 (2d Cir. April 14, 2009). In *Scott*, the

defendant stole clients' assets from three retirement accounts. *Id.* The Second Circuit reasoned

---

[23] Presumably the defendants will not oppose the Government's restitution proposal given their repeated acknowledgment that they do indeed owe the indicated amounts to the identified victims.

that "had the assets remained in those accounts, two of the three accounts would have increased in value by the date of sentencing. Moreover, in light of the fraudulent account statements issued by Scott to his victims and the victims' inaction, it is apparent that the funds would have remained in those accounts but for his theft." *Id.* This case is analogous to *Scott*. For example, had Lily Cates' SBIC funds remained in an escrow account, those funds would have earned interest for a period of years. Similarly, the other funds invested by Cates, as well as the GFRDA investors were maintained in Amerindo accounts. Had those funds been invested according to the defendants' representations they would have earned interest too. Other circuits have similarly held that restitution awards should include prejudgment interest. *See e.g.*, *United States* v. *Gordon*, 393 F.3d 1044, 1058 (9th Cir. 2004) ("foregone interest is one aspect of the victim's actual loss"); *United States* v. *Shepard*, 269 F.3d 884, 886 (7th Cir. 2001) ("return of the same number of dollars would be inadequate for purposes of § 3663A(b)(1)(A) because the money came from an interest-bearing account"). Consequently, prejudgment interest should be incorporated into the restitution calculus.

The Government would propose using the GFRDA represented interest rate on the last GFRDA investment made by GFRDA investors. For Cates, the Government would propose using an interest rate of 9%, which it understands to be the current rate being used by courts in New York state. Should the Court agree to order prejudgment interest, the Government will supply calculations for the prejudgment interest amount for each defendant using the interest rate deemed appropriate by the Court.

**III.**

**THE COURT SHOULD ORDER EACH DEFENDANT TO FORFEIT $80,473,840**

For the reasons set forth below, the Government respectfully submits that the Court should enter Preliminary Orders of Forfeiture, finding Vilar and Tanaka each liable for a personal money judgment in the amount of $80,473,840, and ordering the forfeiture of each defendant's right, title and interest in the entities, accounts, and real properties listed therein (the "Specific Property").[24]

**A.**     **Applicable Legal Principles**

    **1.**     **In General**

Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rising to the forfeiture allegations in an Indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. In particular, Rule 32.2(b) provides:

> (1) In General. As soon as practicable after a verdict or finding of guilty, or after a plea of guilty or *nolo contendere* is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay. The court's determination may be based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt.

---

[24]     The Government will submit proposed preliminary forfeiture orders after the Court makes the necessary findings, and prior to sentencing.

> (2) Preliminary Order.  If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment or directing the forfeiture of specific property without regard to any third party's interest in all or part of it.  Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

Fed. R. Crim. P. 32.2(b).

Although the court may enter a preliminary order of forfeiture prior to sentencing, the court must orally order the forfeiture at the time of sentencing.  *See* Fed. R. Crim. P. 32.2(b)(3) ("At sentencing--or at any time before sentencing if the defendant consents--the order of forfeiture becomes final as to the defendant and must be made a part of the sentence and be included in the judgment.").

2.    **Burden of Proof**

Criminal forfeiture is "an aspect of sentencing."  *Libretti* v. *United States*, 516 U.S. 29, 49 (1995).  Because fact-finding at sentencing is established by a preponderance of the evidence, the preponderance of the evidence standard applies to criminal forfeiture.  *United States* v. *Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).  Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying the proposed personal money judgment listed in the Preliminary Order of Forfeiture.

84

3.    **Property Subject to Forfeiture**

The forfeiture statute pertaining to securities fraud and wire fraud broadly

provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived

from proceeds traceable to [the] violation."  18 U.S.C. § 981(a)(1)(C).[25]

The offense of money laundering also carries forfeiture penalties.  Section

982(a)(1) of Title 18, United States Code, provides:

> The court, in imposing sentence on a person convicted of an
> offense in violation of . . . section 1956 . . . shall order that the
> person forfeit to the United States any property, real or personal,
> involved in such offense, or any property traceable to such
> property.

18 U.S.C. § 982(a)(1).  Property involved in a money laundering offense includes assets that

facilitate the offense, even if they are not the direct subject of the money laundering transaction.

For example, assets of a business that help "bankroll" money laundering and the business

premises on which the transactions occur are forfeitable as property involved in the money

laundering offense.  *United States* v. *Baker*, 227 F.3d 955, 969-70 (7th Cir. 2000); *see also*

*United States* v. *Schlesinger*, 396 F. Supp. 2d 267, 273 (E.D.N.Y. 2005) (factory and business

used in furtherance of money laundering offense were properly forfeited as property involved in

the offense).[26]

---

[25]    Although Section 981 is a civil forfeiture provision, 28 U.S.C. § 2461 provides
that criminal forfeiture is mandated where federal law provides for civil forfeiture but there is no
parallel criminal forfeiture provision.  Section 2461 further provides that "[t]he procedures [in 21
U.S.C. § 853] apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of
such section [relating to burdens of proof and presumptions] applies only in cases in which the
defendant is convicted of a violation of such Act."

[26]    The provisions concerning forfeiture contained in 21 U.S.C. § 853 also apply to
forfeitures under 18 U.S.C. § 982(a)(1).  *See* 18 U.S.C. § 982(b)(1).

In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may obtain a money judgment against the defendant to recover the amount of the defendant's crime proceeds. *E.g.*, *Baker*, 227 F.3d at 970 (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond); Fed. R. Crim. P. 32.2. In a money laundering case, the Government may obtain a money judgment equal to the amount of property involved in the money laundering offense. *E.g.*, *United States* v. *Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005) ("Forfeiture under section 982(a)(1) in a money-laundering case allows the government to obtain a money judgment representing the value of all property involved in the offense, including the money or other property being laundered (the corpus), and any property used to facilitate the laundering offense.") (citation and internal quotation marks omitted).

Numerous courts of appeals, including the Second Circuit, have defined proceeds as property the defendant would not have obtained or retained *but for* the criminal offense. *See United States* v. *Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989); *United States* v. *DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997); *United States* v. *Angiulo*, 897 F.2d 1169, 1213 (1st Cir. 1990); *United States* v. *Ofchinick*, 883 F.2d 1172, 1183 (3d Cir. 1989); *United States* v. *Horak*, 833 F.2d 1235, 1242-43 (7th Cir. 1987); *see also United States* v. *Ivanchukov*, 405 F. Supp. 2d 708, 712 (E.D. Va. 2005); *United States* v. *Reiner*, 397 F. Supp. 2d 101 (D. Me. 2005); *United States* v. *Cianci*, 218 F. Supp. 2d 232, 235 (D.R.I. 2002).

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *E.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181

86

(2d Cir. 2009) (defendant convicted of food stamp fraud was properly sentenced to a forfeiture money judgment equal to the entire loss amount paid by the government, without subtracting the amount of cash that the defendant shared with the food stamp beneficiary; "Because the statute [18 U.S.C. § 981(a)(2)(A)] directs that 'proceeds' are not limited to net profits from the crime, and because any proceeds directly traceable to food stamp fraud are subject to forfeiture, the district court did not commit error by entering a forfeiture order equal to the entire loss amount."); *Huber*, 404 F.3d at 1058-59 (in a money laundering case, concluding that the legitimate expenses incurred in acquiring forfeitable funds should not be deducted from the amount to be forfeited even though the money expended is no longer in the defendant's possession); *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme."); 18 U.S.C. § 981(a)(2)(A) ("In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.").

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *E.g.*, *United States* v. *Day*, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008) (amount of money judgment is not limited to "those assets in the defendant's possession at the time forfeiture is ordered") (citing cases); *United States* v. *Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006) (forfeiture judgment may

87

be entered for the full amount of criminal proceeds, even if the defendant is unable to satisfy the

judgment at the time of sentencing; otherwise, defendants would be able to "dissipate those

proceeds and avoid liability for the ill-gotten gains"); *United States* v. *Hall*, 434 F.3d 42, 59 (1st

Cir. 2006) (district court may order the defendant to forfeit a sum of money equal to the drug

proceeds that he earned but did not retain); *United States* v. *Casey*, 444 F.3d 1071, 1074-76 (9th

Cir. 2006) (because forfeiture is mandatory, a defendant who has already spent the proceeds of

his drug offense must pay a money judgment; otherwise he will have been allowed to enjoy the

fruits of his crime, which would be inconsistent with the remedial purpose of the statute); *United

States* v. *Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4-5 (S.D.N.Y. Oct. 24, 2007)

("Where a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the

money judgment against the defendant is effectively an *in personam* judgment in the amount of

the forfeiture order.").

> As the First Circuit explained in *Hall*,

> > There are two primary reasons for permitting money judgments as part of criminal forfeiture orders. First, criminal forfeiture is a sanction against the individual defendant rather than a judgment against the property itself. Because the sanction "follows the defendant as a part of the penalty," the government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction. *Robilotto*, 828 F.2d at 948-49. Second, permitting a money judgment, as part of a forfeiture order, prevents a drug dealer from ridding himself of his ill-gotten gains to avoid the forfeiture sanction.

434 F.3d at 59 (internal citations omitted).

> In cases involving continuing schemes and conspiracies, the amount involved in

the entire scheme is forfeitable. *See United States* v. *Hasson*, 333 F.3d 1264, 1279 n.19 (11th

Cir. 2003) (in money laundering case, court may not impose a forfeiture order based on a money

laundering offense with which defendant was not charged or for which he was acquitted, but if

defendant is convicted of a conspiracy, the forfeiture may be based on amounts defendant

conspired to launder, including amounts derived from uncharged substantive conduct, or

substantive counts for which he has been acquitted).  Furthermore, "co-conspirators are liable

jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity."

*United States* v. *Coleman Commercial Carrier, Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002);

see also *United States* v. *Fruchter*, 411 F.3d 377, 383-84 (2d Cir. 2005) (affirming imposition of

joint and several liability for all proceeds reasonably foreseeable to defendant in RICO case,

including proceeds derived from acquitted conduct); *United States* v. *Benevento*, 836 F.2d 129,

130 (2d Cir. 1988) (affirming imposition of joint and several liability on defendant under 21

U.S.C. § 853(a)(1) rather than limiting forfeiture to property acquired solely or wholly by

defendant).

   In fraud cases involving a continuing scheme, this means that the defendant is

liable for the full amount derived from the scheme, even if he is charged with and convicted of

only a few substantive counts.  *See United States* v. *Boesen*, 473 F. Supp. 2d 932, 952 (S.D. Iowa

2007) (in a fraud case, forfeiture is imposed because the defendant has been convicted of

perpetrating a scheme; it does not matter how many executions of that scheme were alleged in

the indictment; hence a defendant convicted of 82 substantive counts of health care fraud must

forfeit the proceeds of the entire scheme, not just the proceeds involved in the 82 counts on

which he was convicted); *United States* v. *Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007) (citing

*Boesen* and noting that if a defendant is convicted of mail or wire fraud, or any other offense of

which a scheme is an element, he is liable for the proceeds of the entire scheme); *United States* v.

*Phillips*, 434 F.3d 913, 915 (7th Cir. 2005) (pretrial restraint of defendant's assets is not limited

by the amount involved in the specific substantive health care fraud counts alleged in the

indictment as long as the amount of proceeds derived from the entire scheme is alleged as well).

**4.      Substitute Assets**

Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure provides that:

> On the government's motion, the court may
> at any time enter an order of forfeiture or
> amend an existing order of forfeiture to include property that:
>
> *            *            *
>
> (B) is substitute property that qualifies for forfeiture under an applicable statute.

Fed. R. Crim. P. 32.2(e)(1).

In addition, Title 21, United States Code, Section 853(p) provides that, if any

forfeited property cannot be located upon the exercise of due diligence, has been transferred, sold

to or deposited with a third party, has been placed beyond the jurisdiction of the Court, or has

been commingled with other property which cannot be divided without difficulty, as a result of

the defendant's own actions, the "court shall order the forfeiture of any other property of the

defendant up to the value of property so transferred by the defendant." 21 U.S.C. § 853(p).

Thus, the court may order the forfeiture of substitute assets to satisfy a money

judgment where the money judgment represents the value of the proceeds of the offense, or

property involved in the commission of the offense, that cannot be forfeited directly for one of

the reasons set forth in Section 853(p). *See, e.g.*, *United States* v. *Candelaria-Silva*, 166 F.3d 19,

42-44 (1st Cir. 1999); *United States* v. *Davis*, No. 00 Civ. 8296 (SHS), 2001 WL 47003, at * 1 (S.D.N.Y. 2001).

Once the court enters an order forfeiting a defendant's interest in substitute assets, any person who claims an interest in the substitute assets has an opportunity to challenge the Government's entitlement to the properties during the ancillary forfeiture proceedings. *See* 21 U.S.C.§ 853(n) and Rule 32.2(c) and (c)(2)(B). Under Section 853(n) and Rule 32.2(e)(2), the Government must provide notice of its intent to dispose of forfeited property to known interested parties. Persons alleging an interest in the forfeited property then have 30 days, from the date of last publication or actual notice, within which to petition this Court for a hearing to determine the validity of their claims. 21 U.S.C. § 853(n)(2). If no petitions are filed or the petitions are denied, then the Court may issue a final order of forfeiture as to the substitute assets.

**B.**     **Discussion**

**1.**     **The Proposed Money Judgment**

The Government seeks the entry of two Preliminary Orders of Forfeiture imposing upon each defendant a personal money judgment in the amount of $80,473,840, representing the approximately $75,220,881 of proceeds derived from securities and wire fraud offenses, and $5,252,959, which is equal to the amount of property involved in the money laundering offenses. This calculation is consistent with the evidence at trial.

Specifically, the evidence at trial demonstrated that the defendants obtained approximately $69,795,881 in connection with the GFRDA securities fraud scheme alleged in Counts One and Three, of which both defendants were convicted. The evidence supporting that figure is as follows:

**Forfeitable Proceeds From GFRDA Fraud**

| Investor | | Amount | Source |
|---|---|---|---|
| Mayers | $ | 5,800,000 | Tanaka Mem. 24; GX 8202-B |
| Crain | $ | 400,000 | DX MB; Tr. 4907; GX 8202-B |
| Dextra Holdings Ltd. | $ | 25,000,000 | GX 3363-2 N/A; GX 8202-B |
| Tara Colburn | $ | 1,000,000 | GX 8202-B |
| Lynx/Beulah Birrd | $ | 6,000,000 | Tr. 4259 |
| Paragon Ventures | $ | 6,000,000 | DX JG; Tr. 4179, 4198 |
| Worldwide Tops Ltd. | $ | 10,000,000 | DX JN-1; Tr. 4208 |
| Pelican Trust | $ | 1,500,000 | DX JR; Tr. 4213 |
| Just Capital | $ | 3,700,000 | DX JD-1, JD-2; Tr. 4170-74 |
| Binna Holdings | $ | 7,500,000 | DX KC-5; Tr. 4223 |
| Nemo Holdings | $ | 2,000,000 | DX KI-3; Tr. 4243-44 |
| R.J. Urich | $ | 631,906 | DX MC-2 |
| Marianne Kaye | $ | 99,975 | GX 3333-11; DX MG; Tr. 4909-10 |
| Hrytsyk/Pavlovskyy | $ | 30,000 | GX 3490 |
| Graciela Lecube-Chavez | $ | 74,000 | GX 3308-20; Tr. 300 |
| Robert Cox | $ | 60,000 | Tr. 123 |
| **TOTAL:** | **$** | **69,795,881** | |

In addition, Vilar was convicted of Count Two, relating to the SBIC securities fraud scheme which netted $5 million from Ms. Cates, and was convicted of four money laundering offenses (Counts Eight through Eleven), which involved forfeitable property totaling $5,252,959 (all of which is also forfeitable because it was derived from the overarching conspiracy charged in Count One). Finally, the evidence at trial established that the theft of a total of $425,000 from Lily Cates's managed account at Bear Stearns was also part of the conspiracy charged in Count One. Mr. Tanaka is responsible for the $5.425 million stolen from Ms. Cates, as well as the forfeitable property involved in the money laundering offenses, because all of those offenses were reasonably foreseeable consequences of the conspiracy of which he was convicted, notwithstanding his acquittal on certain substantive counts. *See United States* v.

92

*Hasson*, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003); *United States* v. *Coleman Commercial Carrier, Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002); *see also United States* v. *Fruchter*, 411 F.3d 377, 383-84 (2d Cir. 2005) (affirming imposition of joint and several liability for all proceeds reasonably foreseeable to defendant in RICO case, including proceeds derived from acquitted conduct); *United States* v. *Benevento*, 836 F.2d 129, 130 (2d Cir. 1988) (affirming imposition of joint and several liability on defendant under 21 U.S.C. § 853(a)(1) rather than limiting forfeiture to property acquired solely or wholly by defendant).

To the extent defendants attempt to argue that it is impermissible to forfeit both the $5 million stolen from Ms. Cates in the SBIC fraud, as well as the slightly more than $5 million that was involved in the laundering of those fraud proceeds, their argument should be rejected. The Second Circuit has explicitly held that ordering the forfeiture of the certain funds twice — once as proceeds of fraud, and once as property involved in money laundering — is entirely permissible, because "fraud and money laundering are two offenses impacting two distinct sets of victims," and are ordinarily not grouped for sentencing purposes. *United States* v. *Schlesinger*, 261 Fed. Appx. 355, 361 (2d Cir. 2008); *see also United States* v. *Szur*, 289 F.3d 200, 216 (2d Cir. 2002) (individual investors suffered from defendants' fraud, while the public as a whole was the victim of defendants' attempts to conceal their relationship with one another and the source of their illegally obtained funds); *United States* v. *McCarthy*, 271 F.3d 387, 400 (2d Cir. 2001) (victims of pension embezzlement are employees, whereas the victim of money laundering is society at large, hurt by the defendant's use of the embezzled funds). As explained in *United States* v. *Napoli*, 179 F.3d 1 (2d Cir. 1999),

93

> The "victims" of fraud counts are those persons who have lost money or property as a direct result of the fraud. The "victim" of money laundering is, by contrast, ordinarily society at large. Society is harmed when, for example, the ill-gotten gains from a criminal enterprise are allowed to be used for profit, the sources of these funds are concealed from police investigation or criminals are allowed to "disperse[ ] capital from lawfully operating economic institutions to [other] criminals in and out of the country."

*Id.* at 7-8 (internal quotation marks and citations omitted, alteration in the original).

## 2.    The Specific Property

The Preliminary Orders of Forfeiture also includes the forfeiture of certain assets in which the defendants have an ownership interest, which will be used to satisfy the personal money judgment against the defendants.  The Government believes that it is appropriate to include the following substitute assets in the Preliminary Orders of Forfeiture:

a.    Any and all assets of the following companies:

    i.    Amerindo Investment Advisors Inc.;

    ii.    Amerindo Investment Advisors, Inc.;

    iii.    Amerindo Investment Advisors (UK) Ltd.;

    iv.    Techno Raquia, S.A.;

    v.    Amerindo Management Inc.;

    vi.    Amerindo Technology Growth Fund Inc.;

    vii.    Amerindo Technology Growth Fund II, Inc.;

    viii.    Olafson, Inc.;

    ix.    Amerindo Master Venture Fund LLC;

94

   b. J.P. Morgan Chase (f/k/a Bear Stearns & Co., Inc.) brokerage account numbers:

     i. 102-17995, held in the name of Techno Raquia, S.A.;

     ii. 102-01485, held in the name of Amerindo Management Inc., sub-Account M26;

     iii. 102-01490, held in the name of Amerindo Technology Growth Fund Inc.;

     iv. 102-01495, held in the name of Amerindo Technology Growth Fund II, Inc.;

     v. 102-15833, held in the name of Olafson, Inc.;

   c. All right, title, and interest of the defendants in the following:

     i. The Trustees of the Amerindo Advisors (UK) Ltd. Ret. Benefits Scheme;

     ii. Amerindo Investment Advisors Inc. Money Purchase Plan and Trust;

   d. Approximately $273,611.89 in funds formerly held by @Ventures Management, LLC for the benefit of Amerindo Technology Growth Fund II, Inc.;

   e. Approximately $1.6 million in funds on deposit at U.S. Bank for the benefit of Amerindo Technology Growth Fund II, Inc.;

   f. Any and all right, title, and interest in one or more apartment units located at 860 United Nations Plaza, New York, New York; and

   g. Any and all right, title, and interest in 7 High Coombe Place, Warren Cutting, Kingston Upon Thames, Surrey, England.[27]

(collectively, the "Specific Property").

---

[27] Item (f) is included only in the Preliminary Order of Forfeiture relating to Vilar, as Tanaka is not believed to have any interest in this property, and Item (g) is included only in the Preliminary Order of Forfeiture relating to Tanaka, as Vilar is not believed to have any interest in this property.

As the evidence at trial (including testimony, brokerage account records, bank records, and incorporation documents) demonstrated, and as the Government's investigation has shown, the defendants own and/or control the companies listed in 2.a.i.-ix.  Similarly, the evidence at trial and the Government's investigation has established that the brokerage accounts identified in 2.b.i.-iv. were used by the defendants in the course of the conspiracy to defraud the GFRDA investors and Lily Cates, and the brokerage account identified in 2.b.v. was owned and/or controlled by Tanaka and Renata Tanaka.  The Government has reason to believe that the defendants have interests in the retirement plans of the US and UK Amerindo entities identified in 2.c.  The funds identified in 2.d. and 2.e. represent proceeds from investments made through ATGF II, which funds were likely derived from investments made through one or more of the Bear Stearns (now JP Morgan Chase) accounts used by the defendants in connection with their fraud scheme.  Finally, according to the PSRs, the defendants either own or owned interests in the properties listed in 2.f. and 2.g.  (*See* Vilar PSR ¶ 127; Tanaka PSR ¶ 110, 124-25).

Forfeiture of substitute assets is necessary in this case because the duration of the scheme, the commingling of investor and investment funds, the number of brokerage and bank accounts involved, and the thousands of transactions (including purchases of equities, inter-account transfers, transfers to third parties) have made it impossible to trace the direct proceeds of defendants' frauds.

For the foregoing reasons, the Government respectfully requests that the Court enter Preliminary Orders of Forfeiture, finding the defendants liable for a personal money

judgment in the amount of $80,473,840 and forfeiting all of their right, title and interest in the Specific Property to the United States.

## CONCLUSION

For the foregoing reasons, the Court should impose sentences on the defendants within the recommended Guidelines ranges, order restitution of at least $21,927,478.74, and order forfeiture in the amount of $80,473,840.

Dated:  October 2, 2009
         New York, New York

Respectfully submitted,

PREET BHARARA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States of America*

By:  _____/s/_____

Marc Litt
Joshua Klein
Benjamin A. Naftalis
Assistant United States Attorneys
(212) 637-2295 / -2397/ -2456

97