**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

-against-

**ALBERTO WILLIAM VILAR and**
**GARY ALAN TANAKA**

**Defendants.**

**S3 05 Crim. 621 (RJS)**

**ECF Case**

---

## REPLY SENTENCING MEMORANDUM AND EXHIBITS
## ON BEHALF OF GARY TANAKA

Glenn C. Colton (GCC-2493)
Gary Meyerhoff (GM - 8267)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: (212) 768-6700
Fax: (212) 768-6800

*Counsel for Defendant Gary A. Tanaka*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

TABLE OF EXHIBITS ................................................................................ vii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS – ADDITIONAL SENTENCING LETTERS ...................................3

    A.    Renata Tanaka's Letter ................................................................3

    B.    Additional Letters from Family, Clients, Colleagues, and Friends ........................4

I.    THE ADVISORY GUIDELINES CALCULATION .......................................................6

    A.    When The Trial Evidence Is Considered And The Advisory  Guidelines Followed, The Loss Caused By The Offense Is Zero, Or At The Most $700,000 ...................7

        1.    The GFRDA Investors Who Testified At Trial, Other than the Colburn Estate, Suffered No Loss at All.................................................7

            a.    Returned Money Constitutes a Credit Against "Loss" ...................7

            b.    "Loss" Cannot Include Agreed-Upon Rates Of Return ..................9

            c.    The Government's Attempt to Spin Real and Substantial Profits into Advisory Guidelines "Losses" Should be Rejected.................9

        2.    The "Loss" Amount Attributed to Tara Colburn Should be Zero, or at Most $450,000 .......................................................................11

        3.    The Government Cannot Meet its Burden of Proving Dextra Suffered Any Loss At All. ..................................................................12

        4.    The Government Should Be Estopped From Seeking A Sentencing Enhancement For Alleged Losses Unless It Proves Losses Above The Amount Of The Accounts It Dubbed The "GFRDA Accounts" ...................................................13

            a.    Contrary to its Denials, The Government did Dub the Bear Stearns Accounts "GFRDA Accounts" .......................................13

            b.    The Government's Representations to the Court at Sentencing Regarding the So-Called "GFRDA Accounts" Directly Contradict the Representations Made to the Jury During Trial ......................13

        5.    The Cates "Loss" Attributed to Tanaka Should be Zero, or at Most, $250,000....15

      a.     Cates Suffered No "Loss" As She Was Repaid More Than She Invested .................................................................................................15

      b.     Sentencing Mr. Tanaka Based On Acquitted Conduct Violates His Constitutional Right To Trial By Jury ...........................................15

          i      The Government Ignores the Only Common Sense Reading of the Jury's Verdict – Gary Tanaka Was Acquitted of All Allegations Related to the SBIC ........................................15

          ii     The Law Should Preclude Increasing Sentences Based on Acquitted Conduct ...........................................................16

          iii    Even if Acquitted Conduct and/or Uncharged Conduct is Considered, the Court Should Require the Government to Prove Such Conduct by at Least Clear and Convincing Evidence.........................................................................18

          iv    The Government Cannot Prove By Any Standard That Mr. Tanaka Caused Cates's SBIC Loss...................................19

      c.     Given the Jury's Verdict, the Loss Amount Related to Cates for Tanaka's Advisory Guidelines "Loss" Calculation Should Be, at Most, $250,000 ...........................................................................20

   B.    Summary Of Mr. Tanaka's Guidelines Calculation .............................21

II.    ANALYSIS OF SECTION 3553(a) FACTORS ...........................................21

   A.    Section 3553(a)(1):  History and Characteristics of Gary Tanaka........................21

   B.    Section 3553(a)(1):  Nature And Circumstances Of The Offense........................23

   C.    Section 3553(a)(2):  The Purposes Of Sentencing...................................24

      1.     Seriousness Of The Offense.........................................................24

      2.     Respect For Law, Adequate Deterrence, Just Punishment .......................26

      3.     Protecting The Public From Future Crimes Of The Defendant.................28

      4.     Providing Gary With Needed Treatment ...................................29

   D.    Section 3553(a)(3):  The Kinds Of Sentences Available.............................29

   E.    Section 3553(a)(4) and (a)(5):  The Advisory Guidelines Calculation.................29

   F.    Section 3553(a)(6):  The Need To Avoid Unwarranted Disparities.....................30

   G.    Section 3553(a)(7):  The Need To Provide Restitution .........................................31

III.   RESTITUTION................................................................................................31

IV.   Forfeiture...................................................................................................33

    A.   The Government Cannot Meet its Burden of Proof for Most of the GFRDA Investors..............................................................................................33

    B.   The Government's Attempt to Obtain a Forfeiture Judgment Based on Money Laundering or Other Acquitted Counts Should Be Rejected.................................34

    C.   The Forfeiture the Government Seeks Would Violate the 8th Amendment..........35

CONCLUSION................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ...............................................18

*Apprendi v. New Jersey,* 530 U.S. 466 (2000)...................................................................18

*Blakely v. Washington*, 542 U.S. 296 (2004).....................................................................18

*Davis v. Wakelee*, 156 U.S. 680 (1895) .............................................................................15

*Galin v. Goldfischer*, 2008 WL 5484318 (S.D.N.Y. Dec. 3, 2008)..................................15

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................................15

*Ring v. Arizona* 536 U.S. 584 (2002)..................................................................................18

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................30

*United States v. Alfonso*, 479 F.3d 570 (8th Cir. 2007) .....................................................10

*United States v. Anders*, 2009 WL 1649192 (6th Cir. June 11, 2009)................................8

*United States v. Bajakajian*, 524 U.S. 321 (1998) .............................................................35

*United States v. Booker,* 543 U.S. 220 (2005) ...................................................................18

*United States v. Brownell*, 495 F.3d 459 (7th Cir. 2007).....................................................8

*United States v. Canania*, 532 F.3d 764 (8th Cir. 2008) .............................................17, 18

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007).....................................................35

*United States v. Carrozella*, 105 F.3d 796 (2d Cir. 1992).....................................................9

*United States v. Collado*, 348 F.3d 323 (2d Cir. 2003) ......................................................36

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006) .....................................................17

*United States v. Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008) .....................................30

*United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005) ......................................................35

*United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996) ..........................................................18

*United States v. Hamilton*, 323 Fed. Appx. 27 (2d Cir. 2009)............................................29

*United States v. Hartstein*, 500 F.3d 790 (8th Cir. 2007) ...................................................10

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003) ...........................................34, 35

*United States v. Hodges*, 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) ......................28, 29

*United States v. Ibanga*, 454 F. Supp. 2d 532 (E.D. Va. 2006), *vacated*, 271 Fed.
    Appx. 298 (4th Cir. 2008) ..........................................................................................17

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .....................................................17

*United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007)...............................................17

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) .............................................8, 9

*United States v. Nichols*, 416 F.3d 811 (8th Cir. 2005).................................................8

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y 2009) .................................33, 35

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)....................................30

*United States v. Partow*, 283 Fed. Appx 476 (9th Cir. 2008).....................................10, 11

*United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005) ...................................17

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) ...............................................33

*United States v. Sanchez*, 2007 WL 60517 (S.D.N.Y. Jan. 08, 2007) ..............................29

*United States v. Setser*, 568 F.3d 482 (5th Cir. 2009), *cert. denied*, 2009 WL
    296506 (Oct. 13, 2009) ...............................................................................................8

*United States v. Settles*, 530 F.3d 920 (D.C. Cir. 2008) ..................................................17

*United States v. Treacy*, 08 Cr. 366 (S.D.N.Y. 2008)....................................................30

*United States v. Varrone*, 554 F.3d 327 (2d Cir. 2009)...................................................36

*United States v. Webber*, 536 F.3d 584 (7th Cir. 2008)...................................................33

*United States v. White*, 551 F.3d 381 (6th Cir. 2008), *cert. denied*, 129 S.Ct. 2071
    (2009)............................................................................................................................17

## STATUTES

18 U.S.C. 3553(a) ................................................................................................... *passim*

U.S.S.G. §2B1.1................................................................................................................ *passim*

U.S.S.G. App. C, Vol. II ...............................................................................................8, 10

## INDEX OF EXHIBITS

| TAB | EXHIBIT |
|-----|---------|
| 1. | Letter from Scott Cubbler and Denise Cubbler |
| 2. | Letter from Michelle Drucker |
| 3. | Letter from Françoise Dupuis |
| 4. | Letter from Peter Mendham |
| 5. | Letter from Janina and Jozef Niedbalec |
| 6. | Letter from Lynn Sien |
| 7. | Letter from Renata LePort-Tanaka |
| 8. | Letter from Jenny Zanzuri |
| 9. | Letter from John Rowan |

## PRELIMINARY STATEMENT

The Supreme Court has restored Federal Judges to their rightful place in sentencing and restored their discretion to evaluate each case and each defendant before them to fashion a just and fair sentence that goes no further than necessary to effectuate the policy goals of the sentencing statute.   Through observing Gary Tanaka and his family during the lengthy trial, reading scores of letters written by people from all over the globe that paint a vivid picture of a quiet and complex man who has touched so many so deeply and so profoundly, and from an understanding of the facts that only personal attendance at the trial could provide, this Court is in the best position to really assess Gary Tanaka the person and to look deeper than the mechanical computations of the advisory guidelines.   We submit that when all of the relevant factors are taken into consideration, the Court will see that no good and a lot of harm will flow from sentencing Gary Tanaka to prison.

The government does not really attempt to address who Gary is or the journey that has brought him to this time and to this place -- critical factors that must be part of the sentencing process.  From his birth to parents imprisoned solely for being Japanese, through his battles with cancer that cost him years of his life and most of his jaw, to his years of living under government imposed pretrial restrictions on his liberty, Gary Tanaka has selflessly made a dramatic impact on the people he meets and the lives he touches.   Family, friends, colleagues, employees, business associates, classmates and even investors who are owed money have reached out to write to the Court to describe the real Gary and to seek leniency for a man who rarely asks for anything.  Time and time again, writers relay to the Court personal stories that show who Gary really is -- a man who has lived his life working hard and constantly going the extra mile to care for, support, nurture and teach those who needed him. The letters to the Court also bring to life the devastating effects that the long pretrial period has had on the Tanaka family -- most

critically, how the arrest and prohibition from returning home to England, coming on the heels of the two years of surgeries, radiation and hospital stays, made Gary's pretrial absence from home that much more acute, especially for Gary and his children.

Despite the clear picture of a Gary Tanaka beloved and respected by so many, and despite the facts that (1) Gary was acquitted of most of the charges against him, (2) unlike most white collar fraud cases, only one investor who testified lost money, (3) over the last three years prior to arrests, investors were being paid monies owed without any new money coming in, and (4) Gary Tanaka was lending money to the company and paying employees out of his own pocket, not taking money for himself, the government seeks a veritable life sentence and a forfeiture judgment of **over 300** times greater than the maximum fine amount and **almost 200** times greater than the actual out of pocket losses sustained.   Such a result flies in the face of the mandates of the sentencing statute and would violate the 8th Amendment prohibition on excessive fines.

The government attempts to justify the draconian sentence it seeks by ignoring the jury's nine verdicts of acquittal, improperly equating Vilar (who was convicted on all counts) with Tanaka, relying on evidence it strategically decided to withhold from jury consideration, and by arguing a version of the facts that directly contradict the facts it presented to the jury during trial. Specifically, the government makes no attempt to explain why the Court should impose what is essentially the same life sentence on two defendants the jury clearly determined were not similarly situated.  The government also makes no attempt to explain why (1) the alleged, unproven loss of Dextra, which does not even seek any money in restitution, should count in "loss" calculations or (2) the government purposely decided not to call a witness from Dextra when that entity's alleged loss dwarfs all other investor witnesses combined.  Finally, after dramatically posting a chart showing that the "GFRDA accounts" contained over $700 Million and making the accusation that the defendants absconded with all of the interest not paid to

GFRDA investors -- hundreds of millions of dollars -- the government argues on sentencing that those accounts really were not all GFRDA and the defendants really did not abscond with that money because it belonged to other investors (ATGF investors).  The government should not be allowed to present such divergent views of the facts at different stages of the proceeding.

In the final analysis, nothing in the government's presentation or the entire record of this case warrants the crushing punishment the government seeks.  A probationary sentence with a mandate that Gary aid investors in recouping the additional profit and interest they are owed is the sentence that best serves society and the investors and is the least restrictive sentence that will fulfill the goals of the sentencing statute.

## STATEMENT OF FACTS – ADDITIONAL SENTENCING LETTERS

The facts are laid out in significant detail in our initial sentencing memorandum.  In this fact section, we reference only the sentencing letters that we received after our first filing, most significantly, the letter from Renata Tanaka.

### A.    Renata Tanaka's Letter

In a stirring, heartfelt and detailed letter, Renata Tanaka lays bare for the Court the agony that the Tanaka family has endured over the last six years -- starting in the fall of 2003 when Gary was diagnosed with cancer.  Mrs. Tanaka chronicles the daily struggles the insidious illness imposed on the entire family and then the devastating impact of this case and its attendant additional four and a half year forced separation of a father and husband from his family. Rather than attempt to provide the Court highlights or important snippets, we urge the Court to read the entire letter.  While it is admittedly lengthy, Mrs. Tanaka's letter provides up close and personal insights into Gary Tanaka that no one else could possibly deliver and are crucial to understanding the person upon whom the Court will impose judgment.

### B.     Additional Letters from Family, Clients, Colleagues, and Friends

The other letters received after we submitted our original brief continue to paint a picture of Gary Tanaka as a man beloved by his family, friends, colleagues, and even investment clients. After our first brief was filed and before she suffered a stroke on October 14th, Gary's mother-in-law,  Janina Niedbalec, wrote to the Court seeking leniency for a son-in-law who she came to regard as her own son.[1]  Ms. Niedbalec describes Gary's many acts of kindness, including driving long distances in England just to get a Polish newspaper she and her husband (who do not speak English) can read, taking them sightseeing in London, and making sure to talk to the doctors caring for her whenever she fell ill.  (Letter of Janina Niedbalec, Exh. 5).  Ms. Niedbalec also describes the terrible impact Gary's long pretrial absence has had upon his young son, her grandson.

Jenny Zanzuri, a longtime GFRDA client, submitted a letter to Your Honor seeking compassion for Gary.  (Letter of Jenny Zanzuri, Exh 8).  Specifically, Ms. Zanzuri describes Gary as a "very kind and generous" man who adopted his wife's daughter as his own, has suffered dramatically over the years of separation from his wife and young child, and who has an "uncertain life expectancy" due to serious cancer operations.   She concludes by asking that the Court recognize that he has suffered enough and that no good to society will result from sending Gary to prison.  *Id.*

Professional colleagues continue to describe and praise Gary as a man of integrity who has always acted in an ethical and proper fashion.  *See* Letter of Francoise Dupuis, Exh. 3 ("Mr. Tanaka has always been truthful, honest with the utmost integrity."); Letter of Peter Mendham, Exh. 4 ("[D]uring the period I have acted for Gary he has behaved impeccably and has consistently refused to do anything that was not completely above board.").  The letter from

---

[1] The letter from Ms. Niedbalec is in Polish.  The translation was provided by Renata Tanaka.

Lynn Sien, who has known Gary for over 35 years, provides yet another example of how Gary

Tanaka touched someone's life with kindness. *See* Letter of Lynn Sien, Exh. 6. Ms. Sien

details how Gary took her under his wing at a time when the investment industry "was still a

very male dominated industry." Specifically, Ms. Sien notes that Gary was not the "guy that

needed the limelight" and is a man "whose character and honor [are] more important to him than

what others [think] of him." In fact, she makes crystal clear that "[i]n all the years, I worked in

the investment arena both here in the U.S. and in Asia, ***I never again met anyone professionally***

***as gifted and compassionate as Gary***." *Id*. (emphasis supplied).

Gary's recent friends and professional contacts also continue to weigh in. Denise and

Scott Cubbler, who only met Gary after he was confined on house arrest in New York and

separated from his wife and young son, describe a "sincere, compassionate father and friend

[whom] we have ***never seen*** . . . do anything for personal benefit." (Letter of Denise and Scott

Cubbler, Exh. 1) (emphasis supplied). The Cubblers also note that Gary was an active

participant in their Bible study group, but not someone who "just [ran] to religion in the face of

his challenges." *Id*. Michelle Drucker offers an insight into Gary as a person which she

garnered from a unique perspective:

> My impression of Gary's selflessness was developed upon first meeting,
> but was continuously reaffirmed right up to the moment his fate was to be
> decided. Every time Gary came by the office he was so pleasant, making
> sure to always ask how I was doing. The irony I thought; this man is
> facing serious charges and he asked me how I was doing more than I
> asked him! Before I left for London to attend the depositions of Maxine
> Rye and James Stableford, Gary asked that I do a favor for him. His
> daughter had recently broken up with her boyfriend and so he asked that I
> deliver some books to her to help through the tough time. While looking
> in the bookstore, he found a few books that his wife might like and asked
> that I deliver those books to her as well. Crucial moments arose and yet
> Gary spent his time worried about his family more than he did about
> himself.
>
> During the trial, I spent a lot of time observing Gary's interactions with his
> family and friends. Every morning I witnessed him bring snacks for his

mother and sister in case they got hungry.  When court recessed for lunch, I watched Gary race down to the cafeteria to make sure that he can help his elderly mother (who needs a walker to move about) and sister.  Even when sensitive subjects were discussed in the courtroom Gary would whisper to me that he was worried about his mother because he knew she was crying.  Never once did Gary request sympathy.  Never once did he want anyone to worry about his personal needs.

Often times I would receive emails from Gary in the middle of the night requesting certain items for the next day in court.  When I would quickly reply (showing I was still at work late at night), Gary would respond that I needed to go home because he was concerned I was wearing myself thin.  It was clear to me that Gary didn't tell me to go home because he was concerned about the quality of my work deteriorating; it was clear to me that he said it because he genuinely cared.  Although I often ignored his requests to go home, I appreciated all of his words of concern and gratitude.

(Letter of Michelle Drucker, Exh. 2).

Finally, Francoise Dupuis reiterates what others have written to the Court: rather than take money from the company or investors, Gary Tanaka "kept his company Amerindo afloat by paying his employees out of his own pocket."  (Letter of Francoise Dupuis, Exh. 3).

## I.    THE ADVISORY GUIDELINES CALCULATION

The government calculates an advisory guidelines sentence range of 210 to 262 months -- the equivalent of a life sentence for Gary.  As in most financial fraud cases, the major driver of the advisory guidelines calculated sentence is the "loss amount" enhancement.  That is true of the government's calculations as well.  However, those calculations are based on faulty factual assumptions, incorrect legal interpretations of the guidelines, and most importantly, facts that directly contradict the facts the government presented to the jury during trial.

A.   **When The Trial Evidence Is Considered And The
       Advisory Guidelines Followed, The Loss Caused
       By The Offense Is Zero, Or At The Most $700,000**

   1.   **The GFRDA Investors Who Testified At Trial, Other than the
          Colburn Estate, Suffered No Loss at All.**

Nowhere in its almost 100-page submission does the government contest the most crucial

facts regarding the advisory guidelines calculations:  (1) other than the estate of Tara Colburn, no

investor who testified at trial lost money investing with Amerindo; and (2) other than the estate

of Tara Colburn, all investor witnesses were paid substantial profits, with some being paid

millions more than they invested.  Specifically, it is undisputed that: Robert Cox invested

approximately $60,000 and was paid at least $113,000 (*see* tr. 168); Graciela Lecube Chavez

invested $74,000 and was paid $152,000 (tr. 394); Just Capital invested $3.7 Million and was

paid $4.03 Million (tr. 4175); Paragon Ventures invested $4 Million and was paid approximately

$4.5 Million (tr. 4204-05); Worldwide Tops invested $10 Million and was paid $11 Million (tr.

4209); Pelican Trust invested $1.5 Million and was paid $2.25 Million (tr. 4222); Binna

Holdings invested $7.5 Million and was paid $8.6 Million (tr. 4237-42); Nemo Holdings

invested $2 Million and was paid that plus all interest due (tr. 4255-57); and the Mayer family

invested a total of $5.8 million and received $10.5 million in return (tr. 10/14/08).

   a.   **Returned Money Constitutes a Credit Against "Loss"**

The government does not contest the notion that the Application Notes to U.S.S.G.

§2B1.1 define terms and otherwise describe how the loss amount under advisory guideline

§2B1.1(b)(1) shall be determined.   Application Note 3(E) interprets and explains how the

definition of "loss" applies in circumstances involving returned money:

   <u>Credits Against Loss</u>. -- Loss shall be reduced by the following:

   (i)  The money returned . . . by the defendant or other persons
   acting jointly with the defendant, to the victim before the offense

was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. §2B1.1, Application Note 3(E).

Application Note 3(E) was part of a November 1, 2001 Guidelines change, adopted as part of the 2001 "Economic Crime Package." Prior to the change, the Guidelines definition of loss -- as the "value of property taken" – led to a circuit conflict over whether and how to credit payments made to victims.  The Sentencing Commission resolved that conflict with Application Note 3(E) for stated policy reasons:  "This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not."[2]  U.S.S.G. App. C, Vol. II at 179; *See United States v. Anders*, 2009 WL 1649192, *5-6 (6th Cir. June 11, 2009) (reversing sentence imposed due to miscalculation of loss amount arising from district judge's failure to follow Application Note 3(E)); *United States v. Setser*, 568 F.3d 482, 497 (5th Cir. 2009) (pre-2001 common law rule on repaid money was superseded by the 2001 amendment), *cert. denied*, 2009 WL 296506 (Oct. 13, 2009); *United States v. Brownell*, 495 F.3d 459, 463-64 (7th Cir. 2007) (following Application Note 3(E)); *United States v. Nichols*, 416 F.3d 811, 819 (8th Cir. 2005) (same).  The government does not even attempt to distinguish these cases cited in our initial brief.  Rather, it cites inapposite cases or concepts that do not fit the factual scenario of this case.

When credits required by Application Note 3(E) are applied to investors like the Mayer family, Ms. Lecube-Chavez, and Mr. Cox, their "loss" amount becomes zero.

_____

[2] Thus, the Sentencing Commission rejected the rule previously espoused in the Second Circuit (*see United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994)) that loss includes the value of all property taken, even though all or part of it was returned.

   **b.** **"Loss" Cannot Include Agreed-Upon Rates Of Return**

  The government also does not dispute the application notes to the advisory guidelines

expressly exclude agreed upon rates of return from "loss":

> Exclusions from Loss. -- Loss shall not include the following:
>
> (i)  Interest of any kind, finance charges, late fees,
> penalties, amounts based on an agreed-upon return or rate
> of return, or other similar costs.

U.S.S.G. §2B1.1, Application Note 3(D).

   **c.** **The Government's Attempt to Spin Real and Substantial**
    **Profits into Advisory Guidelines "Losses" Should be Rejected**

  Unable to get away from the basic fact that all but one trial witness (including **all** of

witness Stephen Gray's clients) who invested with Amerindo made substantial profits doing so,

the government resorts to applying the generic "Ponzi" label to the instant case.  However, that

label cannot stick.  First, from 1986 through 2002, every GFRDA investor received the principal

and interest that was due and owing.  Second, even after difficulties arose in or around 2003,

Amerindo made approximately $8 Million to $9 Million in payments, including approximately

$2 Million to the Mayer family.  (*See* tr. 10/14/08).  Third, payments were being made to

investors up until the government shut down Amerindo in May 2005.  (*See, e.g.,* tr. 3690

(payment of $600,000 to GFRDA investor on April 27, 2005)).   Fourth, the payments to

GFRDA investors were being made **without taking in any new GFRDA money.**  Thus, by any

definition, the GFRDA was not a Ponzi scheme, the success of which requires obtaining new

investors and new money to pay off old investors.

  The cases cited by the government do not support either the proposition that prior

payments to investors should be ignored or the unduly lengthy advisory guidelines sentence the

government seeks.  The government cites to the pre-2001 Second Circuit decisions in *United*

*States v. Carrozella,* 105 F.3d 796 (2d Cir. 1992), and *Mucciante, supra,* in its attempt to have

the Court ignore substantial payment to investors.  However, those cases interpret versions of the guidelines that existed before the Sentencing Commission made clear that the proper "[a]pproach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not."  U.S.S.G. App. C, Vol. II at 179.

The government's citations to *United States v. Alfonso*, 479 F.3d 570 (8th Cir. 2007), *United States v. Hartstein*, 500 F.3d 790 (8th Cir. 2007), and *United States v. Partow*, 283 Fed. Appx. 476 (9th Cir. 2008), are equally unavailing.  In *Alfonso*, the court stated the unremarkable proposition that "[F]raudulent schemes . . . come in various forms, and we must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended."  479 F.3d at 573.   The *Alfonso* court then went on to give credit for principal repayments, but not interest repayments. *See Hartstein,* 500 F.3d at 799 (8th Circuit decision clarifying *Alfonso*).  *Hartstein* provides a far more detailed analysis than *Alfonso* and actually supports the position Gary Tanaka takes here.  The *Hartstein* court noted that the rationale for refusing to give credit for gains rests on "defendant's presumed purposes or subjective intentions in paying earlier gains were to . . . garner further investment . . . ." *Id.* at 798, 800 (reversing and remanding for re-sentencing, noting "[I]f the government fails to meet its burden of proof regarding the defendant's intent as to any particular victim or group of victims, it may be necessary to rely on the amount of actual loss . . . .").  The presumption of intent to garner further investment simply does not apply to Gary Tanaka and the GFRDA.  Given that (1) all payments were made for 16 years, (2) no new GFRDA money was solicited or obtained between 2002 and 2005, and (3) GFRDA payments in the millions were made between 2002 and 2005, there is no evidence to support the idea that interest and principal payments were made to "garner further investment."

Like *Hartstein*, *Partow* does not help the government.  The *Partow* court noted that deducting principal payments from loss amount may be proper where there was evidence that such payments were made.  283 Fed. Appx. at 478.  The *Partow* court refused the deduction because it found a lack of evidence of actual payment.  *Id.*  Here, there is no doubt or dispute about the very substantial payments made.  Moreover, *Partow* supports our position in that the court expressly noted that "the district court properly excluded interest charges and the like when considering the amount of the loss."  *Id.*

At bottom, the government not only failed to cite any cases that could transform substantial gains into losses, it cited cases that actually highlight the substantial differences between stereotypical Ponzi schemes, where new money is obtained to pay old debts, and the case at bar, where substantial payments were made in the last few years of the scheme without any new money coming in.  Unlike the perpetrators of many true Ponzi schemes, Gary always intended to pay GFRDA investors in full.  In fact, Gary Tanaka came back to work after life threatening dramatic cancer surgeries to try to get investors paid all the profits they were owed, to get the company back on a strong footing and to save the jobs of those who relied upon the company for their well-being.  (*See* Letter of Renata Tanaka, Exh. 7).

### 2. The "Loss" Amount Attributed to Tara Colburn Should be Zero, or at Most $450,000

With respect to the Colburn Estate, the government contends that the Court should find a "loss" of $936,371.  The government is wrong for two reasons.  First, the government includes the impermissible "rate of return" concept.  *See* U.S.S.G. §2B1.1, Application Note 3(D).  Ms. Colburn invested $1 illion with Amerindo.  Pursuant to a signed settlement agreement executed before the offense had been detected, Amerindo executed a written agreement to pay the Colburn Estate the $1 million, plus interest, in three installment payments.  (Tr. 606 & 609-10.)  The first two principal payments totaling $550,000 were made on time in accordance with the agreement.

(Tr. 626.)  The third payment, $450,000 in principal and $486,371 in interest, was to be paid on August 15, 2005.  (Tr. 632.)  Thus, as demonstrated above and in our original brief, the only amount not repaid that could constitute a loss under the Guidelines is $450,000, not $936,371. U.S.S.G. §2B1.1, Application Note 3(D).

Moreover, the government does not dispute that losses from causes other than the fraud must be excluded from the loss calculation.  Here, Amerindo did not enter an agreement to repay fully the Colburn Estate for fear of criminal prosecution.  Indeed, the complaint the estate filed in state court sought only payment of a debt and did not in any way allege or plead fraud. Moreover, given that (1) the first two payments under the settlement agreement were made when due, (2) there were sufficient funds in Amerindo's Bear Stearns accounts to make the final payment when the government closed Amerindo in May 2005 (*see, e.g.,* tr. 3672), and (3) Mr. Peterzcak testified that Bear Stearns would not release any money from Amerindo managed accounts without permission from the SEC and U.S. Attorney (Tr. 3486), there is substantial evidence from which to conclude that the Colburn Estate would have been paid had Bear Stearns and the government not agreed among themselves that no further payments could be made.

**3.    The Government Cannot Meet its Burden of Proving Dextra Suffered Any Loss At All.**

After making the strategic choice to exclude alleged GFRDA investor Dextra from the trial and from the jury's consideration, the government nevertheless persists in attempting to significantly increase the advisory guidelines "loss" through Dextra.  Remarkably, the government contends that it has met its burden of proving Dextra suffered a loss relevant to the charged conduct, yet buries in footnote 22 on page 80 that Dextra **does not seek restitution** for this supposed loss.  At bottom, the government would improperly end-run the jury and then have this Court suspend all credulity to find that Dextra suffered a loss in excess of $20 Million but yet ***does not want its money back***.  To even state such a proposition is to defeat it.

- 12 -

If the Court is at all inclined to consider the Dextra evidence, which we assert it should not, the Court should at least require the government to prove the loss and relation to the GFRDA scheme (*i.e.*, what was Dextra told, what did they rely upon, were they repaid) through a witness that can be cross-examined by the defense and evaluated by the Court. Moreover, while we continue to contend that increasing a sentence through use of evidence kept from the jury is a 6th Amendment violation, *see* Section IA(5)(b) *infra*, if the Court does hear the evidence it should, at a minimum, apply the heightened clear and convincing burden of proof. *Id.*

4. **The Government Should Be Estopped From Seeking A Sentencing Enhancement For Alleged Losses Unless It Proves Losses Above The Amount Of The Accounts It Dubbed The "GFRDA Accounts"**

a. **Contrary to its Denials, The Government did Dub the Bear Stearns Accounts "GFRDA Accounts"**

In its attempt to avoid having the accounts it dubbed the "GFRDA Accounts" not considered in assessing "loss" amount, the government argues that it did not dub the four Bear Stearns accounts (ATGF I, ATGF II, Techno-Racquia and M26) the "GFRDA Accounts." That is just plain wrong. In rebuttal summation, the government clearly stated: "The value of the **GFRDA Accounts** – we can that down [sic] – the value of the **GFRDA Accounts** listed in exhibit 8202 dropped from $720 Million to less than three million." (Tr. 5487-88) (emphasis supplied).

b. **The Government's Representations to the Court at Sentencing Regarding the So-Called "GFRDA Accounts" Directly Contradict the Representations Made to the Jury During Trial**

In its sentencing brief, the government admits that which it appears to have believed all along: "a much larger portion of the Bear Stearns accounts contained assets invested by ATGF investors" (Gov't Sent. Mem. at 34) – an investment vehicle for which the government alleged no wrongdoing. (*See* Gov't Sent. Mem. at 35 (ATGF investors irrelevant to trial)). The government's sentencing memorandum also specifically states alleges that "[T]he Bear Stearns

- 13 -

accounts contained substantial ATGF funds as well as funds derived from other sources, in addition to the GFRDA funds." *Id.*

These representations in its sentencing memo about the contents of the Bear Stearns accounts directly contradict the argument the government made to the jury in rebuttal summation: "In fact, there was a time that they did so well, that their investments in the Bear Stearns accounts went from somewhere around less than $100 Million, all the way up to over $700 Million. . . .  Now, what did the GFRDA investors get?  They got their 10 percent or 12 percent or 14 percent or whatever it was, at any given time. ***What did the defendants get?  The defendants got the run up, hundreds of times more.***"  (Tr. 5486-87) (emphasis supplied) (the defense objection that immediately followed was overruled by the Court).

The government cannot have it both ways.  It cannot create the impression for the jury that the defendants absconded with hundreds of millions of dollars because the money was all GFRDA (*i.e.*, the difference between the gains in the Bear Stearns accounts and the 10-14 percent return paid to GFRDA investors) and now claim that the defendants didn't really get the "run up, hundreds of times more" because the money was not all GFRDA money, but really ATGF money.  For sentencing purposes, the government should be judicially estopped from contesting that the four Bear Stearns accounts contain GFRDA funds. [3]  As noted in our main sentencing brief:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

_____

[3] Mr. Tanaka in no way waives his right to move for a new trial or argue in this court or on appeal that the government misled the jury by arguing that the defendants took money that the government knew and now admits the defendants did not take because it was substantially that of other investors.

*New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (*quoting Davis v. Wakelee,* 156 U.S. 680,

689 (1895)); *Galin v. Goldfischer*, 2008 WL 5484318, *5 (S.D.N.Y. Dec. 3, 2008) (Sullivan, J.)

("In the Second Circuit, a party invoking judicial estoppel must show that (1) the party against

whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that

position was adopted by the first tribunal in some manner, such as by rendering a favorable

judgment.") (internal quotations and citations omitted).

### 5.     The Cates "Loss" Attributed to Tanaka Should be Zero, or at Most, $250,000.

#### a.     Cates Suffered No "Loss" As She Was Repaid More Than She Invested

The government argues that Mr. Tanaka's advisory guidelines sentence should include

roughly $9.8 million in alleged losses incurred by Lily Cates.  The evidence at trial

demonstrated, however, that Ms. Cates' investment was $6.3 million, and that she received more

than that, $7 million, in repayments.  For the reasons described above and in our original

submission, there is no loss under the Guidelines' definitions.

#### b.     Sentencing Mr. Tanaka Based On Acquitted Conduct Violates His Constitutional Right To Trial By Jury

Given his acquittal for all SBIC-specific charges, Gary Tanaka should not be held

responsible for the $5,225,000 the government attributes to the SBIC investment.

##### i     The Government Ignores the Only Common Sense Reading of the Jury's Verdict – Gary Tanaka Was Acquitted of All Allegations Related to the SBIC

The jury acquitted Gary Tanaka on counts II, V, VI, VII, VIII, IX, X, XI and XII.

Specifically, Gary Tanaka was acquitted of each count that dealt exclusively and specifically

with the SBIC or payments related to the $5 Million Lily Cates invested after her June 2002

meeting with Alberto Vilar.  The only logical reading of the jury's verdict is that they believed

the Government proved the GFRDA case against Tanaka beyond a reasonable doubt (as reflected

in the guilty verdict in Count III related specifically to GFRDA) and did not believe that the government proved guilt beyond a reasonable doubt as to the SBIC (as reflected in the acquittals for mail fraud, wire fraud, money laundering and the SBIC-related securities fraud count). The government argues that Count I – the multi-object conspiracy count – reflects a conviction for SBIC conduct. This contention defies reason. The jury acquitted Gary of joining Vilar in a fraudulent scheme related to the SBIC (as reflected in the SBIC-related mail, wire and securities frauds acquittals). It is irrational to assume that the jury concluded in Count I that Tanaka conspired with Vilar with respect to SBIC when they concluded time and time again that Tanaka did not join Vilar in a scheme to defraud regarding SBIC. Rather, the obvious reading of the guilty verdict in Count I is that the jury found guilt related to the GFRDA as they did in Count III.

This leaves Count IV – the vague investment advisor count. The government is correct when it says that count IV was clarified to relate to Lily Cates. However, given all of the acquittals on SBIC related counts, it again defies reason to assume a conviction related to the SBIC. Rather, the only rational reading of the guilty verdict in count IV is that the jury credited Maxine Rye's testimony and convicted Tanaka with respect to the $250,000 transferred from Lily Cates to Alberto Vilar via cut and paste signature.[4]

**ii      The Law Should Preclude Increasing Sentences Based on Acquitted Conduct**

We repeat here our position, stated in more detail in our opening brief, that enhancing a sentence in reliance on facts relating to charges as to which the jury acquitted -- in essence,

---

[4] The government contends that Gary Tanaka should be held responsible for an additional $175,000 based on another alleged cut and paste incident that was not charged, but rather included in the trial pursuant to Federal Rule of Evidence 404(b). However, under any standard of evidence, that amount should not be included. Maxine Rye had no memory of how the stamp of Gary's signature got on that transfer, frankly admitted that she had previously placed Cates' signature on a transfer without Tanaka knowing (Rye tr. 237) and often stamped Tanaka's name to transfers without his knowledge (Rye tr. 62-63 and 222).

ignoring the jury's verdict -- is a violation of Mr. Tanaka's 6th Amendment right to trial by jury. Admittedly, the Second Circuit has held otherwise to date.[5]  However, there continues to be a backlash against the unfairness of allowing an end-run around the 6th Amendment through use of both acquitted and uncharged conduct to increase sentences.[6]  Federal Judges in increasing numbers have expressed their significant concerns.  *See, e.g, United States v. White*, 551 F.3d 381, 387 (6th Cir. 2008) (en banc) (9-6) (Merritt, J., dissenting), *cert. denied*, 129 S. Ct. 2071 (2009); *United States v. Canania*, 532 F.3d 764, 776 (8th Cir. 2008) (Bright, J., concurring) (internal citations omitted); *United States v. Settles*, 530 F.3d 920, 923-24 (D.C. Cir. 2008) (Kavanaugh, J.) (recognizing appearance of unfairness); *United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, J., dissenting) ("Reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the 6th Amendment"); *United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., concurring) ("I strongly believe … that sentence enhancements based on acquitted conduct are unconstitutional under the 6th Amendment, as well as the Due Process Clause of the Fifth Amendment."); *United States v. Ibanga*, 454 F. Supp. 2d 532, 536 (E.D. Va. 2006) ("Sentencing a defendant to time in prison for a crime that the jury found he did not commit is a Kafka-esque result."), *vacated*, 271 Fed. Appx. 298 (4th Cir. 2008); *United States v. Pimental*, 367 F. Supp. 2d 143, 153 (D. Mass. 2005) ("To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense -- as a matter of law or logic.").

In addition, the trend in Supreme Court 6th Amendment jurisprudence is clear.  As Judge Bright noted in *Canania*, "In the last decade, the Supreme Court re-affirmed the jury's central

---

[5] *E.g., United States v. Jones*, 531 F.3d 163 (2d Cir. 2008).
[6] To be clear, Mr. Tanaka objects to the use of both acquitted and uncharged conduct as violative of the 5th and 6th Amendments.

role in the criminal justice system.  *See, e.g., Apprendi v. New Jersey; Ring v. Arizona; Blakely v. Washington; United States v. Booker.*  Rather than pretending as if these cases were never decided, we federal judges should acknowledge their clear implication:  A judge violates a defendant's 6th Amendment rights by making findings of fact that either ignore or countermand those made by the jury and then relies on these factual findings to enhance the defendant's sentence."  532 F.3d at 776 (citations omitted).  We urge this court to do as Judge Bright advises and heed the implication of recent Supreme Court directives.  However, even if the Court is not inclined to hold that use of acquitted or uncharged conduct violates the Constitutional rights to trial by jury and due process, we ask that the Court take note of the unfairness and do as it is inarguably empowered to do and exercise its discretion to refuse to consider acquitted and uncharged conduct.  *See* Gov't Sent. Mem. at 42 (conceding that this Court has the discretion to refuse to consider acquitted and uncharged conduct in determining sentence).

   iii  **Even if Acquitted Conduct and/or Uncharged Conduct is Considered, the Court Should Require the Government to Prove Such Conduct by at Least Clear and Convincing Evidence**

   If this Court does choose to consider either acquitted or uncharged conduct, which we urge it not to do, it should apply the stricter clear and convincing standard of proof.  The Supreme Court has noted that Due Process may require a standard more stringent than preponderance in some circumstances.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 247-48 (1998); *see also United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) (allowing for possibility that where "relevant conduct" results in substantial increase in sentence, higher standard such as clear and convincing standard may be appropriate).  Here, given the fact that (1) the jury sent a clear message that Gary Tanaka was to be treated and viewed differently than Alberto Vilar, (2) the jury acquitted Tanaka of a vast majority of the charges against him, and (3) the government clearly made strategic choices not to call witnesses or present evidence to the

jury for fear of weakening its case (*e.g.,* Dextra), the Court should, at a minimum, impose a higher standard before allowing the jury's determination to be rejected and awarding the government's tactical decision to keep evidence and witnesses from the jury.

### iv    The Government Cannot Prove By Any Standard That Mr. Tanaka Caused Cates's SBIC Loss

The government produced no evidence that Mr. Tanaka made any specific representations to Ms. Cates about the SBIC program.  Nor is there any evidence that Mr. Tanaka put any of Ms. Cates' money to his personal use.  Nor did any of the evidence the government presented support that Mr. Tanaka knew where Ms. Cates' money was to be invested.  To the contrary, that evidence implicated Mr. Vilar and the New York office of Amerindo in a way that demonstrates that the London office and Mr. Tanaka did not know until much later that the Cates money was earmarked for the SBIC.  (*See* GX 3350-8.)  Nor was there any evidence that Mr. Tanaka knew that the SBIC process had failed, information he would have to know for any of his own conduct to be viewed as causing a loss to Ms. Cates.

In an email sent from New York in June 2002, Mr. Vilar's assistant, Johanna Olsher, gave instructions to Bear Stearns for the "transfer [of] monies into the Amerindo SBIC fund." (GX 5854-R.)  However, Ms. Olsher admitted that nothing she had received from London -- from Mr. Tanaka or anyone else -- prior to sending that email that referenced SBIC at all.  (Tr. 2801).  And eight months later, when a question arose in London as to what the Cates investment was for, Mr. Vilar wrote a memo stating: "Let me state unequivocally that Lily's latest investment was expressly for the SBIC." (Govt. Ex. 3350-8.)  No such statement would have been required had Mr. Tanaka known at the beginning that the investment was to be for the SBIC.  And, when financial statements were given to Ms. Cates, instead of using the form the way the London office produced them, the statements were whited out in New York and typed in a different type face from the one used in London.  (*See* tr. 4756-60.)  This evidence was

insufficient proof of alleged guilt for the jury and should be insufficient for this Court to use in determining a sentence for Mr. Tanaka.

The government's attempt to convince this Court to ignore the jury's clear message that Tanaka should not be held responsible for SBIC is based largely on the fact that stamps of Tanaka's signature are on transfers. Yet, the trial evidence was clear that Maxine Rye often stamped Tanaka's signature without asking him, many stamped signatures of Tanaka were sent to Bear Stearns on days Tanaka was not even in the office (Rye tr. 62-63 & 222) and the government presented no witness or documentary evidence that Tanaka personally oversaw or approved any of the wire transfers related to Cates's SBIC investment. The evidence clearly indicated that Vilar kept Tanaka in the dark about much of the Cates $5 Million investment, including instructing Cates attorney Ed Swanson to deal directly with Vilar. (Tr. 2698).

> ### c. Given the Jury's Verdict, the Loss Amount Related to Cates for Tanaka's Advisory Guidelines "Loss" Calculation Should Be, at Most, $250,000

If the Court attributes "loss" related to Lily Cates despite the fact that her payments from Amerindo were greater than the amount she invested, the "loss" amount properly attributed should be the $250,000 related to the September 25, 2003 transfer from Lily Cates that went to Alberto Vilar via a stamp of Gary Tanaka's signature. Stated another way, to the extent that the government argues that Gary was not acquitted of all Cates-related conduct, they are likely correct. However, since the only Cates-related investment or act other than SBIC that is detailed in the indictment is the $250,000 transfer, that should be the extent of the exposure.[7]

---

[7] The alleged $175,000 loss is addressed in note 5, *supra*. As to Rhodes, despite the almost 100 pages of briefing, the government does not seriously attempt to meet its burden of proving wrongdoing by Tanaka.

### B.      Summary Of Mr. Tanaka's Guidelines Calculation

For the reasons set forth above and in our original submission, Mr. Tanaka contends that

the proper advisory guidelines calculation for his offenses is as follows:

- Base Offense Level:                                                                                7
- Specific Offense Characteristic/offense committed outside U.S.                 +2
- Specific Offense Characteristic/supervisor under 3B1.1(c)                        +2
- Total Offense Level                                                                              **11**

A total offense level of 11 in Criminal History Category I translates to a Guidelines sentence of

from 10 to 14 months.

## II.      ANALYSIS OF SECTION 3553(A) FACTORS

As we noted in our original submission, the Supreme Court has made clear that this

Court, after analyzing the 3553(a) factors, has the discretion to fashion whatever sentence it

deems is just so long as it is no greater than necessary to accomplish the purposes of the

sentencing statute.   The government asserts that the minimum sentence necessary to accomplish

the goals of the sentencing statute is to condemn Gary, a 66+ year-old man and two-time cancer

survivor, to die in jail.   The government is wrong.   In fact, in seeking a veritable life sentence,

the government ignores the 3553(a) factors and instead espouses a rigid and draconian view of

the advisory guidelines that completely ignores fundamental fairness, common sense, and the

facts that *inter alia*, (1) all but one of the trial witness investors profited substantially by

investing with Amerindo and (2) the jury acquitted Gary of a vast majority of the charges against

him.

### A.      Section 3553(a)(1):  History and Characteristics of Gary Tanaka

The government's lengthy brief does nothing to alter the clear picture of Gary Tanaka as

a kind, selfless, and generous family man who has spent a lifetime going out of his way to help

family members, colleagues, employees and strangers alike. Indeed, people from all facets of Gary's life – family, friends, business acquaintances, colleagues and even former investor clients who are still owed additional interest or profits – have come together to ask this Court for leniency on behalf of a man they clearly admire, respect and adore.

The government correctly points out that the crimes of which Gary stands convicted are serious. However, the government does little to counter the fact that Mr. Tanaka has lived a long and overwhelmingly honorable life in which he has touched, mentored, counseled, aided and supported so many. The government's characterization of Gary's conduct with respect to the GFRDA investors ignores many critical facts. The reality is that Gary remained committed to seeing investors paid all the profits and interest they were owed. That is why he returned to work after life-threatening cancer surgeries, radiation treatments and an extremely difficult recovery period. *See* Letter of Renata Tanaka, Exh 7. Gary's commitment to paying investors all they were due is also manifested in the fact that he was loaning the company money and paying employees out of his pocket while Vilar raked in millions to pay off personal obligations. Gary's coming back to work, loaning money to the firm and paying employees out of his pocket is what contributed to $8-9 Million being paid to investors from 2003-2005 (a period in which Amerindo took in no new GFRDA money). Gary stands before the Court guilty of three crimes. However, the record shows that even his last few years in business before arrest were not characterized by greed or attempts to accumulate personal assets, but rather by a desire to get investors paid what they were owed and to insure the health of a company that employed many and benefited many more.

The government's argument that this Court should ignore Gary's early life history of being born in an internment camp to parents imprisoned solely because of their national origin demonstrates that there is nothing in the full picture of Gary's life that warrants the veritable life

sentence the government seeks.   It is pure folly to even assert that starting one's life a prisoner because of your parents' Japanese ancestry would have no effect on a person.  It is equally ludicrous to think that of being raised by parents who would never feel secure in their own home and country because of the lingering and sinking feeling that everything could be taken away again if the political winds blow the wrong way.  Of course his early years in captivity and the torment his parents endured and carried with them for more than a half of a century are a critical part of who Gary is.  That he did not flaunt his early misfortune or often discuss the painful and ugly incident is evidence of nothing other than the fact that some things are just too difficult and deeply personal to discuss.[8]

The history and characteristics of this defendant, who has already suffered so much, weigh heavily in favor of a probationary sentence.  Simply stated, the world will not be a better place or safer place with Gary Tanaka wasting away behind bars.  The public will be no safer if Gary is condemned to die in jail as the government seeks.  Quite the opposite.

**B.      Section 3553(a)(1):  Nature And Circumstances Of The Offense**

The only reasonable reading of the jury's verdict is that Gary Tanaka was acquitted of all SBIC-related offenses.  *See* Section IA(5)(b)(i), *supra.*  That leaves the GFRDA-related offenses and the $250,000 unauthorized transfer out of Lily Cates account -- serious offenses, but offenses that should be viewed in the overall context of the evidence.  The GFRDA program was nothing like the many frauds and ponzi schemes that come before this Court that have left many innocent victims with crushing **out of pocket losses**.  In our original submission, we noted (and the government has not even attempted to refute) critical facts about the GFRDA proven at trial and

---

[8] The government also assails Gary Tanaka for his horse racing activities.  Contrary to the government's assertions, Gary does not own any horses.  While horses do run under his name, those horses are leased -- a common practice in the industry.  Moreover, as is also common in the industry, the substantial expenses of housing, transporting and caring for a horse equal or outpace the purses the horse can earn.

relevant here.  **First**, every GFRDA investor from 1986 through 2002 received the principal and interest that was due and owing – 16 years of success.  **Second**, even after difficulties arose in or around 2003, Amerindo made approximately $8 Million to $9 Million in payments, including approximately $2 Million to the Mayer family.  (*See* tr. 10/14/08.)  **Third**, payments were being made to investors up until the government shut down Amerindo in May 2005.  (*See, e.g.,* tr. 3690 (payment of $600,000 to Jenny Zanzuri on April 27, 2005).)  **Fourth**, in February 2004, Gary Tanaka, despite being stricken with cancer and in between the major cancer surgeries of November 2003 and April 2004, demonstrated his full desire to repay investors additional profit and interest due when he played a role in offering to pay the Mayers in full over time.  (*See* DX FY-1.)  **Fifth**, all but one of the investors that testified at trial made substantial profits in the GFRDA program, including Robert Cox, Graciela LeCube Chavez, the Mayers, Worldwide Tops, Binna Holdings, Just Capital, Nemo Holdings, Paragon Ventures and the Pelican Trust. **Sixth**, while Alberto Vilar was withdrawing substantial sums to pay for personal expenses and to meet personal obligations, Gary Tanaka was lending money to the company to keep it afloat. (*See* GX4037; Letter of Katherine Salmon, Letter of Francoise Dupuis)

### C.   Section 3553(a)(2):  The Purposes Of Sentencing

In Section 3553(a), Congress made it clear that "the Court shall impose a sentence sufficient, but not great than necessary" to insure that the sentence:  (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; (2) affords adequate deterrence to criminal conduct; (3) protects the public from further crimes of the defendant; and (4) provides the defendant with needed training or treatment.

#### 1.   Seriousness Of The Offense

The government goes to great lengths to attempt to elevate the seriousness of the offenses for which Gary Tanaka was convicted.  Given that all but one of the government's investor trial

witnesses made substantial profits investing with Amerindo and given that Gary was acquitted of mail fraud, wire fraud, money laundering and obstruction, the government's attempts fall short. The government references the Mayers, LeCube Chavez and Cates and then states that there was a "human toll" to the offenses. *See* Gov't Sent. Mem. at 68. There has been no dispute that the Mayers are owed substantial additional profits. However, that does not change the other undisputed facts. First, the Mayers scored a tax-free profit of almost $5 Million investing with Amerindo. Second, Gary Tanaka was the person who insured that the Mayers interest rate stayed at the highest rate – an interest rate they benefited from for many years of uninterrupted substantial tax-free interest payments (*See* tr. 1347). Third, even after problems developed, the Mayers were paid over $2 Million of additional profits and interest from 2003-2005. Fourth, Gary Tanaka worked toward getting the Mayers full profits paid when he spearheaded the offer to pay them in full over time.

As to Ms. Lecube Chavez, she did seem genuinely to be hurt and angry. However, that anger is clearly directed toward Mr. Vilar. *See* Gov't. Sent. Mem., Exh. L (letter of Ms. Lecube Chavez stating "I want **Mr. Vilar** to grow older in jail") (emphasis supplied). Moreover, there is no dispute that Ms. Lecube Chavez doubled her money investing in Amerindo. There is also no dispute that she received substantial profit payments over the last couple of years of Amerindo's existence. Finally, Ms. Lecube Chavez was clearly perplexed when the government suggested that Gary Tanaka had something to do with her investment. (Tr. 462). As to Robert Cox, the email to the Court from his nephew Gary Cox references how his uncle was "betrayed by his supposed friend, Alberto Vilar." Email of Gary Cox (attached as an exhibit to the government submission). Finally, as to Lily Cates, the damage and hardship to which the Government cites relate to the SBIC – an investment the jury has already declared does not land at the doorstep of Gary Tanaka.

- 25 -

### 2.    Respect For Law, Adequate Deterrence, Just Punishment

Can there really be any doubt that Gary Tanaka has already been severely punished?  The government does not seriously attempt to challenge any of the following:  Gary's strong and vital marriage has been destroyed.  *Compare* Letter of Janette Tanaka (describing current state of the marriage) *with* Letter of Renata Tanaka (describing close bond of two people who endured an awful illness together).  Gary has been separated from his young son and been prevented from watching him grow up.  The business that took a lifetime to build lays in tatters despite the fact that the overwhelming percentage of that business – the mutual fund and pension fund management business – was indisputably legitimate and successful.  Gary's reputation has been shredded.  He has been forced to stand trial for a vast array of crimes the jury made clear he did not commit.  And last, but not least, Gary has already spent 4.5 years living with his liberty severely restricted, largely on house arrest with the government electronically monitoring his whereabouts.

Instead of challenging the undeniable facts listed above, the government makes some rather remarkable assertions.  Specifically, the government attempts to blame Tanaka for the pretrial delay – a dramatic distortion of the record.  No one can maintain a straight face and deny that Gary Tanaka has consistently and fervently asserted his right to a speedy trial – most of the time before Judge Karas, the Judge to whom this matter was previously assigned.  It is equally clear from the record that the delays in this case were occasioned not by Gary, but by the government's repeated requests for delay to do discovery, the postal inspectors' violation of Gary's 4th Amendment rights, and Vilar's constant changing of counsel.  Indeed, Judge Karas noted that the record of Tanaka's assertion of his speedy trial rights was "crystal clear" (Transcript of April 13, 2007 at 21).

At arraignment, Gary Tanaka asserted his right to a speedy trial. (*See* transcript July 28, 2005). The government objected and said that despite having sought and obtained an indictment, it could not be ready for trial within the statutory 70 days. (*See id.*; transcript August 11, 2005). Over Gary's strenuous objections, the government successfully obtained a four month delay from Judge Karas. However, in granting the delay, Judge Karas stated his intention to resolve any defense motions within that four month period so as not to cause greater delay and consecutive exclusions – an intention on which the defense relied. *See id.* at 50-51. What neither the defense nor Judge Karas knew at that time was that the government had conducted a search so violative of the 4th Amendment that no reasonable law enforcement officer would have conducted the search.

After the Order of April 2007 holding the search of Amerindo's offices to be unconstitutional, Mr. Vilar changed lawyers. His new counsel, Ivan Fisher, requested a substantial delay to file a "taint" motion. Tanaka, through counsel, objected to that delay, but was once again overruled. The "taint" motion, to which Tanaka objected, erased another year from Gary's life. Later delays were then caused by Ivan Fisher's trial schedule (a delay that could have been avoided had Judge Karas not rejected Gary's request that the Court order counsel to hold trial dates, *see* transcript of April 13, 2007 at 20), Vilar's changing counsel to Herald Fahringer, and the government moving for Rule 15 depositions three years after learning of the existence of the witnesses it sought to depose. Plainly stated, it is just wrong to blame Gary Tanaka for the delays.[9]

---

[9] The government argues that Tanaka should have moved for a severance and to dismiss the indictment before trial. These arguments should be given short shrift. First, whether or not he moved for a severance or dismissal, he has been away from his family, mostly on house arrest, for years. Second, a severance motion was highly unlikely to succeed. We would think that the law should discourage, not encourage, the making of motions with scant chance for success. Third, the question of whether a motion to dismiss was required under the Speedy Trial Act is not the issue on sentencing. The issue is the punishment that has already been visited upon the

The government also asserts that somehow Tanaka is responsible for his separation from his young son, derisively attempting to make it a cost issue. Not surprisingly, the boy was deeply affected by his father's absence – an absence no young child could readily understand. *See* Letter of Janina Niedbalec, Tab 5; Letter of Renata Tanaka, Tab 7. That Gary and his family chose to protect Alex from further confusion and attempt to have him live as normal a life as possible (going to school every day, playing with friends on the weekends, etc.) is hardly a reason to criticize a parent or minimize the pain and sacrifice of that parent who, but for the effects of the case at bar, would have seen his son grow up for the last 4.5 years. It cannot be seriously denied that Gary has suffered a serious punishment in being separated by an ocean from his young son.[10]

### 3.     Protecting The Public From Future Crimes Of The Defendant

This factor also weighs overwhelmingly in favor of a probationary sentence. Indeed, the government does not even contest as much. As we have previously highlighted, Gary has been living under charges and substantial government supervision for almost four and one half years. As the Court recognized when it granted Mr. Tanaka bail pending sentencing, he simply poses no danger to society. Moreover, Pre-Trial Services Officer Leo Barrios, who is responsible for supervising Gary, has made clear to the Court on many occasions that Gary has always followed instructions and has caused no problems at all. That Gary poses no danger of committing future crimes is further supported by his advanced age. Numerous courts have noted that recidivism is highly unlikely among older defendants. *See, e.g., United States v. Hodges*, 2009 WL 366231,

---

defendant. Finally, the provision the government cites, section 3162(a)(2) inarguably has nothing to do with the Constitutional right to a speedy trial.

[10] The government also argues that Gary could have gone to England in the spring of 2008 after the court issued an order allowing such a trip for the purposes of reviewing documents. However, Gary chose for strategic reasons not to allocate scarce resources to that endeavor. That he had the integrity not to use a supposed discovery trip as a ruse to end-run the bail conditions should be viewed as a credit to him, not a reason to discount the hardships he has suffered.

*8 (E.D.N.Y. Feb. 12, 2009) (collecting cases); *United States v. Sanchez*, 2007 WL 60517, *4 (S.D.N.Y. Jan. 08, 2007). Moreover, the Second Circuit has held that a sentencing court should consider the dramatically lowered chances of recidivism for someone of Gary's age. *See United States v. Hamilton*, 323 Fed. Appx. 27, 30-31 (2d Cir. 2009).

### 4.   Providing Gary With Needed Treatment

When addressing the need for training or treatment, it is clear that a probationary sentence best accomplishes this goal. Gary is an man of advance age who has already suffered two serious bouts with cancer. Clearly, he can receive better treatment at MSKCC or other private institutions than he can in prison. As Dr. Chiu points out, "It was a pleasant surprise that Mr. Tanaka did well after surgery . . . however . . . cancer can recur at any given time." Letter of Dr. Ernest Chiu; *see also* Letter of Renata Tanaka (describing severity of condition). Thus, this factor weighs heavily in favor of a probationary sentence. The government does not argue that this factor weighs in favor of an incarceratory sentence, but rather that Gary has not demonstrated that the BOP cannot meet his needs. This argument deserves little discussion. Clearly, a man who has endured one relapse of cancer despite aggressive surgery and radiation is at risk of others. Indeed, the medical evidence admitted at trial and the letter of Dr. Chiu say as much.

### D.   Section 3553(a)(3):  The Kinds Of Sentences Available

The government does not dispute that a probationary sentence is an available option. *See* Gov't. Sent. Mem. at 73.

### E.   Section 3553(a)(4) and (a)(5):  The Advisory Guidelines Calculation

Gary Tanaka's calculations are detailed in Section II above and in our original submission. The government, in turn, argues for an advisory guidelines sentence of 210-262 months for a man of 66 years who has survived two life threatening battles with cancer. In other

words, according to the government, the advisory guidelines would have Gary, who was acquitted of a vast majority of the charges and who was confronted with only one witness who lost any money investing with his company, condemned to die in jail.  As detailed in Section I, *supra*, the government's calculations are way off.  However, even if the court were to credit the government's calculations of such a draconian advisory guidelines range, it should follow the lead of the *Adelson* and *Parris* courts and reject the starting point.  *See United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (noting that the "calculations under the guidelines have [] run amok . . ."); *United States v. Parris,* 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) ("[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance."); *see also United States v. Treacy,* 08 Cr. 366 (S.D.N.Y. 2008) (rejecting high guidelines calculation driven by loss amount); *United States v. Ferguson,* 584 F. Supp. 2d 447, 455 (D. Conn. 2008) (same).

**F.**      **Section 3553(a)(6):  The Need To Avoid Unwarranted Disparities**

As detailed throughout both of his submissions on sentencing, Gary Tanaka is very differently situated than most, if not all white collar defendants who come before this Court, including by virtue of the fact that (1) the vast majority of investors who testified at trial made substantial profit, (2) even after conviction on certain counts, investors want to trust their money to Gary and others seek leniency for him, and (3) an overwhelming portion Gary's business was legitimate, successful, and served the clients with distinction.   Thus, we submit that there **should be** a disparity between the treatment accorded Gary and that applied to the likes of Bernard Madoff and Marc Dreier.  Stated another way, disparity from the mechanical application of the guidelines to Gary is very much a **warranted** disparity.

### G.    Section 3553(a)(7):  The Need To Provide Restitution

Plainly, sentencing Gary Tanaka to prison will not help investors obtain restitution.  The government does not even contest this undeniable fact.  Thus, this factor weighs heavily in favor of a probationary sentence.  This is simply not the typical white collar case.  Here, investors who are owed additional profits and interest, colleagues who lost their jobs when Amerindo was closed, and those who have had financial dealings with Gary Tanaka over the last 40 years have all written to the Court seeking leniency.  These letters paint a picture of a man who would obey a probationary sentence containing a court directive and condition that he aid investors in recouping as much of the additional owed profit and interest as possible.  *See* Letter of Paul Marcus ("Simply put, I ask that the Court require Mr. Tanaka to work for the benefit of the investors rather than be sentenced to a prison term – a result that will not help me or my fellow investors. . . . In addition to knowing Gary for a long time, I sat through a good portion of the trial.  I have heard and seen both the good and the bad.  Knowing all I know, I am firmly convinced that Gary is the right man to help me and other investors.  Therefore, I ask that you use your discretion and create a sentence that helps me and other investors.  Please sentence Gary to probation with the condition that he work full time with investors to locate, recoup and grow their assets."); *see also* Letter of Jenny Zanzuri (investor urging the Court not to impose a prison sentence).

In this case, Paul Marcus is absolutely right.  Given all that Gary has suffered and given all that he could help (and investors trust him to help), the just result is to do exactly as investors Paul Marcus and Jenny Zanzuri ask – impose a sentence of probation.

## III.    RESTITUTION

The government seeks a restitution order in the amount of $21,927,478.74.  However, the problem is that this figure once again ignores the jury's verdict.  As to GFRDA, Gary Tanaka has

never disputed that while many of the GFRDA investors who testified at trial were paid all principal and profits due, some are still owed additional profits.  So, Gary Tanaka does not contest the entry of a restitution order providing for joint and several liability with Mr. Vilar that accounts for the additional profits and interest owed to the Mayers ($11,066,713.44)[11], the Estate of Tara Colburn ($936, 371.78)[12], Graciela Lecube Chavez ($48,434.12), and Robert Cox ($105,825.55) -- a total of $12,157,344.89.

As to Lily Cates, as explained in section IA(5)(b)(i), *supra*, the conviction on Count IV relates to a $250,000 transfer.  Mr. Tanaka does not object to a restitution order providing for joint and several liability with Mr. Vilar in that amount.  However, there is no basis for any amounts related to SBIC (given the acquittals) and no basis for amounts related to the alleged, but unproven 404(b) conduct involving Rhodes and the later alleged $175,000 transfer.  The government has not cited to any authority requiring a restitution order for uncharged conduct.  With the addition of the $250,000 referenced in this paragraph, Mr. Tanaka consents to a restitution order with joint and several liability with Mr. Vilar in the amount of $12,407,344.89.

Finally, prejudgment interest is inappropriate in this case.  Amerindo was making payments on the amounts owed up until the government shut down Amerindo and instructed Bear Stearns not to release funds.  Moreover, at government request, Cates and Mayer (and possibly others) refrained from seeking repayment during the pendency of the criminal case.  Finally, the case was delayed from the inception by government requested delays and constitutional violations and later by Alberto Vilar's merry-go-round of lawyers.  The delay just cannot in any semblance of fairness be laid at Gary Tanaka's feet.

---

[11] Indeed, Mr. Tanaka played a key role in offering to pay the Mayers in full long before the arrests of 2005 took place.

[12] Indeed, had the government gathered evidence pre-indictment, rather than indicting and then asking for time to gather evidence, this payment to the Colburn Estate would have already been made.

## IV.   FORFEITURE

Despite the fact that only one investor is out of pocket ($450,000) and the fact that there is no evidence that Gary took any of the GFRDA money for himself, the government seeks an $80,000,000 forfeiture judgment against him.  This court should not countenance such a shockingly disproportionate result.

### A.   The Government Cannot Meet its Burden of Proof for Most of the GFRDA Investors

The government concedes, as it must, that it bears the burden of proving the requisite nexus between the amount of the proceeds underlying a proposed forfeiture judgment and the crime for which a defendant was convicted.  The government cannot meet that burden on a figure anywhere near the $80,000,000 plus it seeks.  The government contends that all money invested in the GFRDA at any point from 1986-2005 constitutes "proceeds" that should be forfeited.  In other words, the government contends that when a GFRDA client invested with Amerindo and was paid all principal and interest in full and on time, the amount of the investment is still proceeds that should be forfeited.  The law does not support such an illogical result.  Indeed, cases the government itself cites lay out crucial concepts that undercut the government's argument.

In *United States v. Nicolo,* 597 F. Supp. 2d 342, 347 (W.D.N.Y 2009), the court explained the differences between restitution and forfeiture.  Specifically, the court noted that "forfeiture is punitive and 'seeks to disgorge any profits that the offender realized from his illegal activity . . . forfeiture is based on the offender's gain.'") (quoting *United States v. Webber*, 536 F.3d 584, 603 (7th Cir. 2008)).  Similarly, in *United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) (also cited by the government), the Second Circuit noted that the "Congressional aim guiding . . . forfeitures is to recover all of the  . . . ill-gotten gains. . . ."   Given that the goal is to disgorge "ill-gotten" gains, it clearly inappropriate to include most of the investors listed on

- 33 -

page 92 of the government's brief.  There is no evidence whatsoever that the Crains, Dextra, Lynx, Paragon, Worldwide Tops, Pelican Trust, Just Capital, Binna Holdings, Nemo Holdings, Urich, Kaye or Hrytsyk had any issues whatsoever -- the money was invested and then paid back with interest.  There is nothing to punish and no ill-gotten gains to retrieve with respect to any of those investors.

Given that it has been Gary's stated goal all along to pay investors all additional profits and interest they are due and given the government's stated intention to use forfeited funds to pay investors who are still owed money, Gary has no objection to a forfeiture judgment that takes into account the investments made by trial witnesses still owed funds -- Mayers ($5,800,000), Tara Colburn ($1,000,000), Graciela Lecube Chavez ($74,000), and Robert Cox ($62,500)[13] -- a total of $6,936,500.[14]

**B.**     **The Government's Attempt to Obtain a Forfeiture Judgment Based on Money Laundering or Other Acquitted Counts Should Be Rejected**

Gary Tanaka was acquitted on all four counts of money laundering.  Therefore, any attempt to impose money laundering-based forfeiture upon him must be rejected.  Section 982(a)(1) by its terms only provides for forfeiture for persons convicted of a violation of section 1956, 1957 or 1960.  Gary Tanaka was not so convicted.  Therefore, no money laundering forfeiture judgment should be entered.  *See United States v. Hasson*, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003) (case cited by government stating "We do not mean to imply that a court could

---

[13] At trial, the government had asserted that Robert Cox invested $60,000.  It was Gary Tanaka who corrected the record and introduced evidence of an additional $2,500 investment.

[14] Given the government's admission that it believes, and has believed all along, that a much larger portion of the four Bear Stearns accounts is made up of ATGF investments for which no wrongdoing is alleged, the government will likely fail in its attempt to prove a nexus between those accounts and the only fraud proven against Gary (GFRDA).  However, if the government reaffirms its intention to use forfeited property to pay investors any amounts still due and owing, Gary will not object to the forfeiture of those accounts.

impose a forfeiture order based on a money laundering offense . . . for which [defendant] was acquitted").

To the extent that the government seeks a forfeiture fraud judgment, they argue that acquitted conduct can be included.  As noted in Section IA(5)(b)(ii) *supra,* and in our original submission, Supreme Court jurisprudence continues to fortify defendants' 6th Amendment rights and Federal Judges continue to highlight the unfairness and impropriety of using acquitted conduct to increase a defendant's punishment.  Given that forfeiture is an element of punishment, *see United States v. Nicolo,* 597 F. Supp. 2d at 347, the same cases and principals cited in Section IA(b)(5)(ii), *supra,* mitigate in favor of rejecting acquitted conduct as a basis for forfeiture.[15]

### C.   The Forfeiture the Government Seeks Would Violate the 8th Amendment

The math is actually quite stark.  All GFRDA investors were paid principal and profits on time for 16 straight years and the only investor who lost money, lost $450,000.  Yet, the government seeks a forfeiture of ***over 80 Million Dollars more than that loss***.  If there ever were a case where the proposed forfeiture violates the 8th Amendment prohibition against excessive fines, this is it.

The Supreme Court has made clear that criminal forfeiture is unconstitutionally excessive in violation of the 8th Amendment if "it is grossly disproportional to the gravity of a defendant's offense."  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  The Second Circuit applies a four factor test:  "(a) the essence of the crime and its relation to other criminal activity, (b) whether [defendant] fit into the class of persons for whom the statute was principally designed,

---

[15] The government cites to *United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005).  In that case the Second Circuit does approve of use of acquitted conduct in forfeiture, but under RICO, not the fraud forfeiture provisions at issue with respect to Gary.  The government also cites to *United States v. Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007).  However the discussion of acquitted conduct in non-RICO forfeiture settings is plainly dicta.

(c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by [defendant]'s conduct." *United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003). These factors clearly prohibit the excessive forfeiture the government seeks against Gary.  One GFRDA investor lost $450,000 and the maximum fine on the securities fraud count, the only crime of which Gary was convicted for which forfeiture may be available, is $250,000.  Thus, the government is seeking a forfeiture of over ***300 times greater than the maximum fine*** allowed for securities fraud.  Earlier this year, the Second Circuit seriously questioned a forfeiture that was far less egregious than that proposed here -- only 40 times greater than the maximum fine.  *See United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (Sotomayor, J.) (remanding for greater consideration of four factors).

The government's proposed forfeiture order would impose an excessive fine in violation of the 8th Amendment.

## CONCLUSION

For the reasons stated herein, we respectfully request that the court impose a probationary sentence with conditions that will ensure that the goals of the sentencing statute are fulfilled.

Dated: October 23, 2009
    New York, New York

                SONNENSCHEIN NATH & ROSENTHAL LLP

                By:   s/  Glenn C. Colton
                      Glenn C. Colton (GCC-2493)
                      Gary Meyerhoff (GM - 8267)
                      1221 Avenue of the Americas
                      New York, New York 10020-1089
                      Telephone:  (212) 768-6700
                      Fax:  (212) 768-6800
                      *Counsel for Defendant Gary A. Tanaka*

17656503

- 36 -